**JAMES H. BARTOLOMEI, III P.A.**
James H. Bartolomei III (SBN 301678)
Of Counsel at Duncan Firm, P.A.
Michael P. Manapol (SBN 258300)
809 W. 3rd Street
Little Rock, Arkansas 72201
Telephone: (501) 228-7600
james@duncanfirm.com
michael@manapollaw.com

**GAFNI & LEVIN, LLP**
Adam I. Gafni, Esq. (SBN 230045)
11811 San Vicente Blvd.
Los Angeles, California 90049
Telephone: (424) 744-8344
adam@gafnilaw.com

**DONIGER / BURROUGHS**
Stephen M. Doniger (SBN 179314)
Benjamin F. Tookey (SBN 330508)
Andres Navarro (SBN 358499)
603 Rose Avenue
Venice, California 90291
Telephone: (310) 590-1820
stephen@donigerlawfirm.com
btookey@donigerlawfirm.com
anavarro@donigerlawfirm.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

THOMAS WILLIAM SHAKESPEARE, NOLAN BUSHNELL, LAURA ESQUIVEL, CHARLES GLASS, J. RANDY TARABORRELLI, ROSE BOOKS, INC., TIFFANY ALICHE, KATHY SIERRA, BERT BATES, VINCE BEISER, CLARA BINGHAM, SUSAN BLILER, BARBARA MARIE BONNEAU, CYLIN BUSBY, BUSBY ROSS INC., STEPHEN J. CALDAS, SCOTT CARNEY, ANNE CANADEO, JORDI CASTELLS, MATTHEW CHASE, WAHIDA CLARK, WAHIDA CLARK PRESENTS PUBLISHING LLC, SUZANNE COPE, JULIE CROSS, RON CURRIE, JR., VICTORIA DAVID, MARCY DERMANSKY, JIM DIEUGENIO, ZACHARY SKLAR, JIM DUTCHER, JAMIE DUTCHER, GINNY DYE, SARAH EDMONDSON, INC., MARA EINSTEIN, RIP ESSELSTYN, JANE ESSELSTYN, BEN L. EVRIDGE, NIR EYAL, JON FINE, KAREN SIFF EXKORN, ISABELLE GALLO, STANLEY GINSBERG, REYNA GOBEL, DAVID GOODMAN, MATT GROSS, THOMAS GUZMAN-

Case No. 5:26-cv-05931-PCP

**FIRST AMENDED COMPLAINT FOR DAMAGES BASED ON COPYRIGHT INFRINGEMENT**

**DEMAND FOR JURY TRIAL**

SANCHEZ, MINAL HAJRATWALA, BRENDA HAMPTON, DONNA BARBA HIGUERA, HUMAN RESOURCE DEVELOPMENT PRESS INC., BUZZY JACKSON, NICK JAMILLA, K. W. JETER, MATTHEW KENNEY, PAMELA KEOGH, LYNNETTE KHALFANI-COX, JOE KONRATH, MARGARET RATNER KUNSTLER, AS EXECUTRIX OF THE ESTATE OF WILLIAM MOSES KUNSTLER, MELISSA LANDERS, LORIE MOEGGENBERG, CAREY CORP, MARIE MYUNG-OK LEE, JOHN LELAND, BARRON LERNER, ARIEL MACARRAN, MAGGIE MACNAB, DEBRA BERNDT MALDONADO, ERIN SIEGAL MCINTYRE, KAREN MCQUESTION, GLEN MERZER, PAMELA POPPER, LINDSAY S. NIXON, HANNAH NORDHAUS, KATE O'HEARN, RANDAL PINKETT, MATTEO PISTONO, BRUCE RATNER, AS EXECUTOR OF THE ESTATE OF MICHAEL RATNER, ANDREW REVKIN, CHRISTOPHER RICCI, SARAH ELIZABETH RICHARDS, JULIAN RUBINSTEIN, DANNY RUST, ALLEN SALKIN, DANIELLE SANTIAGO-COFIELD, DEFOREST B. SOARIES, JR., JESSE STAY, GENE STONE, JORDANA ROTHMAN, ALEX STUPAK, EMPELLON HOLDINGS LLC, KIKI SWINSON, NATALIA SYLVESTER, BRENDA L. THOMAS, BRUCE TULGAN, LISA TURNER, LEMUEL (BOO) WALKER, PATRICE WASHINGTON, BEN WESTHOFF, FLORENCE WILLIAMS, DAVID YOUNG, REBECCA ZANETTI, and KIRK ZUROSKY,

*Plaintiffs*,

v.

ANTHROPIC PBC, a Delaware public benefit corporation; DARIO AMODEI, an individual, and BENJAMIN MANN, an individual,

*Defendants*.

Plaintiffs Thomas William Shakespeare, Nolan Bushnell, Laura Esquivel, Charles Glass, J. Randy Taraborrelli, Rose Books, Inc., Tiffany Aliche, Kathy Sierra, Bert Bates, Vince Beiser, Clara Bingham, Susan Bliler, Barbara Marie Bonneau, Cylin Busby, Busby Ross Inc., Stephen J. Caldas, Scott Carney, Anne Canadeo, Jordi Castells, Matthew Chase, Wahida Clark, Wahida Clark Presents Publishing LLC, Suzanne Cope, Julie Cross, Ron Currie, Jr., Victoria David, Marcy Dermansky, Jim DiEugenio, Zachary Sklar, Jim Dutcher, Jamie Dutcher, Ginny Dye, Sarah Edmondson Inc., Mara Einstein, Rip Esselstyn, Jane Esselstyn, Ben L. Evridge, Nir Eyal, Jon Fine, Karen Siff Exkorn, Isabelle Gallo, Stanley Ginsberg, Reyna Gobel, David Goodman, Matt Gross, Thomas Guzman-Sanchez, Minal Hajratwala, Brenda Hampton, Donna Barba Higuera, Human Resource Development Press Inc., Buzzy Jackson, Nick Jamilla, K. W. Jeter, Matthew Kenney, Pamela Keogh, Lynnette Khalfani-Cox, Joe Konrath, Margaret Ratner Kunstler, as Executrix of the Estate of William Moses Kunstler, Melissa Landers, Lorie Moeggenberg, Carey Corp, Marie Myung-Ok Lee, John Leland, Barron Lerner, Ariel MacArran, Maggie Macnab, Debra Berndt Maldonado, Erin Siegal McIntyre, Karen McQuestion, Glen Merzer, Pamela Popper, Lindsay S. Nixon, Hannah Nordhaus, Kate O'Hearn, Randal Pinkett, Matteo Pistono, Bruce Ratner, as Executor of the Estate of Michael Ratner, Andrew Revkin, Christopher Ricci, Sarah Elizabeth Richards, Julian Rubinstein, Danny Rust, Allen Salkin, Danielle Santiago-Cofield, DeForest B. Soaries, Jr., Jesse Stay, Gene Stone, Jordana Rothman, Alex Stupak, Empellon Holdings LLC, Kiki Swinson, Natalia Sylvester, Brenda L. Thomas, Bruce Tulgan, Lisa Turner, Lemuel (Boo) Walker, Patrice Washington, Ben Westhoff, Florence Williams, David Young, Rebecca Zanetti, and Kirk Zurosky, (collectively, "Plaintiffs") for their First Amended Complaint against Defendant Anthropic PBC ("Anthropic"), Defendant Dario Amodei ("Amodei"), an individual, and Defendant Benjamin Mann ("Mann"), an individual, (collectively, "Defendants"), allege upon personal knowledge as to each of their own respective conduct, and on information and belief based on the investigation of Plaintiffs' counsel as to all other conduct alleged herein, as follows.

## I. NATURE OF THE ACTION

1. "Anthropic" comes from the Greek word *anthrōpos*, meaning human. Yet as alleged herein, Anthropic exploited human creators' copyrighted books on a massive scale as free

inputs, rather than respecting authors' rights to consent, credit, and compensation. Anthropic did what any human with morals and a conscience knows: it is not fair to steal property that does not belong to you.

2. Plaintiffs are authors of various genres of written copyrighted works, including textbooks, corporate training guides, poetry, nonfiction books and fiction books.

3. Plaintiffs bring this case to address Defendants' unlawful downloading, distribution, and exploitation of their works from library websites known to consist of pirated works by using BitTorrent, a file-sharing technology widely used for mass copyright infringement. Defendants downloaded works by torrenting an enormous number of unauthorized copies of Plaintiffs' works from illegal shadow libraries to avoid paying for those works, while at the same time uploading via torrenting unlawful copies of the same works, all in violation of Plaintiffs' copyrights.

4. Defendants unlawfully torrented Plaintiffs' works to amass a vast central library of written texts for Anthropic to maintain and use forever. To the extent that Anthropic later used some subset of these stolen works for AI training, any such claimed use is irrelevant (and would not in any case qualify as fair use). Defendants' piracy of each of Plaintiffs' literary works via torrenting was a standalone act of infringement of Plaintiffs' exclusive rights under the Copyright Act.

5. Defendants exploited BitTorrent, a file-sharing program to access Library Genesis ("LibGen") and Pirate Library Mirror ("PiLiMi"), illegal websites known for hosting pirated content, to download millions of unauthorized copies of books. Evidence made public in the *Bartz v. Anthropic* case reveals that at least one of Anthropic's founders, Benjamin Mann, personally engaged in this illegal torrenting. Other members of Anthropic's senior leadership, including co-founder and Chief Executive Officer Dario Amodei, personally discussed and authorized (including directed and ratified) this illegal torrenting. Defendants knew that the millions of books that they were torrenting were pirated and that the websites from which they were torrenting them were illegal. Defendants intentionally infringed, or at minimum acted in reckless disregard for the rights of copyright holders, including Plaintiffs.

6. Among the books Defendants illegally downloaded, uploaded, copied, or distributed in this manner were hundreds of Plaintiffs' works, including the works identified in Exhibit A, which identifies the United States Copyright Registration number, title of the work, and each author's name. Plaintiffs have standing to file suit as a copyright claimant.

7. Additionally, when Defendants used BitTorrent to download Plaintiffs' works via torrenting, they simultaneously uploaded to the public at large and other BitTorrent users, unauthorized copies of the same works, separately violating Plaintiffs' exclusive right of distribution and encouraging and enabling further infringement of Plaintiffs' respective copyrighted works.

8. Despite the availability of licensing books and having the financial resources to license books through legitimate means, Defendants chose piracy to avoid what Amodei internally characterized as a "legal/practice/business slog."

9. Anthropic did not merely use these works transiently. It stored them in a "central library" or "generalized data area" and adopted a policy to "store everything forever," retaining these pirated copies for various purposes, even after determining the books might never be used for training its AI models and/or would not need to store them forever for the training of its AI models.

10. Anthropic had and has no entitlement to use pirated copies for its central library. Unlike a lawful purchaser of a copy, Anthropic stole these works to create a "permanent, general-purpose library" without compensating Plaintiffs.

11. As the Court in *Bartz v. Anthropic* previously ruled, Anthropic had no defense to use pirated copies for its central library. Creating a permanent, general-purpose library was not fair use excusing Anthropic's piracy.[1]

12. These acts of illicit copying were complete at the moment they occurred and violated each of Plaintiffs' exclusive rights under the Copyright Act, regardless of any later use Anthropic alleges and claims to have made of those copies.

[1] *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1033 (N.D. Cal. 2025).

13. Each Plaintiff dedicated as much as a year or more to ideating, creating, writing, and obtaining publication of their copyrighted works, sometimes risking their lives to reduce a story to the written page, with Anthropic robbing each work with the simple click of a mouse driven by Anthropic's quest for profits, all driven by Anthropic's arms race with Meta, OpenAI and Google to build the most profitable generative AI model.

14. Anthropic built its business of large language models (or "LLMs"), collectively named "Claude," on the backs of authors with mass, large-scale copying of copyrighted works.

15. Anthropic never attempted to offer any compensation to Plaintiffs for the pirated copying and use of the works and was fully aware of their illegal scheme, taking steps to hide the full extent of its copyright theft of Plaintiffs' respective works.

16. Anthropic's meteoric explosion of growth from seed money to a trillion-dollar company in less than five (5) years is part of an "arms race" to build generative intelligence at superhuman scale and by engaging in widespread copyright infringement to obtain pirated copies of literary works.

17. Anthropic has rapidly grown into an AI colossus that today values itself at close to $1 trillion as noted in a confidential filing for its initial public offering prospectus.[2]

18. Despite its trillion-dollar valuation, Anthropic refused until after litigation to start paying for the vast amounts of copyrighted content—including Plaintiffs' literary works—it took without permission or credit to build its business.

19. For human authors that own copyrighted works, Anthropic caused tremendous harm. Based on the brazen infringement to date, if left unchecked, Anthropic would likely engage in further infringement absent a sufficient and meaningful deterrent.

20. Plaintiffs bring this action under the Copyright Act to redress the harm caused by Anthropic's willful decision to illegally download, upload, copy, reproduce, and distribute each of Plaintiffs' works. This constitutes an infringement of the copyright owner's exclusive

---

[2] *See* https://www.cnbc.com/2026/06/01/anthropic-ipo-s1-prospectus.html (last checked August 17, 2026)

reproduction right under the Copyright Act of 1976, 17 U.S.C. §101 *et seq*., and therefore violates the law.

## II. PARTIES

### A. *Plaintiffs*

21. Plaintiffs are authors and copyright owners, or co-owners, of original literary works identified below and more fully catalogued in Exhibit A, attached to this complaint. Plaintiffs are informed and believe, and on that basis allege that Defendants copied, stored, retained, distributed, and exploited Plaintiffs' works without permission. Plaintiffs reserve the right to add additional works to this case based what Anthropic produces in discovery.

22. Plaintiff **Thomas William Shakespeare** is a resident of London, England, in the United Kingdom. Sir Thomas William Shakespeare is a British sociologist and bioethicist best known for his work in disability studies, medical sociology, and bioethics. He has served as Professor of Disability Research at the University of East Anglia, where his research and teaching have focused on disability theory, bioethics, genetics and society, public health, and human rights and social policy. Mr. Shakespeare has contributed to global health and disability policy through collaboration with international organizations, including work related to the United Nations Convention on the Rights of Persons with Disabilities, genetics policy, and inclusive public health frameworks. His scholarship is particularly recognized for its critical and influential engagement with the social model of disability, bridging disability rights advocacy with bioethical debates surrounding genetics, prenatal testing, and medical intervention. Mr. Shakespeare is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Shakespeare, and for which Anthropic caused damages under the Copyright Act. Mr. Shakespeare registered his one (1) work under his name, Tom Shakespeare, *Disability Rights and Wrongs Revisited* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

23. Plaintiff **Nolan Bushnell** is a resident of Los Angeles, California. Mr. Bushnell is

a pioneering American entrepreneur and author who co-founded Atari in 1972 and introduced the world to Pong, the first blockbuster video game, thereby leading to the creation of the video game industry. His design philosophy — that games should be "easy to learn and difficult to master" — continues to influence a new generation of developers, and he has been named one of "50 People Who Changed America" by *Newsweek*. A prolific entrepreneur, Mr. Bushnell has founded more than twenty companies, including Chuck E. Cheese's Pizza Time Theater, Catalyst Technologies (the first Silicon Valley business incubator), Etak (the first in-car navigation system), and uWink (the first touchscreen ordering, entertainment, and checkout system for restaurant tables), and in doing so pioneered many of the workplace innovations that have defined Silicon Valley. He is currently chairman of ExoDexa, a gamified education company, and serves as an advisor and board member to companies in gaming, robotics, eSports, and advanced technology. Mr. Bushnell is the co-author, with Gene Stone, of *Finding the Next Steve Jobs* (2013), in which he recounts, among other subjects, his distinction as the first and only person ever to hire Steve Jobs, and the co-author, with Dr. Leah Hanes, of *Shaping the Future of Education* (2023); a biopic about Mr. Bushnell, tentatively titled Atari, with Leonardo DiCaprio's production company attached to it, is in pre-production. Mr. Bushnell is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Bushnell, and for which Anthropic caused damages under the Copyright Act. Mr. Bushnell registered his one (1) work *Finding the Next Steve Jobs* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. See Exhibit A.

24. Plaintiff **Laura Esquivel**[3] is a resident of Mexico. Ms. Esquivel is a Mexican author, screenwriter, and playwright best known for her groundbreaking contributions to contemporary Latin American literature, and is one of the most internationally celebrated authors of her generation. Born in Mexico City in 1950, she gained worldwide acclaim with her debut

[3] The Court in *Bartz v. Anthropic PBC* granted final approval of the class action settlement on July 20, 2026, and in its final approval order expressly permitted Plaintiff Esquivel's late opt-out request, finding excusable neglect. Having opted out of the *Bartz* settlement, Plaintiff Esquivel pursues all theories of liability pled in this First Amended Complaint.

novel *Como agua para chocolate* (*Like Water for Chocolate*) (1989), a seminal work of magical realism and romantic fiction that tells the story of a young woman whose emotions infuse the food she prepares, linking culinary art with love, family tradition, and personal freedom; the novel became a global bestseller, was translated into more than thirty languages, and was adapted into a critically acclaimed film in 1992 as well as a series on HBO. Ms. Esquivel's subsequent works demonstrate her continued experimentation with narrative form, integrating magical realism, feminist perspectives, Mexican cultural identity, and spiritual and metaphysical themes into richly layered storytelling. Through her vivid depictions of Mexican life, food, and family traditions, Ms. Esquivel has served as a cultural ambassador, helping global audiences connect with Latin American culture, and stands alongside authors such as Isabel Allende as a pioneer in bringing magical realism to worldwide readerships. Ms. Esquivel is the author and copyright owner of five (5) original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Esquivel, and for which Anthropic caused damages under the Copyright Act. Ms. Esquivel registered her five (5) works *Como agua para Chocolate*; *Malinche*; *Mi Negro Pasado*; *Escribiendo la Nueva Historia (Como Dejar de Ser Víctima en 12 Sesiones)*; and *A Lupita le Gustaba Planchar / Lupita Always Liked to Iron* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $750,000 in statutory damages. *See* Exhibit A.

25. Plaintiff **Charles Glass** is a resident of Italy. Mr. Glass is an author, who has written books on conflict and history in the Middle East, Africa and Europe for the past fifty years. His books on the Middle East include *Tribes with Flags* (Atlantic Monthly Press and Picador), *Money for Old Rope* (Picador); *The Tribes Triumphant* (Harper Collins); *The Northern Front: An Iraq War Diary* (Saqi Books); *Syria Burning: A Short History of a Catastrophe* (Verso Books 2016); and *Syria: Civil War to Holy War?* (OR Books, 2025). His books on the Second World War are: *Americans in Paris: Life and Death Under the Nazi Occupation, 1940-1944* (Penguin Press in New York, Harper-Collins in London and Editions Saint-Simon in Paris); *The Deserters: A Hidden History of World War II* (Penguin Press in New York and Harper Press in London); and *They Fought Alone* (Penguin Press) on British agents in France under the German

occupation. He also wrote *Soldiers Don't Go Mad: A Story of Brotherhood, Poetry, and Mental Illness During the First World War* (Penguin Press, New York, and Bedford Square Publishers, London). Among his contributions to other books are his introductions to *Alison Jackson's Confidential: What You See in This Book is Not "Real"* (Taschen, 2007) and *Doctors and Torture: Resistance or Collaboration?* (Amnesty International, as well as essays in collections including *The Syria Dilemma* (M.I.T. Press, 2013). His sole occupation is as a writer and author. Mr. Glass is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Glass, and for which Anthropic caused damages under the Copyright Act. Mr. Glass registered his three (3) works *Americans in Paris: Life and Death Under Nazi Occupation*; *The Deserters: A Hidden History of World War II*; and *They Fought Alone* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $450,000 in statutory damages. *See* Exhibit A.

26. Plaintiff **J. Randy Taraborrelli** is a resident of Pennsylvania. Mr. Taraborrelli is a prolific American journalist, celebrity biographer, author, and media commentator born in Philadelphia, whose career spans decades and includes authorship of more than twenty books, many of which became major bestsellers. Before becoming a full-time biographer, he worked as a magazine journalist and served as editor-in-chief of *Soul* magazine, a publication focused on Black entertainment, before gaining major attention with comprehensive, deeply researched biographies of prominent entertainment figures including Diana Ross, Cher, Michael Jackson, Madonna, Marilyn Monroe, and Elizabeth Taylor, and later expanding into political biography with his acclaimed series on the Kennedy family. Mr. Taraborrelli is known for crafting detailed portraits blending public record, interviews, and cultural context with a narrative accessibility that makes complex lives readable and engaging for mainstream audiences, and several of his biographies have been adapted into television miniseries; he also appears regularly on major media outlets as a commentator and entertainment news analyst. Mr. Taraborrelli is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Taraborrelli, and for which Anthropic caused damages

under the Copyright Act. Mr. Taraborrelli registered his three (3) works *Michael Jackson: The Magic and the Madness*; *Sinatra: Behind the Legend*; and *Madonna: An Intimate Biography* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $450,000 in statutory damages. *See* Exhibit A.

27. Plaintiff **Rose Books, Inc.** is a California company owned by J. Randy Taraborrelli, a resident of Pennsylvania. Rose Books, Inc. is the copyright owner of original literary works authored by Mr. Taraborrelli that Defendants copied, uploaded, distributed, and exploited without authorization, and for which Anthropic caused damages under the Copyright Act. Rose Books, Inc. registered its twelve (12) works *Jackie, Ethel, Joan: Women of Camelot* (Registration No. TX0005160294); *Once Upon a Time: Behind the Fairy Tale of Princess Grace and Prince Rainier*; *Diana Ross: A Biography*; *The Secret Life of Marilyn Monroe*; *Elizabeth*; *Sinatra: Behind the Legend*; *After Camelot: A Personal History of the Kennedy Family 1968 to the Present*; *The Hiltons: The True Story of an American Dynasty*; *Grace & Steel*; *Becoming Beyoncé*; *Jackie, Janet & Lee*; and *The Kennedy Heirs* prior to Defendants' infringement with the United States Copyright Office, and seeks statutory damages of up to $150,000 per work, for a total of up to $1,800,000 in statutory damages. *See* Exhibit A.

28. Plaintiff **Tiffany Aliche** is a resident of New Jersey. Ms. Aliche, widely known as "The Budgetnista," is an award-winning financial educator, entrepreneur, and author recognized as America's foremost personal finance educator. She taught preschool for ten years in Newark, New Jersey, an experience she credits as the foundation of her educational mission, before founding her company, The Budgetnista, through which she has helped over two million women worldwide collectively save more than $250 million and pay off over $200 million in debt. Ms. Aliche's commitment to financial literacy extended to the legislative arena when she partnered with Assemblywoman Angela V. McKnight to author a bill signed into law as New Jersey Law A1414, known as "The Budgetnista Law," which mandated financial education in all New Jersey middle schools. She is a *New York Times* and Amazon bestselling author. Ms. Aliche and her financial advice have been featured on Good Morning America, the TODAY Show, PBS, Time,

The New York Times, The Wall Street Journal, Forbes, CNN/HLN, MSNBC, Fox Business, and Netflix, and in February 2021 she became the first solo Black woman to appear on the cover of *Money* magazine. Ms. Aliche is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Aliche, and for which Anthropic caused damages under the Copyright Act. Ms. Aliche registered her one (1) work *Get Good with Money* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

29. Plaintiff **Kathy Sierra** is a resident of Washington State. Ms. Sierra is a programming instructor, author, and learning-science educator whose work focuses on how people learn complex technical skills, with particular emphasis on cognitive load, confidence, and expertise development in technical fields. She is best known as the co-creator of the Head First series, published by O'Reilly Media, and as a co-author of *Head First Java* and numerous other titles in that series, which became global bestsellers used in universities, coding bootcamps, corporate training programs, and self-taught developer communities worldwide. Ms. Sierra previously served as an instructor and Java evangelist at Sun Microsystems, and has been a widely respected speaker and writer on learning design, instructional methodology, and software education culture. Her work applied cognitive science principles — including spaced repetition, active learning, and brain-friendly design — to technical education long before those concepts were mainstream in the field, and in doing so helped lower barriers to entry in software development for learners worldwide. Ms. Sierra is the co-author and co-copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Sierra, and for which Anthropic caused damages under the Copyright Act. Ms. Sierra registered her one (1) work *Head First Java* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

30. Plaintiff **Bert Bates** is a resident of Washington State. Mr. Bates is a software developer, technical author, and educator with deep experience in Java and other programming

languages, and is best known as the co-creator of the Head First series, published by O'Reilly Media. He co-authored *Head First Java* and multiple other titles in the Head First series, bringing a developer's perspective to each work to ensure technical accuracy while supporting a learner-centered instructional approach grounded in cognitive science. Mr. Bates has contributed broadly to software education through writing, teaching, and developer advocacy, helping translate complex technical systems into accessible, learner-friendly explanations that have been used in universities, coding bootcamps, corporate training programs, and self-taught developer communities worldwide. His work, together with his co-author, fundamentally reshaped expectations for technical education publishing, demonstrating that pedagogical design and technical rigor are complementary rather than competing values, and influencing a generation of technical authors and educators. Mr. Bates is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Bates, and for which Anthropic caused damages under the Copyright Act. Mr. Bates registered his one (1) work *Head First Java* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

31. Plaintiff **Vince Beiser** is a resident of Vancouver, British Columbia, Canada. Mr. Beiser is an award-winning journalist and author who has reported from over one hundred countries, states, provinces, kingdoms, occupied territories, and disaster zones, covering stories ranging from conditions in California's harshest prisons and training with U.S. Army soldiers to natural disaster response and investigative reporting from around the world. His work has appeared in *Wired*, *The Atlantic*, *The Guardian*, *Mother Jones*, *Rolling Stone*, *The Economist*, *The Los Angeles Times*, *The Wall Street Journal*, and *The New York Times*, and has been honored by the Society of Professional Journalists, the New York Public Library, the National Association of Science Writers, Investigative Reporters and Editors, the Columbia, Medill, and Missouri Graduate Schools of Journalism, and many other institutions; he has also shared in three National Magazine Awards and an Emmy. Mr. Beiser is a finalist for a PEN America Award and a California Book Award that spawned a TEDx talk. He graduated *summa cum laude* from the

University of California, Berkeley, with a degree in Middle Eastern Studies, and is also the co-author of a feature film screenplay commissioned by director Steven Soderbergh. Mr. Beiser is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Beiser, and for which Anthropic caused damages under the Copyright Act. Mr. Beiser registered his one (1) work *The World in a Grain: The Story of Sand and How It Transformed Civilization* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

32. Plaintiff **Clara Bingham** is a resident of Brooklyn, New York. Ms. Bingham is an American journalist, author, and documentary film producer renowned for her investigative reporting and scholarly work on women's rights, social justice, and American political culture. Born into a newspaper-publishing family in Louisville, Kentucky, she attended Harvard University, graduating in 1985 with a degree in History and Literature, and later served as a Washington, D.C.-based correspondent for *Newsweek* from 1989 to 1993, covering the George H.W. Bush White House and the 1992 presidential election. Ms. Bingham is the author of multiple influential nonfiction works. In addition to her writing, Ms. Bingham produced the documentary *The Last Mountain* (2011), which examined mountaintop-removal coal mining, premiered at the Sundance Film Festival, and won the International Documentary Association's Pare Lorentz Award. Ms. Bingham is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Bingham, and for which Anthropic caused damages under the Copyright Act. Ms. Bingham registered her one (1) work *WITNESS TO THE REVOLUTION Radicals, Resisters, Vets, Hippies, and the Year America Lost Its Mind and Found Its Soul* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

33. Plaintiff **Susan Bliler** is a resident of Montana. Ms. Bliler is an American author of paranormal romance and urban fantasy fiction, born and raised in Great Falls, Montana, whose work draws inspiration from the landscapes and cultural influences of that region. She began

writing seriously in middle school and, after early rejections from traditional publishers, turned to self-publishing on platforms such as Amazon, where she built a significant and loyal readership demonstrating that independent authors can carve out vibrant careers outside traditional publishing. Ms. Bliler is the author of more than 40 novels spanning several series and standalone works, most notably the long-running *Skin Walkers* series — a paranormal romance series built around shape-shifter cultures, pack politics, mating bonds, and supernatural conflict that currently includes more than twenty books — as well as the related Territory series, which explores pack and mating dynamics set against the wilds of the American West. Her novels have charted on Amazon's bestseller lists and attracted a dedicated following among readers of shifter romance, pack dynamics, and extended supernatural sagas. Ms. Bliler is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Bliler, and for which Anthropic caused damages under the Copyright Act. Ms. Bliler registered her three (3) works *A Lion's Pride*; *Skin Walkers: Leto*; and *Tyce (Skin Walkers 15)* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $450,000 in statutory damages. *See* Exhibit A.

34. Plaintiff **Barbara Marie Bonneau** is a resident of Dijon, France. Dr. Bonneau is an American-born US Citizen, psychologist and psychodynamic therapist who lives and works in France, and whose creative work bridges her clinical background with literary fiction and graphic novel creation. She earned a doctorate in Fundamental Psychopathology from the Université of Paris Cité, with a thesis titled « *Les Mots dans l'Oeil* » (Words in the Eye), which serves as the name of her bilingual blog and publishing company. Her thesis (2001), published in France under the title, *Les Mots Dans l'Oeil, Jouissance du Miroir et Vérité du Sujet*, is protected under the Berne Convention, as is her review of one of Faulkner's works titled, *Du Semblant au Sang Rouge dans les Cent Milles Carrés de Sutpen : Le Racism, le Symptôme et le Sinthome dans le roman de Faulkner: Absalon! Absalon!* (2012), as well as several scientific articles published in France, Australia, and Brazil. Dr. Bonneau's childhood engagement with writing grew equally from her clinical practice, inspired by questions raised by her initial hospitalized patient in 1991,

leading her to write about body image. She has since returned to fiction writing and collaborates with her disabled patients to create graphic novels. She is the author of three literary suspense novels drawn from her childhood experiences near the Mississippi River, and infused with supernatural, metaphysical, and psychological elements. Dr. Bonneau launched her literary career with the publication of *These Beans Have Too Much Salt* in 2016 and has since completed a trilogy with the addition of *White Light Yoga; What Really Happened* (2022) and *Deviling the Devil* (2022). Dr. Bonneau is the author of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Dr. Bonneau, and for which Anthropic caused damages under the Copyright Act. Dr. Bonneau registered her book, *These Beans Have Too Much Salt* prior to the Defendants' infringement with the United States Copyright Office and she seeks statutory damages of up to $150,000 for this one work. See Exhibit A.

35. Plaintiff **Bonneau** also is the author and copyright owner of an original literary work that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from Dr. **Bonneau**, and for which Anthropic caused damages under the Copyright Act and which titles did not appear on the *Bartz v. Anthropic* works list. Dr. **Bonneau** registered her one (1) title *White Light Yoga; What Really Happened* and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages for this one work. See Exhibit A.

36. Plaintiff **Cylin Busby** is a resident of Los Angeles, California. Ms. Busby is an American author, screenwriter, and editor whose work spans memoir, young adult fiction, children's picture books, and screenwriting, and who has published more than twenty books for young readers with rights sold in multiple countries. She attended Hampshire College and began her career as a children's book editor at major publishing houses including Random House, HarperCollins, and Simon & Schuster before relocating to Los Angeles around 2000 to expand her writing into young adult fiction and screenwriting. Ms. Busby is best known for *The Year We Disappeared* (2008), a bestselling true crime memoir co-written with her father, John Busby, recounting the family's ordeal after her father — a police officer — was shot on duty when she

was nine years old; the book reached number three on the *Wall Street Journal* nonfiction bestseller list, number one on Amazon nonfiction, and was featured in a CBS "48 Hours" television special. Her body of work further includes the young adult *novel Blink Once* (2012), the middle-grade novel *The Nine Lives of Jacob Tibbs* (2016), and children's picture books including *The Bookstore Cat* (2020) and *The White House Cat* (2022), reflecting her range across genres and age categories. As a screenwriter, her screenplay *Rebecca and Quinn Get Scared* was a finalist at the Austin Film Festival and was sold to New Line/WB. With her writing partner, she has also written Hallmark holiday films, including *A Tale of Two Christmases* (Hallmark 2022). Ms. Busby is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Busby, and for which Anthropic caused damages under the Copyright Act. Ms. Busby registered her three (3) works *Date Him or Dump Him? Ski Trip Trouble; The Nine Lives of Jacob Tibbs* and *The Stranger Game* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $450,000 in statutory damages. See Exhibit A.

37. Plaintiff **Busby Ross Inc.** is a California company owned by Plaintiff **Cylin Busby** and is a loan out company for certain works. Ms. Busby registered her one (1) work *The Year We Disappeared: A Father-Daughter Memoir* with **Busby Ross Inc.** prior to Defendants' infringement with the United States Copyright Office, and seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. See Exhibit A.

38. Plaintiff **Stephen J. Caldas** is a resident of Brooklyn, New York. Dr. Caldas is an American educational scholar, author, and professor best known for his research on school desegregation, bilingual education, and the social contexts of public schooling. He holds a Ph.D. in Education and has taught at several universities, including Manhattanville College, Hofstra University, and the University of Louisiana at Lafayette, and has served as a visiting professor at McGill University in Montreal and at L'École nationale d'administration publique in Quebec City. Over his career, Dr. Caldas has authored or co-authored more than seventy-five scholarly articles, book chapters, and books that intersect education policy, sociolinguistics, and the

sociology of schooling, employing advanced quantitative methods — including multivariate statistical modeling — to analyze educational outcomes, achievement gaps, and policy impacts. His major works, several co-authored with Carl L. Bankston III, include *A Troubled Dream: The Promise and Failure of School Desegregation in Louisiana*; *Forced to Fail: The Paradox of School Desegregation*; *Still Failing: The Continuing Paradox of School Desegregation*; *Public Education — America's Civil Religion: A Social History*; and *Raising Bilingual-Biliterate Children in Monolingual Cultures*, a longitudinal case study documenting bilingual development in French and English within primarily monolingual environments. Dr. Caldas's publications are widely cited in academic circles and are used in teacher education, sociology of education, and policy studies, making him a significant interdisciplinary voice spanning sociology, linguistics, history, and education policy. Dr. Caldas is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Dr. Caldas, and for which Anthropic caused damages under the Copyright Act. Dr. Caldas registered his one (1) work *Forced to Fail* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

39. Plaintiff **Scott Carney** is a resident of Colorado. Mr. Carney is an American investigative journalist and anthropologist whose work delves into the intersections of human bodies, resilience, culture, and ethical systems, and who has reported from some of the most challenging environments in the world — including multiple years in South Asia — for outlets such as *Wired*, *Mother Jones*, and *Foreign Policy*. He earned his B.A. at Kenyon College and an M.A. in anthropology from the University of Wisconsin–Madison before transitioning from academic research to immersive investigative journalism, and he currently serves as CEO of his media company Foxtopus Ink. In 2010, Mr. Carney was awarded the Payne Award for Ethics in Journalism for his investigative story exposing an international adoption and kidnapping ring, and his subsequent books have established him as a leading voice in narrative nonfiction. His body of work includes *The Red Market* (2011), which exposed the global trade in human body parts and tissues; *The Enlightenment Trap* (2015); *What Doesn't Kill Us* (2017), in which he embedded

with extreme human-performance systems and climbed Mount Kilimanjaro in minimal clothing; *The Wedge* (2020), exploring consciousness, stress, and human adaptation; and *The Vortex* (2023, co-authored with Jason Miklian), which details how a natural disaster escalated into geopolitical conflict and was long-listed for the Carnegie Medal for Excellence in Nonfiction. Mr. Carney is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Carney, and for which Anthropic caused damages under the Copyright Act. Mr. Carney registered his five (5) works *A Death On Diamond Mountain: A True Story of Obsession, Madness, and The Path To Enlightenment; The Red Market*; *The Wedge*; *The Vortex*, and *What Doesn't Kill Us* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $750,000 in statutory damages. *See* Exhibit A.

40. Plaintiff **Anne Canadeo** is a resident of Northport, New York. Ms. Canadeo is the author of over 40 works of fiction, best known for the acclaimed Black Sheep Knitting Mysteries series and the *New York Times* bestselling *Cape Light* and *Angel Island* novels. She began her career as a journalist, serving as the Denver correspondent for Environment Reporter and as a reporter for Sun News in Eden Prairie, Minnesota, before moving to New York where she worked for many years as a fiction editor. Ms. Canadeo launched the *Black Sheep Knitting Mysteries* series with *While My Pretty One Knits* (2009), which Publisher's Weekly described as "a crafty first of a new cozy series," and the series has grown in popularity with each subsequent title; she also created the Cape Light novel series for artist Thomas Kinkade, ghost-writing twenty-one titles under the pseudonym Katherine Spencer, and created and wrote the spin-off series The Inn at Angel Island, with both series having won the hearts of countless readers worldwide over more than twenty years. Her forthcoming work, *More Than You Know*, a historical mystery set in post-war New York City, was published in February 2026. Ms. Canadeo holds a Master's degree from Columbia University and a Bachelor of Arts from Stony Brook University. Ms. Canadeo is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Canadeo, and for which Anthropic caused damages under the Copyright Act. Ms. Canadeo registered her twelve (12) works *While*

*My Pretty One Knits; Knit, Purl, Die; A Dark and Stormy Knit; Stitch Before Dying; Till Death Do Us Purl; The Silence of the Llamas; Knit to Kill; Purls and Poison; The Postman Always Purls Twice; A Murder in Mohair; The Baby Plan*; and *Baby on the Run* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $1,800,000 in statutory damages. See Exhibit A.

41. Plaintiff **Canadeo** also is the author and copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Canadeo, and for which Anthropic caused damages under the Copyright Act and which titles did not appear on the *Bartz v. Anthropic* settlement works list. Ms. Canadeo registered her 12 titles *Sweet Temptation*; *Paradise Days, Paradise Nights*; *Squeeze Play*; *Fact or Fiction Files: UFOs*; *Ralph Lauren: Master of Fashion*; *Sam Walton: Giant of Walmart*; *Charles P. Lazarus: The Titan of Toys "R" Us*; *Warren G. Harding: 29th President of the United States*; *A Bachelor At the Wedding*; *Dad In Disguise*; *Hounds of the Basket Stitch*, and *Strangers on a Skein*, with the US Copyright Office prior to Defendants' infringement. She seeks statutory damages of up to $150,000 per work, for a total of up to $1,800,000 in statutory damages for these works. See Exhibit A.

42. Plaintiff **Jordi Castells**[4] is a resident of Atlanta, Georgia. Mr. Castells is an Illustrator, Motion Designer, and Creative Director whose lifelong passion for comic books has informed both his professional and creative work. Beyond his commercial career, Mr. Castells is a multidisciplinary creative whose pursuits span writing television pilots and feature screenplays, performing music live, and collecting comic books and records. He is the illustrator and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Castells, and for which Anthropic caused damages under the Copyright Act. Mr. Castells registered his one (1) work *Pierced by the Sun* (with Laura Esquivel) prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory

[4] The Court in *Bartz v. Anthropic PBC* granted final approval of the class action settlement on July 20, 2026, and in its final approval order expressly permitted Plaintiff Castells' late opt-out request, finding excusable neglect. Having opted out of the *Bartz* settlement, Plaintiff Castells pursues all theories of liability pled in this First Amended Complaint.

damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

43. Plaintiff **Matthew Chase** is a resident of Georgia. Mr. Chase, writing under the pseudonym Devon McCormack, is an American author who has published more than forty novels across the paranormal, young adult, and romance genres. He began his publishing career in 2012 through small presses with *The Clipped Saga*, a dark erotic paranormal trilogy, and in 2014 published three young adult novels — *Hideous*; *When Ryan Came Back*; and *The Night Screams* — noted for their complex, positive portrayals of young queer characters overcoming obstacles and challenges. In 2016, he began publishing romance novels with his first collaboration with co-author Riley Hart, *Weight of the World*. His works published on his own include *Cheating Bastard*; *Lying Bastard*; *Still Your Guy*; *Trouble*; *Between These Sheets*; *The Pining*; *Filthy Little Secret*; *The Guy Next Door*; *Twisted Rivalry*; *Tight End*; *#BURN*; *#ROYAL*; *Pretty Things*; *King of Liars*; *Forever and Ever*; *Lust*; *Fever*; *Frat Around and Find Out*; *The Frathole*; and *Betrothed in Fury*. With his co-author, his standalone and series titles include *Up for the Challenge*; *Beautiful Chaos*; *No Good Mitchell*; *Faking It*; *Working It*; *Owning It*; *Trying It*; *Hitching It*; *Game On*; *The Step Bet*; *The Step Don't*; *The Step Dare*; and *For Frat's Sake*. Mr. Chase is best known for his *BFF* trilogy and *FU: Fixer Uppers* series, and his books have routinely appeared on Amazon bestseller lists, with most published as audiobooks and available in several languages. Mr. Chase is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Chase, and for which Anthropic caused damages under the Copyright Act. Because some of Mr. Chase's works were registered under his legal name and published under his pseudonym, the *Bartz v. Anthropic* claims administrator's name-matching process failed to attribute those works to him, and certain of his registered works were excluded from the *Bartz* settlement Works List. Only works appearing on the Works List were included in the *Bartz* class, the final judgment in *Bartz* expressly preserved, unaffected by the settlement, all claims arising out of works not on the Works List, including Mr. Chase's claims asserted herein. Mr. Chase registered his nineteen (19) works *Trouble*; *King of Liars*; *Clipped*; *Forever and Ever*; *Hideous*; *Pretty Things*; *BFF: Best*

*Friend's Father*; *BFF: Forever*; *Gagged*; *The Night Screams*; *When Ryan Came Back*; *Hitching It* (with Riley Hart); *FU: Fixer Uppers*; *Bastards* (published as *Cheating Bastard*); *The Pining of Kevin Harding* (published as *The Pining*); *BFF: Best Friend's Father Claimed*; *Faking It* (with Riley Hart); *Up for the Challenge* (with Riley Hart); and *FU: Fixer Uppers: Étape 1: Rebâtir* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $2,850,000 in statutory damages. *See* Exhibit A.

44. Plaintiff **Wahida Clark** is a resident of Georgia. Her legal name is Louise Clark. She is an American author, publisher, and entrepreneur widely recognized as one of the pioneering voices of modern urban fiction and street literature. Ms. Clark is a four-time *New York Times* bestselling author whose novels have sold over one million copies nationwide and have become foundational works within the urban fiction genre. Her literary works have appeared on national bestseller lists and have been distributed through major publishing channels as well as through independent publishing ventures she developed and operated herself. Ms. Clark is best known for her Thug series and related literary works, which feature interconnected characters navigating themes of loyalty, survival, relationships, power, and street culture through both male and female perspectives. In addition to her success as an author, Ms. Clark played a significant role in expanding the commercial visibility and legitimacy of urban fiction through independent publishing and direct-to-market distribution strategies that helped shape the genre's growth and influence subsequent generations of writers and publishers. Ms. Clark is the author and copyright owner of original literary works that Defendants copied, reproduced, distributed, and exploited without authorization, causing damages under the Copyright Act. Ms. Clark registered her ten (10) works — *Every Thug Needs a Lady; Thugs and the Women Who Love Them; Thug Lovin'; What's Really Hood!; Thug Matrimony; Payback with Ya Life; Honor Thy Thug; The Golden Hustla; Justify My Thug;* and *Payback Ain't Enough* — with the United States Copyright Office prior to Defendants' infringement and seeks up to $150,000 per work, for a total of up to $1,500,000 in statutory damages. See Exhibit A.

45. Plaintiff **Wahida Clark Presents Publishing LLC** ("WCPP") is a Nevada

company, and is an independent publishing company owned and operated by Plaintiff Wahida Clark. WCPP publishes, distributes, licenses, and manages original literary works and intellectual property assets within the urban fiction genre. Through WCPP and its predecessor publishing ventures, Ms. Clark helped pioneer author-led independent publishing models within street literature, contributing to the genre's commercial growth and broader market acceptance. As the publishing entity and/or copyright holder for certain literary works identified in Anthropic's dataset disclosures, WCPP owns and manages copyrighted works that Defendants copied, reproduced, distributed, and exploited without authorization, causing damages under the Copyright Act. WCPP registered its ten (10) works — *Karma 2; Lickin' License; The Game of Deception; A Life for a Life; Lickin' License II; Nude Awakening; Under Pressure; The Pussy Trap; Flippin' the Hustle,* and *Karma with a Vengeance* — and seeks statutory damages of up to $150,000 per work, for a total of up to $1,500,000 in statutory damages. *See* Exhibit A.

46. Plaintiff **Suzanne Cope** is a resident of Brooklyn, New York. Dr. Cope is an American author, narrative journalist, scholar, and educator whose work bridges food history, cultural studies, feminism, and social change, and who holds a doctorate and serves as a professor of writing and narrative at New York University. Her writing has appeared in major national and international outlets including *The New York Times*, *The Atlantic*, *The Washington Post*, the BBC, the *Los Angeles Review of Books*, *Food & Wine*, and *Aeon*, exploring topics related to food, culture, power, and politics. Dr. Cope is the author of *Small Batch: Pickles, Cheese, Chocolate, Spirits, and the Return of Artisanal Food* (2014), which examines the craft and culture of small-batch food production, connecting culinary craftsmanship to cultural identity, economic history, and foodways, and *Power Hungry: Women of the Black Panther Party and Freedom Summer and Their Fight to Feed a Movement* (2021), which tells the stories of women activists who used food programs as tools of political strategy and community building in movements for racial and social justice. Her forthcoming work, *Women of War: The Italian Assassins, Spies, and Couriers Who Fought the Nazis* (2025), uses narrative history and scholarship to illuminate the roles of Italian women in the anti-fascist resistance during World War II, spotlighting figures often omitted from mainstream histories. Dr. Cope is the author and copyright owner of an original literary work that

Defendants copied, uploaded, distributed, and exploited without authorization from Dr. Cope, and for which Anthropic caused damages under the Copyright Act. Dr. Cope registered her one (1) work *Small Batch: Pickles, Cheese, Chocolate, Spirits, and the Return of Artisanal Foods* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

47. Plaintiff **Julie Cross** is a resident of California. Ms. Cross is an American author best known for her young adult and contemporary fiction, particularly in the science fiction, time-travel, and romance genres, whose career spans traditionally published novels, collaborative works, and contemporary romance written for both young adult and adult audiences. She rose to prominence with her debut novel *Tempest*, a young adult science fiction novel centered on time travel and romantic suspense that received significant attention within the YA market for its blend of high-concept speculative elements and emotionally driven storytelling, and which she followed with the sequels *Vortex* and *Timestorm*. Ms. Cross subsequently expanded into contemporary romance and sports-themed young adult fiction, including *Letters to Nowhere*, *Whatever Life Throws at You*, *Breaking the Ice*, *Off the Ice*, *Chasing Truth*, and *Third Degree*, demonstrating genre flexibility while maintaining a consistent focus on character development, emotional resilience, and relationship-driven narratives. Her career reflects the evolution of young adult commercial fiction in the 2010s, particularly the blending of speculative genre elements with romance-driven storytelling, and her transition into adult romance and collaborative writing further reflects adaptability across evolving publishing formats, including digital and genre-focused markets. Ms. Cross is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Cross, and for which Anthropic caused damages under the Copyright Act. Ms. Cross registered her nine (9) works *Letters to Nowhere*; *Chasing Truth*; *Breaking the Ice*; *Timestorm*; *Vortex*; *Off the Ice*; *Tempest*; *Whatever Life Throws at You*; and *Third Degree* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $1,350,000 in statutory damages. *See* Exhibit A.

48. Plaintiff **Ron Currie, Jr.** is a resident of Maine. Mr. Currie is an American novelist, short-story writer, and screenwriter whose work blends literary fiction with speculative, existential, and genre-bending elements, and who was raised in Waterville, Maine, where the region's mill towns, Franco-American communities, and cultural histories have deeply informed his writing. He emerged on the literary scene with his debut collection *God Is Dead* (2007), which received widespread critical acclaim, and has since published several other novels, a body of work that displays growing ambition and scope and has drawn comparisons to Kurt Vonnegut for its use of dark humor and absurdity to explore questions of meaning, mortality, and human frailty. In addition to his literary career, Mr. Currie is a screenwriter who has worked on the Apple TV+ series *Extrapolations* and developed projects with major production companies including AMC Studios, Amblin Television, and ITV America, and he teaches in the University of Southern Maine's Stonecoast MFA program. His fiction consistently occupies a rare space between literary realism and bold speculative imagination, exploring themes of faith, apocalypse, identity, addiction, and the undercurrents of violence in quiet places, while rooting surreal narratives in the recognizable cultural specificity of New England and Franco-American heritage. Mr. Currie is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Currie, and for which Anthropic caused damages under the Copyright Act. Mr. Currie registered his four (4) works *Everything Matters!*; *Flimsy Little Plastic Miracles*; *God Is Dead.*; and *The One-Eyed Man* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $600,000 in statutory damages. *See* Exhibit A.

49. Plaintiff **Victoria David** is a resident of Texas. Ms. David, writing under the pen name Victoria Danann, is an American author known for her work in speculative fiction, and is best recognized for creating expansive series such as *Knights of Black Swan*, which blends romance, high fantasy and supernatural mythology in contemporary settings. She emerged during the rise of digital independent publishing in the early 2010s, building a dedicated readership through serialized storytelling, recurring characters, and interconnected supernatural worlds. She

has earned *New York Times* and *USA Today* bestseller status along with awards such as Best Paranormal Romance Series five years in a row. *Knights of Black Swan* (2010) launched what became a multi-volume saga featuring a secret order of vampire slayers and firmly established her voice in the indie paranormal romance market through its blend of original themes of warrior mythos and romantic destiny. Ms. David's broader body of work within this universe includes *A Tale of Two Kingdoms*, *Solomon's Sieve*, *Gathering Storm*, *Moonlight*, *The Witch's Dream*, and *The Summoner's Tale*, among other titles, and her career as a whole illustrates how independent authors reshaped genre fiction in the digital era by cultivating loyal readerships and building long-running fantasy universes outside traditional publishing channels. Ms. David is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. David, and for which Anthropic caused damages under the Copyright Act. Ms. David, through her pseudonym Victoria Danann, registered her six (6) works *A Tale of Two Kingdoms*; *Solomon's Sieve*; *Gathering Storm*; *Moonlight*; *The Witch's Dream*; and *The Summoner's Tale* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $900,000 in statutory damages. See Exhibit A.

50. Plaintiff **Marcy Dermansky** is a resident of New Jersey. Ms. Dermansky is an acclaimed American novelist, short-story writer, editor, and critic whose work is widely recognized for its sharp dark humor, emotional depth, and boldly unconventional characters navigating the messy realities of contemporary life. She holds a Bachelor of Arts from Haverford College and a Master of Arts from the Center for Writers at the University of Southern Mississippi, and her fiction and essays have appeared in literary journals including *McSweeney's*, *Guernica*, and *The Indiana Review*, as well as in the anthology *Goodbye to All That: Writers on Loving and Leaving New York*. Ms. Dermansky is the author of six novels: *Twins* (2005), selected as a *New York Times* Editor's Choice Pick; *Bad Marie* (2010), a Barnes & Noble Discover New Writers selection; *The Red Car* (2016), named a Best Book of the Year by *BuzzFeed*, the *San Francisco Chronicle*, and *The Huffington Post* and a *New York Times* Editors' Choice Pick; *Very Nice* (2019) and *Hurricane Girl* (2022), both featured in *The New York Times*, NPR, and *The*

*Washington Post*; and *Hot Air* (2025). In addition to her novels, Ms. Dermansky has contributed to contemporary literary culture through her work as a film critic, editor, and essayist, and through her contributions to literary journals and anthologies. Ms. Dermansky is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Dermansky, and for which Anthropic caused damages under the Copyright Act. Ms. Dermansky registered her four (4) works *Bad Marie*; *The Red Car*; *Twins*; and *Very Nice* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $600,000 in statutory damages. *See* Exhibit A.

51. Plaintiff **Jim DiEugenio** is a resident of California. Mr. DiEugenio is an American historian, author, editor, screenwriter, and investigative researcher best known for his extensive work on the assassination of President John F. Kennedy and other major political assassinations of the 1960s, whose career spans decades of writing books, editing research publications, contributing to documentary films, and challenging mainstream historical narratives through meticulous primary document analysis. He earned an M.A. in Contemporary American History from California State University, Northridge, and previously worked as a history teacher before becoming a full-time author and researcher. Mr. DiEugenio is the author of *Destiny Betrayed: JFK, Cuba, and the Garrison Case* (1992; revised 2012), a comprehensive examination of the Jim Garrison investigation focusing on documents and evidence often overlooked by mainstream histories; *Reclaiming Parkland* (2013, expanded as *The JFK Assassination: The Evidence Today*), a critique of Vincent Bugliosi's *Reclaiming History* and its influence on public perceptions and film representation; and co-editor of *The Assassinations: Probe Magazine on JFK, MLK, RFK and Malcolm X* (2003). He co-founded and co-edited *Probe Magazine* (1993–2000), a journal devoted to assassination research and primary document analysis, has edited the Kennedys and King website since the early 2000s, and in 2021 wrote the screenplays for Oliver Stone's documentaries *JFK Revisited: Through the Looking Glass* and *JFK: Destiny Betrayed*, bringing years of archival research to broad public audiences. Mr. DiEugenio is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited

without authorization from Mr. DiEugenio, and for which Anthropic caused damages under the Copyright Act. Mr. DiEugenio registered his one (1) work *Destiny Betrayed: JFK, Cuba, and the Garrison Case* (original edition/co-authored by Plaintiff **Zachary Sklar**) prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

52. Plaintiff **Jim DiEugenio** also is the author and copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from **DiEugenio**, and for which Anthropic caused damages under the Copyright Act and which titles did not appear on the *Bartz v. Anthropic* settlement works list. **DiEugenio** registered his one (1) title *Tom Hanks, Gary Goetzman and Bugliosi's Bungle* with the US Copyright Office prior to Defendants' infringement. He seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages for this work. See Exhibit A.

53. Plaintiff **Zachary Sklar** is a resident of New York. Mr. Sklar is a screenwriter, journalist, author, and editor. He is best known as coauthor (with Oliver Stone) of the Academy Award-nominated screenplay for the film *JFK*. *La Fiesta del Chivo*, an adaptation (with Luis Llosa and Augusto Cabado) of Mario Vargas-Llosa's novel about Dominican dictator Rafael Trujillo, premiered at the Berlin Film Festival in February 2006. His adaptation (with U-Wei bin Haji-Saari) of Joseph Conrad's first novel *Almayer's Folly*, now entitled *Hanyut*, premiered in Dubai in 2012. Sklar has served as a creative adviser at screenwriting labs for Sundance (Utah), Sundance International (Mexico, Brazil, Cuba, Ecuador, Turkey, Greece, and Spain), Equinoxe (France), the Australian Film Commission, the Royal Jordanian Film Commission, and Johns Hopkins University. He also teaches screenwriting for the Harlem Dramatic Writing Workshop in New York. Sklar co-wrote (with Marvin Barrett) a book of media criticism, *The Eye of the Storm: The DuPont-Columbia Survey of Broadcast Journalism* (Lippincott-Crowell). As a freelance journalist, he has written for many publications, including *The New York Times*, *The Washington Post*, *Geo*, *Scenario*, *The American Scholar*, *The Nation*, and *Huffington Post*. Sklar has edited numerous non-fiction books, including the number-one-bestselling *On the Trail of the Assassins*

by Jim Garrison, from which the film *JFK* was adapted; *Moving the Bar: My Life as a Radical Lawyer* by Michael Ratner; *Profits of War* by former Israeli intelligence operative Ari Ben-Menashe; *Deadly Deceits* by former CIA case officer Ralph McGehee; *Footnote on an Historic Case: In Re Alger Hiss* by William A. Reuben; and *Brilliant Bylines: Notable Newspaperwomen in America* by Barbara Belford. Sklar taught at the Columbia University Graduate School of Journalism for a decade and served as Executive Editor of *The Nation*, the oldest weekly in the U.S., and as Editor of *Juris Doctor*, a monthly legal magazine. In addition to his Oscar nomination, Sklar also received best screenplay award nominations for *JFK* from the Writers Guild of America, the Golden Globes, the Mystery Writers of America, and the British Academy of Film and Television Arts. Mr. Sklar is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Sklar, and for which Anthropic caused damages under the Copyright Act. Mr. Sklar registered his one (1) work *Destiny Betrayed: JFK, Cuba, and the Garrison case* (co-authored and co-owned with Plaintiff **Jim DiEugenio**) prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

54. Plaintiff **Jim Dutcher** is a resident of Idaho. Mr. Dutcher is an American wildlife naturalist, filmmaker, photographer, author, and conservationist who began his career producing and directing wildlife documentaries in collaboration with the National Geographic Society, and whose professional focus increasingly shifted toward wolf behavior and conservation. He is best known as the co-founder of the Sawtooth Wolf Project — a six-year immersive field study in Idaho in which he and his co-author lived in close proximity to a gray wolf pack, documenting natural wolf behavior, social structure, and communication in order to challenge public misconceptions and promote conservation — and for the documentary films produced from that fieldwork, including *Wolves at Our Door*. Mr. Dutcher co-founded Living with Wolves, Ltd., a nonprofit organization dedicated to wolf education, public outreach, youth engagement, and advocacy for wolf protection and human-wildlife coexistence, and has been a prominent voice in debates surrounding wolf reintroduction, predator management, and ecosystem balance. He is the

co-author of *The Hidden Life of Wolves* and *The Wisdom of Wolves*, works that combine photography, field observations, and narrative reflections connecting wolf social systems with broader themes of community, leadership, and ecological balance. Mr. Dutcher is the recipient of a Primetime Emmy Award for Outstanding Cinematography and a News & Documentary Emmy Award for Outstanding Informational/Cultural Programming. Mr. Dutcher is the co-author and co-copyright owner along with Plaintiff **Jamie Dutcher** of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Dutcher, and for which Anthropic caused damages under the Copyright Act. Mr. Dutcher registered his one (1) work *The Wisdom of Wolves* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. See Exhibit A.

55. Plaintiff **Jim Dutcher** also is the co-author and co-copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from **Dutcher**, and for which Anthropic caused damages under the Copyright Act and which titles did not appear on the *Bartz v. Anthropic* works list. **Dutcher** registered his four (4) titles *Wolves At Our Door: The Extraordinary Story Of The Couple Who Lived With Wolves; Living with Wolves; A Friend for Lakota - The Incredible True Story of a Wolf Who Braved Bullying* and *Running with Wolves: Our Story of Life with the Sawtooth Pack* with the US Copyright Office prior to Defendants' infringement. He seeks statutory damages of up to $150,000 per work, for a total of up to $600,000 in statutory damages for these works. See Exhibit A.

56. Plaintiff **Jamie Dutcher** is a resident of Idaho. Ms. Dutcher is an American wildlife filmmaker, sound recordist, photographer, author, and conservation advocate whose career has centered on wildlife conservation, storytelling, and reshaping public perceptions of wolves through immersive fieldwork, documentary production, and public education. She is best known as the co-founder of the Sawtooth Wolf Project — a six-year immersive field study in Idaho in which she and her co-author lived in close proximity to a gray wolf pack, documenting natural wolf behavior, social structure, and communication in order to challenge public

misconceptions and promote conservation — and for the documentary films produced from that fieldwork, including *Wolves at Our Door*, which portrayed wolves as highly social and intelligent animals defined by complex family bonds, cooperative behavior, and emotional depth. Ms. Dutcher received a Primetime Emmy Award for Outstanding Sound Mixing. Ms. Dutcher co-founded Living with Wolves, Ltd., a nonprofit organization dedicated to wolf education, public outreach, youth engagement, and advocacy for wolf protection and human-wildlife coexistence, and has contributed to policy advocacy and educational initiatives aimed at countering anti-wolf sentiment and promoting evidence-based conservation. She is the co-author of *The Hidden Life of Wolves* and *The Wisdom of Wolves*, works that combine photography, field observations, and narrative reflections connecting wolf social systems with broader themes of community, leadership, and ecological balance. Ms. Dutcher is the co-author and copyright co-owner along with Plaintiff **Jim Dutcher** of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Dutcher, and for which Anthropic caused damages under the Copyright Act. Ms. Dutcher registered her one (1) work *The Wisdom of Wolves* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. See Exhibit A.

57. Plaintiff **Jamie Dutcher** also is the co-author and co-copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from Jamie **Dutcher**, and for which Anthropic caused damages under the Copyright Act and which titles did not appear on the *Bartz v. Anthropic* works list. **Dutcher** registered her four (4) titles *Wolves At Our Door: The Extraordinary Story Of The Couple Who Lived With Wolves; Living with Wolves; A Friend for Lakota - The Incredible True Story of a Wolf Who Braved Bullying* and *Running with Wolves: Our Story of Life with the Sawtooth Pack* with the US Copyright Office prior to Defendants' infringement. She seeks statutory damages of up to $150,000 per work, for a total of up to $600,000 in statutory damages for these works. See Exhibit A.

58. Plaintiff **Ginny Dye** is a resident of Maine. Ms. Dye, who also publishes under the

pen name Virginia Gaffney, is an American novelist best known for her prolific writing of historical fiction, particularly through *The Bregdan Chronicles*, a long-running epic saga set during the American Civil War and Reconstruction era. Born in North Carolina, she describes herself as a wanderer at heart, having lived across many parts of the United States and drawn on diverse life experiences — including managing horse ranches in Texas and Oregon and working with teens nationwide — before focusing on writing full-time; her writing career began in earnest during a period of illness in her early adulthood, when she wrote her first book to keep herself engaged, a work that ultimately became her first published novel. Ms. Dye has since authored more than 30 novels spanning multiple series, including *The Bregdan Chronicles*, the young adult series *Pepper Crest High*, and the children's 19 volume BEDtime Book Series (My Best Ever Dreams), demonstrating versatility across genres and age audiences while maintaining a consistent focus on historical immersion, character-driven narratives, and themes of resilience, hope, and personal transformation. She is also the founder of the Millions For Positive Change organization, dedicated to fostering a community passionate about living meaningful and impactful lives. Ms. Dye is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Dye, and for which Anthropic caused damages under the Copyright Act. Ms. Dye registered her ten (10) works *Storm Clouds Rolling In* (Book #1 in the Bregdan Chronicles) (not on the *Bartz* Works List); *On To Richmond* (Book #2 in the Bregdan Chronicles)(not on the *Bartz* Works List); *Spring Will Come* (Book #3 in the Bregdan Chronicles) (not on the *Bartz* Works List); *Dark Chaos* (Book #4 in the Bregdan Chronicles) (not on the *Bartz* Works List); *The Last Long Night* (Book #5 in the Bregdan Chronicles); *Carried Forward by Hope* (Book #6 in the Bregdan Chronicles); *Glimmers of Change* (Book #7 in the Bregdan Chronicles); *Shifted by the Winds* (Book #8 in the Bregdan Chronicles); *Always Forward* (Book #9 in the Bregdan Chronicles); and *Walking into the Unknown* (Book #10 in the Bregdan Chronicles) prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $1,500,000 in statutory damages. *See* Exhibit A.

59. Plaintiff **Sarah Edmondson Inc.** is a company owned by **Sarah Edmondson** who

is a resident of Georgia. Ms. Edmondson is a Canadian actress-turned-author, podcaster, and cult-recovery advocate whose career bridges storytelling, activism, and education, and who began her professional journey as an actress and voice artist appearing in television and film before becoming one of the primary whistleblowers exposing the abuses of NXIVM, a self-improvement organization later exposed as a coercive cult. Her 2019 memoir, *Scarred: The True Story of How I Escaped NXIVM, the Cult That Bound My Life* (with Kristine Gasbarre, Chronicle Books), became an international success, illuminating the psychological mechanisms of control and the courage required to leave high-control systems, and her story has been featured in *The New York Times* and HBO's *The Vow*. Beyond writing, Ms. Edmondson co-hosts the podcast *A Little Bit Culty* with her husband, Anthony "Nippy" Ames, interviewing survivors, experts, and journalists to expose manipulative dynamics in wellness, spiritual, and personal-growth communities, and she delivers keynote talks and workshops worldwide, including a TEDx Talk titled "How to Spot a Cult," offering practical tools for critical thinking, emotional intelligence, and boundary-setting. Through her writing, podcasting, and public speaking, Ms. Edmondson has elevated the global conversation around psychological manipulation, critical awareness, and ethical wellness culture, and her work continues to influence how mainstream media, mental health professionals, and the public understand cult recovery and the complex path to reclaiming one's autonomy. Sarah Edmondson Inc. is the copyright owner of *Scarred* as employer for hire, and the work was copied, uploaded, distributed, and exploited by Defendants without authorization, causing damages under the Copyright Act. Sarah Edmondson Inc. owns her one (1) work *Scarred*, originally registered under Sarah Edmondson Inc., and by written assignment, owns the work. She caused the work to be registered with the United States Copyright Office prior to Defendants' infringement, and seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

60. Plaintiff **Mara Einstein** is a resident of New York. Dr. Einstein is a distinguished scholar, author, and critic whose career focuses on the intersection of marketing, media, consumer culture, and power, and who began her career as an executive in corporate marketing working with major brands at organizations including NBC, MTV Networks, and top advertising agencies

before transitioning into academia. She holds a Ph.D. in Media Ecology from New York University and an MBA from the Kellogg Graduate School of Management, and serves as a tenured professor and former chair in the Department of Media Studies at Queens College, CUNY, bringing more than a decade of professional experience in marketing and media to her scholarship and 25 years in the academic world. Dr. Einstein is the author of several influential books *including Brands of Faith: Marketing Religion in a Commercial Age* (2008); *Compassion, Inc.: How Corporate America Blurs the Line between What We Buy, Who We Are and Those We Help* (2012); *Black Ops Advertising: Native Ads, Content Marketing and the Covert World of the Digital Sell* (2016); and *Advertising: What Everyone Needs to Know* (2017) and *Hoodwinked: How Marketers Use the Same Tactics as Cults* (2025), works that collectively examine how marketing and media shape society and how individuals are manipulated through branding, native advertising, influencer culture, and cause marketing. Her work has been cited by *The New York Times*, *The Guardian*, *Bloomberg Businessweek*, and *The Wall Street Journal*, and her scholarship consistently bridges academic research and practical industry insight to empower readers and audiences to recognize and resist manipulative marketing tactics. Dr. Einstein is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Dr. Einstein, and for which Anthropic caused damages under the Copyright Act. Dr. Einstein registered her three (3) works *Advertising: What Everyone Needs to Know*; *Brands of Faith*; Compassion, Inc.: *How Corporate America Blurs the Line between What We Buy, Who We Are, and Those We Help* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $450,000 in statutory damages. See Exhibit A.

61. Plaintiff **Rip Esselstyn** is a Texas resident, former world-class triathlete, firefighter, number one *New York Times* bestselling author, entrepreneur, and leading plant-based nutrition advocate. A standout All-American swimmer at the University of Texas at Austin, Mr. Esselstyn competed in the 1984 U.S. Olympic Trials and, in 2019, set the World Record in the 200-meter backstroke for men ages 55–59. He served as a firefighter with the City of Austin from 1997 to 2009. During that time, he introduced a whole-food, plant-based diet to Austin's Engine 2

Firehouse to reverse a fellow firefighter's serious health issues—an experiment that became the foundation for his national bestselling book, *The Engine 2 Diet* (2009). That book, which powerfully demonstrates the life-changing benefits of plant-based nutrition, is prominently featured in the acclaimed documentary *Forks Over Knives*. Mr. Esselstyn is the founder and CEO of Plant Strong, through which he develops and delivers nutrition education programs for individuals, families, corporations, and organizations worldwide. He hosts the Plant Strong Podcast, which consistently ranks among the top ten nutrition podcasts in the United States. He also served as executive producer of the 2019 documentary *The Game Changers*, which explores the relationship between plant-based nutrition, protein, and elite athletic performance. He is the author of four books, including *The Engine 2 Diet* (2009), *Plant-Strong* (2014), *The Engine* 2 *Seven-Day Rescue Diet* (2017), and *The Engine 2 Cookbook* (2018). He has appeared on hundreds of national television and radio programs, including the Today Show, CBS Sunday Morning, and Good Morning America. Mr. Esselstyn is the author and copyright owner of the original literary works that Defendants copied, uploaded, distributed, and exploited without authorization. He registered *The Engine 2 Diet* and *The Engine 2 Seven-Day Rescue Diet* with the United States Copyright Office prior to the infringement and seeks statutory damages of up to $150,000 per infringed work, for a total of up to $300,000. See Exhibit A.

62. Plaintiff **Rip Esselstyn** also is the author and copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from **Rip Esselstyn**, and for which Anthropic caused damages under the Copyright Act and which titles did not appear on the *Bartz v. Anthropic* settlement works list. **Rip Esselstyn** registered his one additional title, *My Beef with Meat: The Healthiest Argument for Eating a Plant Strong Diet*, with the US Copyright Office prior to Defendants' infringement. He seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages for this work. See Exhibit A.

63. Plaintiff **Jane Esselstyn** is a resident of Ohio. She is a nurse, researcher, and mother dedicated to creating on-ramps to the plant-based way of life. Ms. Esselstyn is an avid and inventive designer of plant-based recipes and the co-author of the *New York Times Bestseller*, *Be*

*a Plant-Based Woman Warrior: Live Fierce, Stay Bold, Eat Delicious*, and *The Prevent and Reverse Heart Disease Cookbook* with her mom, Ann Esselstyn. They present their work, research, and high energy demos around the world and on her YouTube channel. Ms. Esselstyn also created the recipe section of #1 NYTimes bestseller, *Plant-Strong*, and *The Seven-Day Rescue*, by Rip Esselstyn. She is co-author of *The Engine 2 Cookbook*. Her research with the Cleveland Clinic's Department of Pediatrics observes the effects of a plant-based diet on pediatric obesity and hypercholesterolemia. The Journal of Pediatrics published one of their studies in February of 2015 where Ms. **Esselstyn** created the classroom curriculum and the kitchen curriculum for the study. The Journal of Pediatrics published a second research study of theirs in September 2022. She graduated from the University of Michigan, where she competed nationally as a recruited swimmer and rower, and earned a B.S. in Nursing from Kent State University. Plaintiff **Jane Esselstyn** registered her two (2) works *The Prevent And Reverse Heart Disease Cookbook* and *Prevent and reverse heart disease* (authored by Dr. Caldwell B. Esselstyn, Jr. and assigned by written agreement) prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $300,000 in statutory damages. *See* Exhibit A.

64. Plaintiff **Ben L. Evridge** is a resident of Idaho. Mr. Evridge is a technical author and mechanical expert known for writing practical, accessible nonfiction focused on mechanical systems — particularly marine mechanics — whose work is grounded in two decades of hands-on experience maintaining large fishing vessel fleets in Kodiak, Alaska, under demanding marine conditions. That real-world expertise underpins his ability to translate complex mechanical issues into commonsense, actionable guidance for boat owners and marine technicians, and distinguishes his writing from abstract or purely theoretical technical manuals. Mr. Evridge is the author of *Practical Boat Mechanics: Commonsense Ways to Prevent, Diagnose, and Repair Engines and Mechanical Problems*, a comprehensive hands-on guide for diagnosing, maintaining, and repairing boat engines and marine mechanical systems. *Practical Boat Mechanics* includes roughly 100 pages of material enabling novice boaters to troubleshoot marine systems by the five senses, sight, sound, touch, smell, and yes, that includes tasting some fluids. He is also the co-

author, with Erich J. Schulz, of the *Diesel Mechanics* textbook and student workbook, widely used for instruction in engine diagnosis, repair, and maintenance. He has also contributed regularly to industry publications including *National Fisherman*, sharing insights and practical advice with professionals in the commercial fishing and marine industries. Mr. Evridge is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Evridge, and for which Anthropic caused damages under the Copyright Act. Mr. Evridge registered his one (1) work *Practical Boat Mechanics: Commonsense Ways to Prevent, Diagnose, and Repair Engines and Mechanical Problems* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

65. Plaintiff **Nir Eyal** is a resident of New York. Mr. Eyal is an author, educator, consultant, and entrepreneur best known for his influential work on behavioral design, habit formation, and distraction management, whose writing blends psychology, technology, and business to help companies build engaging products and to help individuals and organizations reclaim focus and productivity. He earned a B.A. from Emory University and an MBA from the Stanford Graduate School of Business, where he has lectured on applied behavioral psychology and marketing, and has also taught at the Hasso Plattner Institute of Design at Stanford; early in his career he worked in video gaming and advertising, gaining firsthand experience with techniques of user engagement that he would later both analyze and critique in his writing. Mr. Eyal is the author of two major bestselling works: *Hooked: How to Build Habit-Forming Products* (2014), a Wall Street Journal bestseller that introduced the Hook Model — a foundational framework for designers and product teams explaining how products create user habits through a loop of triggers, actions, rewards, and investment — and *Indistractable: How to Control Your Attention and Choose Your Life* (2019), which was named among the Best Business and Personal Development Books of the Year by Amazon and Audible and offers evidence-based strategies for managing distraction and reclaiming intentional focus in an age of constant digital interruption. His essays and articles have appeared in major publications including the *Harvard*

*Business Review*, *The Atlantic*, *TechCrunch*, *Psychology Today*, and *Time*, and he is an active angel investor in technology startups and a consultant to organizations on behavioral design and product strategy. Mr. Eyal is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Eyal, and for which Anthropic caused damages under the Copyright Act. Mr. Eyal registered his one (1) work *Indistractable* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

66. Plaintiff **Jon Fine** is a resident of New York. Mr. Fine is an American journalist, author, musician, and commentator known for his deep reporting and incisive analysis on a wide range of topics: music, business, media, wine, food, and pop culture. His work encompasses books, major recorded works and musical performances, major newspaper and magazine articles and columns, podcasts, radio, and documentary and television appearances. He has been Editor in Chief of *The New Wine Review*, the Editorial Director and Acting Editor-in-Chief of *Inc*.—where he spent five years in senior roles—an award-winning media columnist for *Business Week,* and an on-air Contributor to CNBC. His articles have appeared in *GQ*, *Vanity Fair*, and *The Atlantic*, among many other prominent national outlets. He's won a James Beard Award for Best Wine Writing for his work in *Food & Wine,* and his columns in *Business Week* won an award from the National Headliners Club. During his five years as a top editor at *Inc*., that magazine was a two-time finalist for the top National Magazine Award—General Excellence. He has also been a noted musician in multiple bands; with them he has recorded extensively and performed in more than a dozen countries scattered across three continents. Those experiences in music are the subject of his book *Your Band Sucks: What I Saw At Indie Rock's Failed Revolution (But Can No Longer Hear) (2015)*, which won critical acclaim in outlets ranging from *The New York Times* to *Esquire* to *The Atlantic* to *The Dallas Morning News* to *The Philippine Star*. Mr. Fine is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Fine, and for which Anthropic caused damages under the Copyright Act. Mr. Fine registered his one (1) work *Your Band Sucks: What I Saw at Indie*

*Rock's Failed Revolution (But Can No Longer Hear)* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

67. Plaintiff **Karen Siff-Exkorn** is a resident of New York. Ms. Siff-Exkorn is a bestselling author, award-winning playwright, and screenwriter whose work spans nonfiction, theater, and film, and who has established herself as a prominent voice in both literary and advocacy communities. She is the author of *The Autism Sourcebook: Everything You Need to Know About Diagnosis, Treatment, Coping and Healing — From a Mother Whose Child Recovered* (HarperCollins, 2005), an internationally bestselling work that was translated into multiple languages, spawned a special edition published in collaboration with Autism Speaks for worldwide distribution, and led to Ms. Siff-Exkorn's appearances on Good Morning America, the Today Show, CNN, CBS, PBS, The View, NBC Nightly News, and Nightline, and in *The New York Times* and *The Wall Street Journal*. She is also the author of *Fifty Two Shades of Blue-ish* (Orange Press, 2012) and a contributing writer to the *Huffington Post*, Thrive Global, and Today.com. As a playwright, Ms. Siff-Exkorn's works have been produced globally, with her current solo play in plans to be produced in London by a Tony Award-winning producer and her Six Short Plays About Love in consideration for a podcast and television series; her screenplay *Artichoke* won the World Film Festival in Cannes, the Berlin International Screenwriting Festival, and the New York Independent Cinema Awards. Ms. Siff-Exkorn is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Siff-Exkorn, and for which Anthropic caused damages under the Copyright Act. Ms. Siff-Exkorn (under Karen Siff Exkorn) registered her one (1) work *The Autism Sourcebook* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

68. Plaintiff **Isabelle Gallo** is a resident of New York. Ms. Gallo is an American fiction author known for writing speculative and fantasy novels that blend imaginative world-building with character-driven storytelling, exploring themes of memory, identity, self-discovery,

and adaptation to radical circumstances. She is the author of *Opulent* (2012), a speculative fantasy novel in which the protagonist Chenille East, forced to leave Earth and seek refuge on a mysterious planet, struggles with memory and identity while navigating a world filled with danger and uncertainty, and *Candescent*, the second book in The Opalescent Collection, which continues her exploration of the same speculative world and extended narrative arc. Her additional works include *Aileron*, the first book in The Aileron Duology, further extending her speculative fiction repertoire through complex world-building and multi-volume storytelling. Through her creation of The Opalescent Collection and other serialized works, Ms. Gallo contributes to the tradition of extended narrative fiction within the speculative and fantasy genres, building reader investment across multiple volumes through richly imagined settings and psychologically resonant character arcs. Ms. Gallo is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Gallo, and for which Anthropic caused damages under the Copyright Act. Ms. Gallo registered her six (6) works *Candescent*; *Opulent*; *Translucent*; *Evanescent*; *Reminiscent*; and *Aileron* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $900,000 in statutory damages. *See* Exhibit A.

69. Plaintiff **Stanley Ginsberg** is a resident of California. Mr. Ginsberg is an American food writer, baking historian, and rye bread specialist widely regarded as one of the foremost English-language authorities on rye bread, whose work has played a major role in reviving interest in traditional rye breads and documenting the cultural, technical, and historical importance of rye baking across Europe and the United States. His writing bridges practical baking instruction with deep historical research, making complex and often misunderstood rye traditions accessible to both professional bakers and serious home enthusiasts, and his contributions have elevated rye baking to the same level of respect as wheat-based artisan bread in the English-speaking baking world. Mr. Ginsberg is the author of *The Rye Baker: Classic Breads from Europe and America*, the result of extensive firsthand research to study regional rye breads, milling practices, and fermentation techniques, which combines meticulously tested

recipes with historical context, regional variations, and explanations of rye's unique chemistry and behavior in baking, documenting traditions from Germany, Poland, Scandinavia, the Baltics, Eastern Europe, and Jewish and immigrant American baking communities; the book is now considered a cornerstone text in artisan baking. Beyond his books, Mr. Ginsberg has written articles and essays on bread, baking traditions, and food history, contributing to the broader artisan baking movement and the renewed appreciation of grain-based culinary heritage. Mr. Ginsberg is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Ginsberg, and for which Anthropic caused damages under the Copyright Act. Mr. Ginsberg registered his one (1) work *The Rye Baker: Classic Breads from Europe and America* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

70. Plaintiff **Reyna Gobel** is a resident of New York. Ms. Gobel is an American journalist, author, and financial and nutrition commentator whose career focuses on personal finance, nutrition, pets, parenting economics, education funding, and consumer financial issues, and who is best known for translating complex financial, pet, and health policies — particularly those affecting families — into practical, accessible guidance. She built her career as a personal finance, health, and travel journalist contributing to major national publications and media outlets such as *US News & World Report, Reuters, Money, National Geographic, Harvard Public Health*, and *Scientific American*, with reporting focused on household budgeting, education savings and student loans, tax policy, healthcare costs, parenting-related financial planning, nutrition, travel and has appeared on hundreds of television and radio programs as a personal finance, nutrition, and travel expert providing commentary on college affordability, tax credits for families, nutrition, travel, and financial planning for parents. Ms. Gobel gained broader recognition through her books, most notably *CliffsNotes Graduation Debt: How to Manage Student Loans and Live Your Life* editions one through four and counting and *the CliffsNotes Parents Guide to Paying for College*, a series of guides to managing college costs, student loans, and post-graduation financial planning that blends policy explanation with step-by-step financial

strategy and reflects her particular effectiveness at translating complex government policies and tax codes into practical action steps for readers. This work has carved out focused niches in personal finance by addressing the economic realities of parenting and education funding, combining policy literacy with pragmatic, solution-oriented guidance to help parents and students make more informed financial decisions during pivotal life transitions. Ms. Gobel is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Gobel, and for which Anthropic caused damages under the Copyright Act. Ms. Gobel registered her one (1) work *CliffsNotes Graduation Debt: How to Manage Student Loans and Live Your Life* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. See Exhibit A.

71. Plaintiff **Reyna Gobel** also is the author and copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from **Gobel**, and for which Anthropic caused damages under the Copyright Act and which titles did not appear on the *Bartz v. Anthropic* works list. **Gobel** registered her one title *CliffsNotes Graduation Debt, 2nd Edition: How to Manage Student Loans and Live Your Life* with the US Copyright Office prior to Defendants' infringement. She seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages for these works. See Exhibit A.

72. Plaintiff **David Goodman** is a resident of Vermont. Mr. Goodman is a New York Times bestselling author, journalist, and host of the public affairs radio show and podcast The Vermont Conversation, whose award-winning reporting spans world and national politics, climate change, adventure travel, and the outdoors, and whose writing has appeared in *The New York Times*, *Mother Jones*, *Outside*, the *Boston Globe*, the *Los Angeles Times*, and other national publications, including as part of a package that won the National Magazine Award for General Excellence. He is a graduate of Harvard University and has appeared as a guest on PBS NewsHour, NPR's Fresh Air, Morning Edition, C-SPAN, and CNN, among other national programs. Mr. Goodman is the co-author, with his sister Amy Goodman and Denis Moynihan, of

*Democracy Now! Twenty Years Covering the Movements Changing America* (Simon & Schuster, 2016), and the co-author with Amy Goodman of three additional New York Times bestsellers: *The Exception to the Rulers* (Hyperion, 2004), *Static* (Hyperion, 2006), and *Standing Up to the Madness* (Hyperion, 2008); he is also the author of *Fault Lines: Journeys Into the New South Africa* (University of California Press, 2002), praised by Archbishop Desmond Tutu, and the nationally award-winning guidebook *Best Backcountry Skiing in the Northeast*, which *Backcountry Magazine* has called "the bible of Eastern backcountry skiing." In 2023, the Vermont Ski and Snowboard Hall of Fame honored Mr. Goodman with the Paul Robbins Journalism Award in recognition of his contributions to skiing literature and the backcountry skiing community. Mr. Goodman is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Goodman, and for which Anthropic caused damages under the Copyright Act. Mr. Goodman, together with co-authors Amy Goodman and Denis Moynihan, registered their one (1) work *Democracy Now!* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

73. Plaintiff **David Goodman** also is the author and copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from **Goodman**, and for which Anthropic caused damages under the Copyright Act and which titles did not appear on the *Bartz v. Anthropic* works list. **Goodman** registered his four (4) titles *Best Backcountry Skiing in the Northeast; Best Backcountry Skiing in the Northeast, Third Edition; Backcountry Skiing Adventures: Maine & New Hampshire* and *Classic Backcountry Skiing: New England* with the US Copyright Office prior to Defendants' infringement. He seeks statutory damages of up to $150,000 per work, for a total of up to $600,000 in statutory damages for these works. See Exhibit A.

74. Plaintiff **Matt Gross** is a resident of New York. Mr. Gross is an American travel and food writer, author, and editor best known for his work as the "Frugal Traveler" columnist for *The New York Times*, a role he held from 2006 to 2010 in which his budget-minded, candid style

made travel feel accessible to a wide audience by demonstrating how curiosity and flexibility could drive meaningful journeys regardless of means. He graduated from Johns Hopkins University and soon after moved to Ho Chi Minh City, Vietnam, marking the beginning of his career as a global traveler and writer; over the course of his career he wrote nearly 200 stories for the *New York Times* Travel section, created and contributed to the Times' "Getting Lost" series focused on spontaneous, unplanned travel, and has written for publications including *Saveur*, *Afar*, and *New York Magazine*. Mr. Gross is the author of *The Turk Who Loved Apples: And Other Tales of Losing My Way Around the World* (2013), a collection of essays and stories reflecting decades of travel that emphasizes authentic experience over tourism, exploring the discomforts, surprises, and human connections encountered across the world. Beyond travel writing, Mr. Gross has served as web editor of *Bon Appétit*, combining his passions for food and writing, and co-founded the parenting blog DadWagon.com, reflecting the versatility and adaptability that has defined his career across travel, food, lifestyle, and family writing. Mr. Gross is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Gross, and for which Anthropic caused damages under the Copyright Act. Mr. Gross registered his one (1) work *The Turk Who Loved Apples* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

75. Plaintiff **Thomas Guzman-Sanchez** is a resident of California. Mr. Guzman-Sanchez is an American dance historian, author, choreographer, and educator widely recognized as one of the foremost authorities on the development of American urban street dance forms of Funk Boogaloo, Locking, Popping, Roboting, and B-boying — foundational forms that later became globally known as hip-hop dance. Born in San Francisco and raised in Reseda, California, he became involved with street dance in the early 1970s as part of the original generation of urban street dancers, co-founding the influential dance group Chain Reaction, which pioneered and popularized funk-based urban street dance forms and, along with his related company United Street Force, became the only urban street dance company to perform at the White House. Mr.

Guzman-Sanchez combined his artistic practice with decades of scholarship and cultural preservation, founding the International Urban Dance Master Association, teaching and promoting street dance history globally, and contributing research that has been incorporated into curricula at universities including Ohio State, UCLA, UC Riverside and Duke; he also successfully advocated for the inclusion of terms such as “Locking,” “Popping,” “B-boying,” “Rocking,” and “Urban Dance” in major dictionaries, including working with the American Heritage Dictionary’s editorial board. He is the author of *Underground Dance Masters: Final History of a Forgotten Era* (2012), considered a definitive historical account of American urban street dance that situates foundational dance forms in their true historical, social, and geographic contexts — tracing regional developments from the 1960s through the 1970s and 1980's across cities including Reseda, Los Angeles, Oakland, San Francisco, and the Bronx — and also produced and directed a feature documentary of the same title, which was featured at the Dance on Camera Festival. Mr. Guzman-Sanchez is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Guzman-Sanchez, and for which Anthropic caused damages under the Copyright Act. Mr. Guzman-Sanchez registered his one (1) work *Underground Dance Masters* prior to Defendants’ infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

76. Plaintiff **Minal Hajratwala** is a resident of New York. Ms. Hajratwala is a writer, performer, poet, and activist of Indian descent, born in 1971 in San Francisco, California, raised in New Zealand and suburban Michigan, and a graduate of Stanford University. She worked for eight years as a journalist at the *San Jose Mercury News*, served as a board member of the National Lesbian and Gay Journalists Association, and was a National Arts Journalism Program fellow at Columbia University’s Graduate School of Journalism in 2000–01, before turning her focus to long-form narrative writing and performance. Ms. Hajratwala is the author of *Leaving India: My Family’s Journey from Five Villages to Five Continents* (2009), a work she researched and wrote over seven years, traveling the world to interview more than seventy-five members of

her extended family, which Alice Walker has called "incomparable" and *The Washington Post* characterized as "searingly honest." Her creative work has appeared in journals, anthologies, and theater spaces and has received recognition and support from the Sundance Institute, the Hedgebrook writing retreat for women, and other institutions; she also founded Unicorn Authors Club, a writing community and sanctuary for authors of color and allies, and is the editor of *Out! Stories from The New Queer India* (2010) and the author of *Bountiful Instructions for Enlightenment* (2015). Ms. Hajratwala is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Hajratwala, and for which Anthropic caused damages under the Copyright Act. Ms. Hajratwala registered her one (1) work *Leaving India: My Family's Journey from Five Villages to Five Continents* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

77. Plaintiff **Brenda Hampton** is a resident of Missouri. Ms. Hampton is a national bestselling novelist, screenplay writer, film producer, literary agent, and entrepreneur whose name has appeared on the *Essence Magazine* bestseller list, Ubawa's Top 100 Authors list, and the AAMBC Black Authors list, and who has been named among the Top 100 Most Admired African American Women in literature, listed as a favorite female writer in *Upscale Magazine*, and recognized as a Delux Power100 Honoree, a 2025 Unsung Hero, and the recipient of a proclamation and resolution from the City of Saint Louis proclaiming June 24th as Brenda Hampton's Day. A native of St. Louis, Missouri, Ms. Hampton is best known for creating the *Naughty* series, one of the most acclaimed book series in urban literature, and for her reality TV drama series *Hell House*, named a top book choice by the Sankofa Literary Society; the film adaptation of her book series *Who Ya Wit* is currently streaming on multiple platforms alongside numerous additional films produced from her screenplays. Through her production company Black Girl Powerhouse Films, Ms. Hampton has written, produced, and directed films including *The Blood Brothers*, *Who Ya Wit 2*, *Complicated Christmas*, and *Gateway to Sin*, and she additionally founded Wall Street Company and Doll-N-Style Co., reflecting the broad

entrepreneurial vision that has defined her career across publishing, film, and business. Ms. Hampton is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Hampton, and for which Anthropic caused damages under the Copyright Act. Ms. Hampton registered her nine (9) works *Naughty 5: Too Naughty*; *Bff's 2*; *Naughty 4: Naughty by Nature*; *Hell House*; *Bff's*; *The Roof Is on Fire*; *Bff's 3*; *Naughty No More*; and *The Reunion Show* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $1,350,000 in statutory damages. *See* Exhibit A.

78. Plaintiff **Donna Barba Higuera** is a resident of Washington State. Ms. Higuera is an American author of children's and middle-grade fiction whose storytelling blends folklore, cultural heritage, humor, and imaginative settings to explore themes of identity, resilience, and the power of narrative, and who has become one of the most celebrated voices in contemporary children's literature. She grew up in a small agricultural region of Central California, later pursued a degree in biology, and went on to become an optometrist running her own practice while writing creatively on the side before establishing herself as a published author. Ms. Higuera is the author of *Lupe Wong Won't Dance* (2020), her debut middle-grade novel about a determined young girl who aspires to become the first female pitcher in Major League Baseball, which won a Pura Belpré Honor, the Sid Fleischman Humor Award, and the Pacific Northwest Booksellers Award, and appeared on the American Library Association's Best Books for Youth list. She is also the author of *The Last Cuentista* (2021), a middle-grade dystopian science-fiction novel about a young girl who must preserve the stories and memory of Earth after its destruction, which won both the 2022 John Newbery Medal — the most prestigious award in children's literature in the United States — and the Pura Belpré Medal honoring representation of the Latinx experience in children's books, cementing Ms. Higuera's status as a leading voice in her field. Her additional works include the picture book *El Cucuy Is Scared, Too!* and *The Yellow Handkerchief*, further reflecting her commitment to culturally rich, humor-infused storytelling for young readers. Ms. Higuera is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Higuera,

and for which Anthropic caused damages under the Copyright Act. Ms. Higuera registered her one (1) work *Lupe Wong Won't Dance* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

79. Plaintiff **Human Resource Development Press Inc.** d/b/a HRD Press, Inc. a/k/a HRD Press or HRD is a publishing company located in Belchertown, Massachusetts. HRD Press is an American publisher specializing in human resource development, organizational training, and workforce development products, and has served HR professionals, trainers, and organizations for over 45 years, building a catalog of more than one thousand human resource development products and counting among its customers over ninety percent of the Fortune 500 as well as thousands of businesses worldwide. Its publications span training solutions, hiring solutions, consulting resources, and custom HR product development across a broad range of topics including leadership, management, performance, coaching, mentoring, diversity, emotional intelligence, and organizational learning, and its works have been authored by leading practitioners, educators, and subject matter experts in the human resources and organizational development fields.

80. Plaintiff **Human Resource Development Press Inc.** had registered and/or owns the exclusive publication rights through written assignment 83 works including titles: *Twenty Reproducible Assessment Instruments for the New Work Culture*; *Job Analysis at the Speed of Reality*; *Flip Chart Magic!: 77 Energizing Ideas for Novices and Experts*; *All New Tricks for Trainers*; *The Manager's Pocket Guide to Documenting Employee Performance*; *The Manager's Pocket Guide to Influence with Integrity: Power, Principles, and Persuasion*; *The Manager's Pocket Guide to Leadership Skills*; *The Manager's Pocket Guide to eCommunication: Communicating Effectively in a Digital Age*; *The Manager's Pocket Guide to Effective Writing*; *The Manager's Pocket Guide to Creativity*; *The Possibilities Organization: The New Science of Possibilities Management*; *Instructional Design for Web-Based Training*; *The Manager's Pocket Guide to Workplace Coaching*; *The Manager's Pocket Guide to Corporate Culture Change*; *The Possibilities Mind: Conversations with God, Einstein and Others*; *The Manager's Pocket Guide*

*to Performance Management*; *The Manager's Pocket Guide to Knowledge Management*; *Excuses, Excuses, Excuses: For Not Delivering Excellent Customer Service — and What Should Happen!* (by written assignment); *50 Activities for Achieving Excellent Customer Service* (by written assignment); *Planning and Managing Human Resources*; *Creative Training Techniques Handbook: Tips, Tactics and How-To's for Delivering Effective Training* (by written assignment); *HR Optimization: From Personnel Administration to Human and Organizational Capital Development*; *The Competency Toolkit: Volume 1*; *The Competency Toolkit: Volume 2*; *The Manager's Pocket Guide to Systems Thinking & Learning*; *The Manager's Pocket Guide to Effective Meetings*; *The Manager's Pocket Guide to Public Presentations*; *The Meeting Spectrum*; *Learning Points: 100 Activities and Actions for E-Communications Excellence* (by written assignment); *The Manager's Pocket Guide to Diversity Management*; *The Leader's Communication Toolkit*; *The Manager's Pocket Guide to Emotional Intelligence*; *The Manager's Pocket Guide to Organizational Learning*; *The Manager's Pocket Guide to Spiritual Leadership*; *Guide to Mentee Planning*; *Solving the People Puzzle: Practical Strategies for Optimizing Workforce Performance*; *50 Activities for Developing Leaders*; *50 Activities for Developing Emotional Intelligence*; *Leadership Lessons from Professional Football* (by written assignment); *Leadership Lessons from the Game of Golf* (by written assignment); *Social Intelligence Skills for Sheriff's Departments Supervisors/Managers*; *So You Want to Be Mentored: An Application Workbook for Using Five Strategies to Get the Most Out of a Mentoring Relationship* (by written assignment); *Learning at Work: How to Support Individual and Organizational Learning* (by written assignment); *The Front Line Guide to Mastering the Manager's Job*; *The Front Line Guide to Communicating with Employees*; *The Front Line Guide to Creating a Winning Management Style*; *Seven Keys for Coaching Power: An Application Handbook for Leaders on the Front Line* (by written assignment); *Team Leader Workbook* (by written assignment); *PPD — Productive Program Development*; *PPS — Productive Problem Solving*; *25 Legendary Leadership Activities* (by written assignment); *Blended eLearning: Integrating Knowledge, Performance Support, and Online Learning*; *Manager's Pocket Guide to Interviewing and Hiring Top Performers*; *Leading in Tough Times: The Manager's Guide to Responsibility, Trust, and*

*Motivation* (by written assignment); *The Strategic Development of Talent*; *The Process-Based Organization (*by written assignment); *Survival Writing for Business*; *Giving and Receiving Performance Feedback*; *101 Leadership Actions for Performance Management*; *An Overview of Online Learning*; *The Possibilities Leader*; *Quintessential Guide to Using Consultants*; *Cases in Government Succession Planning* (by written assignment); *Framed!: Solve an Intriguing Mystery and Master How to Make Smart Choices* (by written assignment); *Organizational Design: A Practical Methodology and Toolkit*; *The Manager's Pocket Guide to Innovation*; *500 Creative Classroom Techniques for Teachers and Trainers* (by written assignment); *Achieving High Performance*; *Changes, Choices and Consequences: A Guide to Mega Thinking and Planning* (by written assignment); *15 Reproducible Activities for Reinforcing Business Ethics and Values*; *25 Reproducible Activities for Customer Service Excellence*; *The Manager's Pocket Guide to Using Consultants*; *Learning Points: 89 Activities and Actions for Coaching Call Center CSRs* (by written assignment); *Guaranteeing Performance Improvement* (by written assignment); *The Front Line Guide to Thinking Clearly*; *101 Ways to Build Better Relationships with Your Customers* (by written assignment); *The Manager's Pocket Guide to Training*; *50 Activities for Employee Engagement* (by written assignment); *The Art of Helping, Ninth Edition Trainer's Guide*; *101 Leadership Actions for Managing Change in the 21st Century* (by written assignment); *50 Activities for Coaching/Mentoring*; *Ethical Leadership: Rebuilding Trust in Corporations*; *Job Aids for Everyone* and *101 Leadership Actions for Effective Presentation* prior to Defendants' infringement with the United States Copyright Office. HRD Press, through its CEO Gregory B. Carkhuff and Publisher Robert W. Carkhuff, owns the copyright in a substantial catalog of the 83 registered works that Defendants copied, uploaded, distributed, and exploited without authorization, and for which Anthropic caused damages under the Copyright Act, and seeks statutory damages of up to $150,000 per work, for a total of up to $12,450,000 in statutory damages. *See* Exhibit A.

81. Plaintiff **Human Resource Development Press Inc.** also has registered, and/or owns through written assignment from the registered claimant or is exclusive licensee of an additional 342 original literary works that, upon information and belief, Defendants copied,

uploaded, distributed, and exploited without authorization from HRD Press, and for which Anthropic caused damages under the Copyright Act. These titles did not appear on the *Bartz v. Anthropic* Works List. These additional registered works span HRD Press's catalog of human resource development, training, and organizational development titles — including *The Art of helping IV*; *The Art of helping IV: student workbook*; *The Complete series 6 study book*; *Toward actualizing human potential*; *Helping through action: action-oriented therapies*; *Build your career: a workbook for advancing in an organization*; *Performance based supervisory development*; *The Guide to D P training courses: descriptions of over 300 programs and workshops*; *Sources of human productivity*; *The Student workbook for The Art of helping*; *The Art of helping*; *The Art of helping: trainer's guide*; *IPS: interpersonal skills and human productivity*; *IPS, interpersonal skills and human productivity*; *The Productive teacher: 1, An Introduction to curriculum development*; *The Best and the brightest*; *The Exemplar: the exemplary performer in the age of productivity*; *Helping and human relations: v. I, Selection and training*; *The Development of human resources*; *Helping and human relations: v. II, Practice and research*; *The Third century in American education*; *Training delivery skills: I, Preparing the training delivery*; *Training delivery skills: II, Making the training delivery*; *ISD instructional systems design: 1, Designing the instructional system*; *ISD instructional systems design: II, Evaluating the instructional system*; *PPR: Peer pressure reversal*; *Productive parenting skills*; *PPS, productive problem-solving*; *The Productive supervisor: planning skills*; *How to help yourself: the art of program development*; *PPD, productive program development*; *Human processing and human productivity*; *Success with six!: a financial planner's guide to the N. A. S. D. exam*; *The Art of helping: VI*; *The Art of helping, VI: trainer's guide*; *Positive peer groups*; *Using adult learning principles: practical skills that work: instructor guide*; *High impact presentation skills: instructor guide*; *Immigration survival kit*; *PPR, peer pressure reversal: an adult guide to developing a responsible child*; *Talk it out!: 4 steps to managing people problems in your organization*; *When to say yes!: and make more friends*; *The Ten commandments for public speakers*; *The Structured on-the-job training workshop*; *Right-to-know: compliance guide*; *The Strategic planning workshop: trainer's guide*; *The Language of leadership*; *Listening skills: practical skills that*

*work: coursebook*; *The Goals-oriented performance appraisal workshop: trainer's guide*; *The Employee discipline workshop*; *Managing your stress workshop*; *The Productive supervisor*; *Right-to-know: employee self-study booklet*; *Leadership: myths and realities*; *Police personnel*; *The Age of the new capitalism*; *The Employee selection workshop: participant coursebook*; *Teenagers and parents: ten steps for a better relationship*; *Ethical leadership: a competitive edge*; *Communicating in the business environment*; *Too smart for trouble*; *Starting off right: a resource guide for employee orientation*; *Learning from conflict: a handbook for trainers and group leaders*; *Total quality transformations: optimizing missions, methods, and management*; *Processwriting workshop--a systematic writing strategy*; *Thinking metric*; *Serve yourself: the internal customer*; *Serve yourself: the internal customer resource guide*; *Needs assessment coursebook and workshop*; *Polarity managment: identifying and managing unsolvable problems*; *The sexes at work*; *FLEX--a flexible system for continuously improving your evaluation of training effectiveness*; *The handbook of HRD technology*; *The ASTD reference guide to professional human resource development roles and competencies: vol. 1-2*; *Hiring winners: a comprehensive guide to recruiting, interviewing, and selecting salespeople*; *The trainer's dictionary: HRD terms, acronyms, initials, and abbreviations*; *Designing effective health promotion programs: a culture-based approach to integrated health services*; *Globalization: the international HRD consultant and practitioner*; *The art of helping*; *50 activities for quality leadership: vol. 1*; *50 activities for managing cultural diversity*; *The trainer's dictionary: HRD terms, acronyms, initials, and abbreviations*; *The handbook of creative learning exercises*; *Human resource development: a strategic approach*; *Advertising is a waste of money: a smart guide to promoting your business, product or service*; *How to hire winners legally*; *50 case studies for management & supervisory training*; *50 activities for self-directed teams*; *50 activities for empowerment*; *The basic quality improvement tools*; *Preventing sexual harassment in the workplace: a workshop*; *The human diversity workshop: instructor's guide*; *Great games for trainers*; *Active management: structured training activities & exercises*; *High performance teamwork: HRD strategies for the new work culture*; *Training for non-trainers: a practical guide*; *Training and legal issues: the law and how it relates to training*; *Competency-based performance*

*improvement: organizational assessment package*; *Honoring boundaries: preventing sexual harassment in the workplace*; *You developed it: can your training programs survive the reality test?*; *The new language of work*; *25 role plays for negotiation skills*; *Competency-based performance improvement: a strategy for organizational change*; *The quality managing & planning tool system*; *Team building blocks: practicing group collaboration*; *The no-nonsense team kit*; *The confident leader: a powerful & practical tool kit for managers & supervisors*; *The fieldbook of team interventions: the step-by-step guide to high performance teams!*; *Changing pace: outdoor games for experiential learning*; *Creating a high-performance culture: 58 activities for sustaining quality and building an empowered, learning organization*; *Business process reengineering--plain and simple: planning to successfully achieve dramatic increases in productivity and profits*; *Power, the infinite game*; *360 degree feedback: strategies, tactics, and techniques for developing leaders*; *Employee recruitment and selection in a post-ADA environment*; *Terrific training materials: high impact graphic designs for workbooks, handouts, instructor guides, and job aids*; *Surveying employees: a practical guidebook*; *Handbook of best practices for teams: vol. 1*; *The HR handbook: vol. 1*; *The six pillars of reality-based training: a practical guide to designing and delivering training that works*; *Just-in-time training assessment instrument*; *The self-directed on-the-job learning workshop*; *Train-the-trainer: practical skills that work*; *The executive's guide to competency-based performance improvement*; *Interactive lectures: add participation to your presentation*; *Humor works*; *Make the change to customer-driven sales*; *The project manager's partner: a step-by-step guide to project management*; *50+ activities to teach negotiation*; *Performance-based sales training: building a sales curriculum that will enable your salespeople to sell more*; *How To Say No and Keep Your Friends*; *Best practices in customer service*; *The facilitator's fieldbook: step-by step procedures, checklists and guidelines, samples and templates*; *Human possibilities: human capital in the 21st century*; *New Science of Possibilities 1*; *The new fieldbook for trainers: tips, tools & techniques*; *25 instruments for team building*; *Training clips: 150 reproducible handouts, discussion starters and job aids*; *Bruce Tulgan's Just in time leadership: workshop: participant course book*; *Becoming a mentor: a video-based workshop: instructor's guide*; *Becoming a mentor: a video-based workshop:*

*participant workbook*; *The new sales game: facilitator's instruction book*; *The complete guide to facilitation: enabling groups to succeed*; *Service heroes in hospitality: a customer service training program*; *Learning style questionnaire (LSQ): leader's guide*; *Post-heroic leadership: managing the virtual organization: leader's guide*; *50+ activities to teach negotiation*; *The principles of adult mentoring inventory (PAMI)*; *Flex style negotiating: instructor's manual*; *Creativity by design: a leader's guide for the personal creativity assessment (PCA) and the manager's pocket guide to creativity*; *Establishing the value of training*; *Flex style negotiating: participant workbook*; *Interview for success: participant workbook*; *Skills for internal consultants: instructor's guide*; *Quick wits: a compendium of critical thinking skills activities*; *Skills for internal consultants: participant's coursebook*; *Learning style questionnaire*; *The personal creativity assessment (PCA)*; *Mentor critique form (MCF) for the principles of adult mentoring inventory*; *Post-heroic leadership: managing the virtual organization: assessment instrument: other*; *Flex style negotiating: situational negotiation strategy selector*; *Flex style negotiating: behavioral style assessment/other*; *Flex style negotiating: behavioral style assessment/self*; *Dealing with conflict instrument: 360-degree feedback set*; *Dealing with conflict instrument*; *Post-heroic leadership: managing the virtual organization: assessment instrument, self*; *Principles of adult mentoring inventory (PAMI)*; *The complete guide to systems thinking and learning*; *The competent leader*; *The mentee's guide to mentoring*; *Strategic employee polls*; *Step-by-step guide to starting an effective mentoring program*; *A trainer's handbook for participative learning*; *Human possibilities: human capital in the 21st century*; *New work culture: HRD transformational management strategies*; *The manager's pocket guide to project management*; *The manager's pocket guide to employee relations*; *The manager's pocket guide to strategic and business planning: the systems thinking approach*; *Project management tool kit*; *Interview for Success: a half-day competency-based workshop: instructor' guide*; *Transformational coaching workshop: facilitator's guide*; *JUSTinTIME leadership workshop: participant coursebook*; *An overview of online learning*; *HR consultant-in-a-box*; *Incident at Elves Chasm: action plan: consensus and consultation*; *Stranded in Grand Canyon: a creative problem-solving adventure*; *Incident at Elves Chasm: priority setting: consensus and consultation*; *Assessment of*

*organizational readiness for mentoring: guidance and inventories*; *The project manager's partner: a step-by-step guide to project management*; *The manager's pocket guide to virtual teams*; *The new possibilities teacher: bks. 1-3*; *The emotional intelligence activity book: 50 activities for developing EQ at work*; *Team workout: a trainer's sourcebook of 50 team-building games and activities*; *The project manager's partner: a step-by-step guide to project management*; *The business ethics activity book: 50 exercises for promoting integrity at work*; *Discovering Operational Discipline*; *The complete guide to wellness*; *50 activities for promoting ethics within the organization*; *The question book goes interactive*; *CBI question booklet: version 2.0*; *Train-the-trainer: participant coursebook*; *Train-the-trainer: instructor's guide*; *Freedom-building: implementing the freedom doctrine*; *Leading in tough times: the manager's guide to responsibility, trust, and motivation*; *The highly effective meeting profile*; *Right person, right job: guess or know*; *Training professionals' web design toolkit: Microsoft Office FrontPage 2003*; *The strategic leadership workshop: teaching the strategic leadership model: participant coursebook*; *Train the trainer: coursebook*; *Managing information and human performance: strategies and methods for knowing your workforce and organization*; *The strategic leadership workshop: instructor guide*; *Freedom-building: implementing the freedom doctrine*; *The leadership lexicon: a handbook of leadership competencies with skills and development actions*; *Change management readiness survey*; *Possibilities Economy*; *Test of supervisory skills: question booklet*; *Planning, organizing & scheduling test: question booklet*; *Management and organization skills test: question booklet*; *Mechanical and understanding test: question booklet*; *Recruiting the workforce of the future*; *101 leadership actions for creating & managing virtual teams*; *The Manager's Pocket Guide to preventing sexual harassment*; *The freedom wars*; *The Everyday Negotiator*; *The processing technologies*; *The power of e-communication*; *50 activities for team building: vol. 1*; *50 activities for diversity training*; *50 case studies for management and supervisory training*; *50 activities for sales training*; *Leadership Lessons From Dad*; *Social intelligence skills for law enforcement managers/supervisors*; *Coaching yourself to leadership: five key strategies for becoming an integrated leader*; *mLearning*; *Stories they will remember*; *Disc styles assessment*; *PTI psychological type indicator*; *Leadership Lessons From Mom*; *51 Activities for Collaborative*

*Management*; *The facilitator's fieldbook: step-by-step procedures, checklists and guidelines, samples and templates*; *Management effectiveness profile*; *Management effectiveness profile: facilitator's guide*; *25 Sales Strategies and Activities*; *Developing and implementing a corporate university*; *Social intelligence skills for law enforcement officers*; *Social intelligence for government supervisors/managers*; *Social intelligence for correctional officers*; *Social intelligence skills for correctional managers*; *The front line guide to building high performance teams*; *Strategic training: putting employees first*; *Interpersonal skill training for information technology professionals: participant coursebook*; *Interpersonal skills training for information technology professionals facilitator's guide*; *HOW TO BE IN A PERSONAL RELATIONSHIP*; *The Manager's Pocket Guide to Downsizing with Confidence*; *The Manager's Pocket Guide to Downsizing with Confidence*; *HR Skills Series - Alternative Workforce Strategies*; *HR Skills Series - Legendary Leadership*; *HR Skills Series - Performance Feedback*; *HR Skills Series - Downsizing*; *HR Skills Series - The Ethical Dilemma*; *HR Skills Series - Retention*; *Foundations of Instructional and Performance Technology*; *Power Surge: A Conduit for Enlightened Leadership*; *The Secrets of Helping*; *Goodbye College--Hello Life! Go-To Answers from a Got-There Grown-Up*; *The Art of Helping, 9th Edition*; *Saving America! The Generativity Solution*; *The Art of Helping Ninth Edition Student Workbook*; *Team Communication: 20 Essential Aids*; *Effective Meetings: 20 Sure-Fire Tools*; *Team workout: a trainer's sourcebook of 50 team-building games and activities*; *Team Leadership: 20 Proven Tools for Success*; *Creating a Positive Team Climate*; *HR Skills Series: Conducting Workplace Investigations*; *HR Skills Series: Terminations*; *The Exceptional Team Survey*; *Tales from the Front*; *Urban Survival Series-Getting Money Out of an ATM*; *Urban Survival Series-Facilitator's Guide*; *Urban Survival Series - Vacation Destination*; *Urban Survival Series- Lost Wallet or Purse*; *Urban Survival Series-Stuck in an Elevator*; *The New Managers Primer*; *Team Empowerment: 20 Ways to Get There*; *Business Coaching for Managers and Organizations*; *Designing the Learning Moment - A Rapid Approach to Creating More Meaningful and Memorable E-Learning*; *Selling the Moment - Values, Needs and Relationships: Turning Ordinary Sales into a Lifetime of Success*; *Team Rewards: 20 Real Life Lessons*; *Team Trust: 20 Trustworthy Tips*; *Building Relationships for*

*Team Success*; *Balancing Work and Family: A Practical Guide to Help Organizations Meet the Global Workforce Challenge*; *Managerial Assessment of Proficiency-Participant Workbook and Handouts*; *Managerial Assessment of Proficiency-Instructor's Materials*; *Managerial Assessment of Proficiency: Instructor Materials: Form S*; *Leadership for Academic Units*; *The Heart of Empathy*; *Polarity Coaching: Coaching People and Managing Polarities*; *Applied Social Intelligence: A Skills-Based Primer*; *Successful Team Building: 20 Tips, Tools, and Exercises*; *50 Communications Activities, Icebreakers, and Exercises*; *THE CRITICAL THINKING TOOL KIT: SPARK YOUR TEAM'S CREATIVITY WITH 35 PROBLEM SOLVING ACTIVITIES*; *Managerial Assessment of proficiency-Participant Workbook and Handouts-Forms*; *Motivating a Multicultural Workforce*; *Small Group Facilitation*; *Leaders Without Titles*; *Collaborative Leadership in Action*; *The Art of Performance Feedback*; *The Manager's Pocket Guide to Social Media*; *NEGOTIATION AT WORK: MAXIMIZE YOUR TEAM'S SKILLS WITH 60 HIGH-IMPACT ACTIVITIES*; *THE MANAGEMENT TRAINING TOOL KIT: 35 EXERCISES TO PREPARE MANAGERS FOR THE CHALLENGES THEY FACE EVERY DAY*; *INNOVATION AT WORK: 55 ACTIVITIES TO SPARK YOUR TEAM'S CREATIVITY*; *THE FACILITATOR'S FIELDBOOK, Third Edition*; *Managing to EXCEL2: Setting Goals and Standards Instructor's Guide*; *Managing to EXCEL2: Giving Clear Information Instructor's Guide*; *Managing to EXCEL2: Thinking Clearly and Analytically Instructor's Guide*; *Managing to EXCEL2: Disciplining and Counseling Instructor's Guide*; *Managing to EXCEL2: Appraising People and Performance Instructor's Guide*; *Managing to EXCEL2: Training, Coaching and Delegating Instructor's Guide*; *Managing to EXCEL2: Planning and Scheduling Work Participant Workbook*; *Managing to EXCEL2: Time Management and Prioritizing Participant Workbook*; *Managing to EXCEL2: Listening and Organizing Participant Workbook*; *Managing to EXCEL2: Getting Unbiased Information Participant Workbook*; *Managing to EXCEL2: Identifying and Solving Problems Participant Workbook*; *Managing to EXCEL2: Making Decisions, Weighing Risk Participant Workbook*; *Managing to EXCEL2: Thinking Clearly and Analytically Participant Workbook*; *Managing to EXCEL2: Training, Coaching and Delegating Participant Workbook*; *Managing to EXCEL2: Giving Clear Information Participant Workbook*; *Managing to*

*EXCEL2: Disciplining and Counseling Participant Workbook*; *Managing to EXCEL2: Setting Goals and Standards Participant Workbook*; *Managing to EXCEL2: Appraising People and Performance Participant Workbook*; *Managing to EXCEL2: Making Decisions, Weighing Risk Instructor's Guide*; *Managing to EXCEL2: Time Management and Prioritizing Instructor's Guide*; *Managing to EXCEL2: Planning and Scheduling Work Instructor's Guide*; *Managing to EXCEL2: Identifying and Solving Problems Instructor's Guide*; *Managing to EXCEL2: Getting Unbiased Information Instructor's Guide*; *Managing to EXCEL2: Listening and Organizing Instructor's Guide*; *Productive thinking skills: I: overview, version no. 15*; *Productive thinking skills, I: overview--trainee version*; *The Creative leader: II, Creative organizations & economic growth*; *The Thinking manager*; *The Creative leader: I, human & information capital & economic growth*; *The Creative leader: III, Creative personnel & economic growth*, and *Continuous learning in organizations--50 principles & 150 activities.* Each is identified, together with its United States Copyright Registration number, in Exhibit A. HRD Press registered each of these additional works, and/or owns or is exclusive licensee of each such work by written assignment, prior to Defendants' infringement, and seeks statutory damages of up to $150,000 per work, for a total of up to $51,300,000 in additional statutory damages for these works. *See* Exhibit A.

82. Plaintiff **Buzzy Jackson** is a resident of Colorado. Ms. Jackson is an American author, historian, and teacher whose work spans nonfiction and historical fiction, integrating deep research with engaging narrative, and who holds a Ph.D. in U.S. History from the University of California, Berkeley. She is a member of the National Book Critics Circle, a fellow of the Edith Wharton Writing Residency, and has taught at UC Berkeley and the Center of the American West at the University of Colorado, Boulder, where her scholarship and teaching contribute to how audiences understand the past and interpret human stories. Ms. Jackson is the author of *A Bad Woman Feeling Good: Blues and the Women Who Sing Them* (W.W. Norton, 2005), an exploration of blues music through the voices of influential women singers; *Shaking the Family Tree: Blue Bloods, Black Sheep, and Other Obsessions of an Accidental Genealogist* (Simon & Schuster, 2010), a blend of memoir, genealogy, and cultural history; *The Inspirational Atheist: Wise Words on the Wonder and Meaning of Life* (Plume, 2015), a philosophical reflection on

meaning, belief, and human experience; and *To Die Beautiful* (Dutton, 2023), an award-winning historical novel bringing to life Dutch resistance fighter Hannie Schaft during World War II, which won the Colorado Book Award for historical fiction and was a National Jewish Book Award finalist. In addition to her books, Ms. Jackson writes essays, reviews, and cultural pieces for various publications, contributes to radio and film projects, and works as an editor, writing consultant, and creative coach. Ms. Jackson is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Jackson, and for which Anthropic caused damages under the Copyright Act. Ms. Jackson registered her three (3) works *A Bad Woman Feeling Good; Shaking the Family Tree;* and *The Inspirational Atheist: Wise Words on the Wonder and Meaning of Life* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $450,000 in statutory damages. *See* Exhibit A.

83. Plaintiff **Nick Jamilla** is a resident of Maryland. Mr. Jamilla is a writer, researcher, and former martial arts instructor whose work occupies a distinctive niche at the intersection of historical swordsmanship, martial arts scholarship, and cinematic fighting. He has represented the Philippines in international fencing competition, including the World University Games and the World Fencing Championships, and has previously worked as a fencing and martial arts instructor, bringing real-world precision and discipline to his study of both historical and fictional combat. Mr. Jamilla is the author of *Sword Fighting in the Star Wars Universe: Historical Origins, Style and Philosophy* (McFarland, 2008), originally self-published as *Shimmering Sword* and later revised and expanded under academic publication, which analyzes how lightsaber duels in the Star Wars universe draw on ancient samurai, medieval knight, and other historical sword-fighting traditions — treating fictional cinematic combat as a disciplined movement practice with deep real-world parallels. In addition to his written scholarship, Mr. Jamilla created the lightsaber choreography for the independent fan film *Star Wars: Revelations*, further connecting his martial arts expertise with creative cinematic work and demonstrating the holistic approach — combining writing, choreography, and teaching — that defines his contributions to fan scholarship and martial arts communities. Mr. Jamilla is the author and

copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Jamilla, and for which Anthropic caused damages under the Copyright Act. Mr. Jamilla registered his one (1) work *Sword Fighting in the Star Wars Universe* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

84. Plaintiff **K. W. Jeter** is a resident of Oklahoma. Mr. Jeter is an American science fiction, fantasy, and horror author who has been active since the late 1970s and is best known for helping define and name the steampunk genre, having famously coined the term "steampunk" in a 1987 letter to *Locus* magazine, retroactively labeling a body of work — including his own — that reimagined Victorian-era technology through speculative fiction. He emerged from the California science fiction scene of the 1970s in close literary association with writers Tim Powers and James Blaylock, and his early novels stood out for their bleak tone, transgressive content, and psychologically complex sensibility, placing him at the margins of the New Wave and early cyberpunk movements as a key transitional figure across literary genres. Mr. Jeter's bibliography includes acclaimed original works such as *Infernal Devices*, *Morlock Night*, *The Glass Hammer*, *Death Arms*, *Farewell Horizontal*, *Fiendish Schemes*, and *Noir*, as well as the official authorized sequels to director Ridley Scott's 1982 film *Blade Runner* and to Philip K. Dick's novel *Do Androids Dream of Electric Sheep?*, upon which the film was based (*Blade Runner* 2, 3, and 4) — a rare case in which a contemporary author was entrusted to continue a canonical science-fiction universe, and works frequently cited as among the most philosophically serious authorized continuations in the genre. Across decades of work, Mr. Jeter's writing has consistently explored themes of technology as psychological threat, identity and memory, dark anti-heroic narratives, and the deconstruction of genre conventions, reflecting a worldview skeptical of easy redemption and resistant to heroic or utopian framing. Mr. Jeter is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Jeter, and for which Anthropic caused damages under the Copyright Act. Mr. Jeter registered his twelve (12) works *Morlock Night*; *Mantis*; *Wolf Flow*; *Farewell Horizontal*; *Death*

*Arms*; *Madlands*; *Noir*; *Fiendish Schemes*; *Infernal devices: A Mad Victorian fantasy*; *Soul Eater*; *The First Time*; and *True Love* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $1,800,000 in statutory damages. See Exhibit A.

85. Plaintiff **Matthew Kenney** is a resident of Florida. Mr. Kenney is an American chef, restaurateur, author, educator, and entrepreneur widely recognized as a pioneer in modern plant-based and raw cuisine, whose career has helped shift vegan and raw food from niche diets to high-end and globally accessible gourmet cuisine. Born in Connecticut and raised in Searsport, Maine, he completed a B.A. at the University of Maine and trained at the French Culinary Institute, grounding himself in classical culinary technique before opening his first namesake restaurant in New York City in 1993; in 1994 he was named one of *Food & Wine* magazine's Best New Chefs in America. In 2004 Mr. Kenney co-launched Pure Food & Wine, one of New York City's early upscale raw and vegan restaurants, and in 2012 he founded Matthew Kenney Cuisine, a global plant-based lifestyle company spanning hospitality, education, media, products, licensing, and services, through which he has opened dozens of plant-based restaurants worldwide and taught a generation of chefs and home cooks plant-based culinary techniques. Mr. Kenney is the author of numerous cookbooks on raw, vegan, and plant-based cuisine, works that reflect his broader mission of treating food as part of a lifestyle, wellness philosophy, and ecosystem — bridging culinary art with sustainability, health, and ethical eating on a global scale. Mr. Kenney is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Kenney, and for which Anthropic caused damages under the Copyright Act. Mr. Kenney registered his nine (9) works *Everyday Raw Detox*; *Everyday Raw Gourmet*; *Everyday Raw*; *Plant Food (Everyday Raw)*; *Everyday Raw Desserts*; *Everyday Raw Express*; *Raw Chocolate (Everyday Raw)*; *Plantlab: Crafting the Future of Food*; and *Entertaining in the Raw* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $1,350,000 in statutory damages. *See* Exhibit A.

86. Plaintiff **Pamela Keogh** is a resident of New York. Ms. Keogh is an American

author celebrated for her *New York Times* bestselling biographies of cultural icons and style legends, blending biography with fashion, design, and personal narrative. Before becoming a full-time author, she worked as a journalist and television producer, and her writing has appeared in publications including the *New York Times*, *Vanity Fair*, *Vogue*, *People* magazine, and *Town & Country*. She is a graduate of Vassar College, Ms. Keogh is the author of several acclaimed works, including: *Audrey Style*, a style biography of Audrey Hepburn combining rarely seen photographs, designer sketches, and rare interviews with friends and fashion insiders (this first book of hers was featured in the 57 Street windows of Bergdorf Goodman for three weeks, the first time they put a book in the windows); *Jackie Style*, exploring Jacqueline Kennedy Onassis's fashion, personal life, and public persona, again, using original research; *Elvis Presley: The Man, the Life, the Legend*, examining Elvis Presley through the lens of his style, image, and cultural significance; *What Would Audrey Do?: Timeless Lessons for Living with Grace and Style*, a guide inspired by Audrey Hepburn's grace, values, and elegance; and *Are You a Jackie or a Marilyn*?, a lifestyle book comparing Jacqueline Kennedy Onassis and Marilyn Monroe as style icons. Her works bridge biography and lifestyle in a very distinctive manner, examining how cultural icons of the twentieth century expressed themselves through fashion and public image, and ensuring that the elegance, values, and cultural significance of these figures remain relevant for modern readers. Ms. Keogh is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Keogh, and for which Anthropic caused damages under the Copyright Act. Ms. Keogh registered her one (1) work *What Would Audrey Do?: Timeless Lessons for Living with Grace and Style* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. See Exhibit A.

87. Plaintiff **Lynnette Khalfani-Cox** is a resident of Texas. Ms. Khalfani-Cox is an American personal finance expert, author, speaker, and media personality known as "The Money Coach," whose career bridges journalism, entrepreneurship, financial coaching, and public advocacy, with a particular focus on financial literacy, credit education, debt management, and

wealth-building strategies for middle-income and historically underserved communities. She began her career as a business and financial news reporter and correspondent for CNBC, where she covered personal finance, markets, and consumer issues, before transitioning into financial education and entrepreneurship and founding TheMoneyCoach.net, a national financial literacy platform offering credit repair strategies, debt reduction systems, financial literacy courses, coaching and consulting, and consumer financial rights education. Ms. Khalfani-Cox is the author of numerous personal finance, credit, and college-planning books, including *Zero Debt: The Ultimate Guide to Financial Freedom*, *Zero Debt for College Grads: From Student Loans to Financial Freedom*, *Perfect Credit: 7 Steps to a Great Credit Rating*, *Bounce Back: The Ultimate Guide to Financial Resilience*, *The Money Coach's Guide to Your First Million*, *Your First Home: The Smart Way to Get It and Keep It*, *College Secrets: How to Save Money, Cut College Costs and Graduate Debt Free*, *College Secrets for Teens: Money-Saving Ideas for the Pre-College Years*, and multiple children's books in the *Millionaire Kids Club* series, works that emphasize actionable, implementable strategies for eliminating debt, improving credit, paying for college, and rebuilding finances after economic setbacks over abstract financial theory. She has appeared as a financial expert across major television and radio platforms, providing commentary on credit scoring, debt management, economic inequality, and consumer protection, and has developed structured financial education programs for schools, corporations, and community organizations, extending her impact beyond books and media into scalable training environments. Ms. Khalfani-Cox is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Khalfani-Cox, and for which Anthropic caused damages under the Copyright Act. Ms. Khalfani-Cox registered her one (1) work *Zero Debt for College Grads: From Student Loans to Financial Freedom* prior to Defendants' infringement with the United States Copyright Office and under her name Lynnette Khalfani, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. See Exhibit A.

88. Plaintiff **Lynnette Khalfani-Cox** also is the author and copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded,

distributed, and exploited without authorization from **Lynnette Khalfani-Cox**, and for which Anthropic caused damages under the Copyright Act and which titles did not appear on the *Bartz v. Anthropic* works list. **Lynnette Khalfani-Cox** registered her 14 titles *Your First Home: The Smart Way to Get it and Keep It; Perfect Credit: 7 Steps To A Great Credit Rating; Perfect Credit: Steps to a Great Credit Rating 2nd Edition; Free Pre-College Programs: A Guide to No-Cost and Low Cost Summer Programs for Teens; Zero Debt: The Ultimate Guide to Financial Freedom 3rd Edition; Zero Debt for College Grads: From Student Loans to Financial Freedom 2nd Edition; College Secrets: How to Save Money, Cut College Costs and Graduate Debt Free; Zero Debt: The Ultimate Guide to Financial Freedom 2nd edition; College Secrets for Teens: Money Saving Ideas for the Pre-College* Years; *The Money Coach Guide to Your First Million; The Millionaire Kids Club: Home Sweet Home* (assigned from Advantage World Press to **Lynnette Khalfani-Cox)**; *The Millionaire Kids Club: Garage Sale Riches Home* (assigned from Advantage World Press to **Lynnette Khalfani-Cox)**; *The Millionaire Kids Club: Penny Power Home* (assigned from Advantage World Press to **Lynnette Khalfani-Cox)**, and *The Millionaire Kids Club: Putting the Do in Donate Home* (assigned from Advantage World Press to **Lynnette Khalfani-Cox)** and she seeks statutory damages of up to $150,000 per work, for a total of up to $2,100,000 in statutory damages for these works. See Exhibit A.

89. Plaintiff **Joe Konrath** is a resident of Wisconsin. Mr. Konrath is an American author who has written over sixty books across the thriller, mystery, horror, science fiction, and erotica genres, and has sold millions of books worldwide. He is best known for his Jacqueline "Jack" Daniels series, which currently spans twenty-four novels plus five short story collections and an interactive choose-your-own-path book, as well as sixteen novels in the Konrath Dark Thriller Collective, nine Codename: Chandler spy novels co-written with Ann Voss Peterson, the Timecaster trilogy, and the Stop A Murder puzzle book series, with many of these works featuring interconnected characters and crossover storylines. He has also co-written seventeen novels in the erotica genre under the pen name Melinda DuChamp, and his short stories have been published in dozens of magazines; his novella *Shapeshifters Anonymous* was adapted into a one-hour special for the Shudder streaming service series *Creepshow*, titled *The Creepshow*

*Holiday Special*. Mr. Konrath is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Konrath, and for which Anthropic caused damages under the Copyright Act. Mr. Konrath registered his six (6) works *Cherry Bomb*; *Bloody Mary*; *Timecaster*; *Shaken*; *Stirred*; and *Three* prior to Defendants' infringement with the United States Copyright Office, timely opted out these books. He seeks statutory damages of up to $150,000 per work, for a total of up to $900,000 in statutory damages. *See* Exhibit A.

90. Plaintiff **Joe Konrath** also registered 13 additional works with the US Copyright Office that on information and belief, were infringed by Defendants: *Whiskey Sour; Rusty Nail; Dirty Martini; Fuzzy Navel; Cherry Bomb; Shaken; Stirred* (co-authored with Blake Crouch)*; Spree* (co-authored with Ann Voss Peterson)*; Three* (co-authored with Ann Voss Peterson)*; Timecaster* (registered under his pen name Joe Kimball)*; Afraid* (registered under his pen name Jack Kilborn)*; Symbios* (short story), and *Street Music* (short story). He seeks statutory damages of up to $150,000 per each of these works, for a total of up to an additional $1,950,000. *See* Exhibit A.

91. Plaintiff **Margaret Ratner Kunstler, as Executrix of the Estate of William Moses Kunstler**, is a resident of New York. William Moses Kunstler (1919-1995) was an American civil rights and criminal defense attorney and author best known for representing controversial political defendants and activists, and who became one of the most visible and polarizing trial lawyers in the United States over the course of his career. Already well known for his movement defense work during the 1960s, including representing Freedom Riders arrested in the South, he became a nationally-recognized figure as defense counsel in the Chicago Seven trial, representing defendants charged with conspiracy and inciting riots for protesting the 1968 Democratic National Convention. He went on to represent members of the Black Panther Party, inmates in the Attica prison uprising, activists involved in the Wounded Knee occupation, and a wide range of clients across politically-charged cases, approaching trials not only as criminal proceedings, but as battles over constitutional rights and the limits of government power. Mr. Kunstler was also a co-founder of the Center for Constitutional Rights, which remains a major

force in civil liberties and human rights litigation. In addition to his legal career, Mr. Kunstler was an author whose works — including *Deep in My Heart*, a memoir reflecting on his political trials and legal philosophy with a foreword by Martin Luther King Jr, and *My Life as a Radical Lawyer*, an autobiographical examination of his transformation into a civil rights attorney — blended courtroom narrative with critique of the American legal system and helped shape the field of movement lawyering, where attorneys align legal defense with broader civil rights activism. The Estate of William Moses Kunstler is the copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization, and for which Anthropic caused damages under the Copyright Act. Kunstler registered the one (1) work *Trials and Tribulations* prior to Defendants' infringement with the United States Copyright Office, and seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

92. Plaintiff **Melissa Landers** is a resident of Ohio. Ms. Landers is an American novelist and *New York Times*, *USA Today*, and *Sunday Times* bestselling author best known for her young adult science fiction and fantasy novels, who also writes adult contemporary romance under the pseudonym Macy Beckett. Before becoming a full-time writer, she worked as a teacher, and she now lives in Cincinnati, Ohio, balancing family life with a prolific writing career spanning multiple genres and series. Ms. Landers is the author of the Alienated Trilogy, comprising *Alienated* (2014), *Invaded* (2015), and *United* (2016), a science fiction romance series exploring human-alien relations and high-stakes interstellar conflict, and the Starflight Duology, comprising *Starflight* (2016) and *Starfall* (2017), a beloved science fiction romance adventure series; her additional young adult works include *Lumara* (2022) and *Make Me a Liar* (2023). Additionally, Ms. Landers authored the middle grade novel, *Blastaway* (2019), and the international bestselling Half King Duology, adult fantasy romance, comprising *The Half King* (2024) and the forthcoming sequel *The Heretic Queen*. Under her pseudonym Macy Beckett, Ms. Landers has also authored the Sultry Springs series and the Dumont Bachelors series, adult contemporary romance, including *Sultry with a Twist* (2012), *A Shot of Sultry* (2013), *Surrender to Sultry* (2014), *Make You Blush* (2014), *Make You Mine* (2014), and *Make You Remember*

(2015), demonstrating her versatility across middle grade, young adult, and adult fiction and her dexterity with emotional arcs, relational depth, and character chemistry beyond the young adult market. Ms. Landers is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Landers, and for which Anthropic caused damages under the Copyright Act. Ms. Landers registered her nine (9) works *Alienated*; *Invaded (An Alienated Novel)*; *Starflight*; *Starfall: A Starflight Novel*; *A Shot of Sultry*; *Make You Mine*; *Make You Remember*; *Sultry with a Twist*, and *Surrender to Sultry* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $1,350,000 in statutory damages. See Exhibit A.

93. Plaintiff **Lorie Moeggenberg** is a resident of Ohio. Ms. Moeggenberg, sometimes writing under the pen name Lorie Langdon, is an American young adult novelist known for her imaginative storytelling, rich character voices, and compelling re-interpretations of classic tales, who writes across young adult fantasy, contemporary fiction, and reimagined classics, blending romance, adventure, and nuanced protagonists, and has achieved Amazon bestselling status while working with major publishers including Disney Publishing Worldwide and HarperCollins. She initially pursued a corporate career before rediscovering her passion for storytelling and turning to fiction writing full time, first gaining major attention as co-author of the bestselling Doon series — a young adult fantasy romance re-imagining of the classic musical Brigadoon, co-written and co-owned with Carey Corp — which became an international bestseller and expanded into multimedia including a choose-your-own-ending video game. Ms. Moeggenberg is also the author of *Gilt Hollow*, a young adult romantic thriller that received critical recognition and award nominations; *Olivia Twist*, a widely praised gender-swapped re-imagining of Charles Dickens's *Oliver Twist* that is in development for film adaptation; and the Disney Villains: Happily Never After series, commissioned by Disney Publishing Worldwide, which explores the origin stories of beloved villains with moral complexity and empathy. Her work has contributed to expanding young adult literature's reach into retellings, cross-genre experiments, and emotionally resonant storytelling, making her a recognized voice among both readers and industry professionals. Ms.

Moeggenberg is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Moeggenberg, and for which Anthropic caused damages under the Copyright Act. Ms. Moeggenberg registered her six (6) works *Gilt Hollow*; *Olivia Twist*; *Doon* (co-authored and co-owned with Plaintiff Carey Corp); *Destined for Doon* (co-authored and co-owned with Plaintiff Carey Corp and under Lorie Langdon); *Shades of Doon* (co-authored and co-owned with Plaintiff Carey Corp and under Lorie Langdon); and *Forever Doon* (co-authored and co-owned with Plaintiff Carey Corp and under Lorie Langdon) prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $900,000 in statutory damages. *See* Exhibit A.

94. Plaintiff **Carey Corp** is a resident of Kentucky. Ms. Corp is a *New York Times* and *USA Today* bestselling author known for her imaginative storytelling, love of reinvention, and ability to breathe new life into beloved classic stories and beloved fictional universes — a passion she has cultivated since writing her first book, a retelling of Star Wars, at age seven. She is best known as the co-author and co-owner, with Plaintiff **Lorie Langdon**, of the Doon series — a young adult fantasy romance re-imagining of the classic musical Brigadoon comprising *Doon*, *Destined for Doon*, *Shades of Doon*, and *Forever Doon* — which became an international bestseller and expanded into multimedia including a choose-your-own-ending video game. Ms. Corp has been featured at New York City ComicCon, Book Expo America, BookCon, the American Library Association national conference, and in *Entertainment Weekly*, and has participated as a panelist, lecturer, and guest speaker to educators, bloggers, readers, and students at numerous regional book festivals and schools around the world, including in China, on topics ranging from craft to personal character. She has also been commissioned by Disney Publishing Worldwide to contribute a story centered on the character of Wandering Oaken for a Frozen short story anthology published in 2023, further reflecting industry confidence in her ability to expand and honor beloved fictional universes. Ms. Corp is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Corp, and for which Anthropic caused damages under the Copyright Act. Ms. Corp

registered her four (4) works *Destined for Doon*; *Doon*; *Forever Doon*; and *Shades of Doon* (all co-authored and co-owned with Plaintiff **Lorie Moeggenberg**) prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $600,000 in statutory damages. *See* Exhibit A.

95. Plaintiff **Marie Myung-Ok Lee** is a resident of New York. Ms. Lee is an American author, novelist, and essayist, and a co-founder of the Asian American Writers' Workshop, an organization formed in 1991 to support AAPI writers. She grew up in Hibbing, Minnesota, a small mining town, the daughter of parents who fled North Korea to the South before eventually immigrating to the United States, and graduated with a Bachelor of Arts from Brown University in 1986. Writing under the name Marie G. Lee, she is the author of several acclaimed young adult novels, including *Finding My Voice* (1992) — widely recognized as the first teen novel released by a major publisher with a contemporary Asian American protagonist by an Asian American author, which won a Best Book for Reluctant Readers award from the American Library Association and the Young People's Literature Award from the Friends of American Writers — as well as *Necessary Roughness* (1996), *Saying Goodbye* (1994*), If It Hadn't Been for Yoon Jun* (1993), and *F is for Fabuloso* (1999); her later works include *Somebody's Daughter* (2005), based on her year as a Fulbright Scholar to South Korea, *and The Evening Hero* (2022, Simon & Schuster). Ms. Lee's essays and stories have appeared in *The Atlantic, The Kenyon Review*, *Newsweek*, *Slate*, *Guernica*, *The Guardian*, and *The New York Times*; she has received an O. Henry honorable mention, a MacColl Johnson literature fellowship, and fellowships from the Rhode Island State Council on the Arts, Yaddo, MacDowell Colony, and the New York Foundation for the Arts; and she has taught fiction writing at Yale University, Brown University, and Columbia University. Ms. Lee is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Lee, and for which Anthropic caused damages under the Copyright Act. Ms. Lee registered her two (2) works *Finding My Voice* and *Necessary Roughness* prior to Defendants' infringement with the United States Copyright Office under her pen name, **Marie G. Lee**, and she seeks statutory damages of up to $150,000 per work, for a total of up to $300,000 in

statutory damages. See Exhibit A.

96. Plaintiff **John Leland** is a resident of New York. Mr. Leland is an American journalist and author known for covering cultural and human-interest reporting, and is best recognized for his work as a reporter and feature writer at *The New York Times*, where he has covered aging, religion, immigration, popular culture, and urban life. Before joining *The New York Times*, he worked for alternative and mainstream publications including *Spin*, where he served as an editor and writer covering music and youth culture. Mr. Leland is the author of *Hip: The History*, which traces the evolution of what it means to be "hip" in American culture, examining its roots in African American culture and its transformation into the mainstream, and *Happiness Is a Choice You Make*, which grew out of a multi-year reporting project in which he followed several elderly residents in New York City. Mr. Leland is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Leland, and for which Anthropic caused damages under the Copyright Act. Mr. Leland registered his one (1) work *Happiness Is a Choice You Make: Lessons from a Year Among the Oldest Old* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

97. Plaintiff **Barron Lerner** is a resident of New York. Dr. Lerner is an American physician, medical historian, author, and educator whose work examines the ethical, cultural, and historical dimensions of modern medicine, and who is especially known for exploring how medical authority, patient autonomy, public health policy, and moral judgment intersect in clinical practice. He holds dual training as both a practicing physician and a historian, and serves as a professor of medicine and population health at the NYU Grossman School of Medicine, where he teaches medical students and clinicians about medical ethics, professionalism, and the historical context of healthcare. Dr. Lerner is the author of several influential books blending medical history with ethical analysis, including *The Breast Cancer Wars*; *When Illness Goes Public: Celebrity Patients and How We Look at Medicine*, which analyzes how public narratives shape trust in medicine and influence health policy; *The Good Doctor: A Father, a Son, and the*

*Evolution of Medical Ethics*, which examines the evolution of medical professionalism through a deeply personal lens; and *One for the Road: An Obituary for Addictive Behaviors*, which examines addiction as both a medical condition and a social phenomenon. His writing is widely used in medical education, bioethics programs, and public health curricula, and he is a frequent contributor to mainstream publications on healthcare policy, medical ethics, and physician responsibility, and is widely regarded as a leading voice in medical ethics and history for his ability to make complex ethical issues accessible without oversimplifying them. Dr. Lerner is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Dr. Lerner, and for which Anthropic caused damages under the Copyright Act. Dr. Lerner registered his three (3) works *The Breast Cancer Wars*; *When Illness Goes Public*; and *The Good Doctor* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $450,000 in statutory damages. *See* Exhibit A.

98. Plaintiff **Ariel MacArran** is a resident of South Carolina. Ms. MacArran is an American romance novelist best known for her emotionally driven, character-centered love stories that blend romantic suspense, heartfelt drama, and psychological depth, writing primarily within contemporary romance and romantic suspense under both her own name and the pen name Willow Danes. Her work centers on relationships shaped by trauma, redemption, trust, and personal transformation, and is marked by strong character interiority, slow-building tension, and realistic emotional consequences, positioning her novels within a more introspective and emotionally grounded strand of popular romance fiction that appeals to readers seeking psychological nuance and emotional credibility alongside romantic fulfillment. Ms. MacArran has published multiple novels circulating widely in digital and print romance markets, including *Another Man's Bride* and *Stardancer* under her own name, and *Captured* and *Taken* under her pen name Willow Danes, all reflecting her consistent thematic focus on emotional healing, vulnerability, and the portrayal of love as something earned through personal reckoning and growth rather than assumed. Her career reflects the evolution of modern romance authorship, demonstrating how contemporary romance writers build sustainable audiences through digital

publishing, reader trust, and thematic consistency. Ms. MacArran is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. MacArran, and for which Anthropic caused damages under the Copyright Act. Ms. MacArran registered her four (4) works *Another Man's Bride*; *Stardancer*; *Captured* (written under the pen name Willow Danes); and *Taken* (written under the pen name Willow Danes) prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $600,000 in statutory damages. *See* Exhibit A.

99. Plaintiff **Maggie Macnab** is a resident of New Mexico. Ms. Macnab is an American designer, author, educator, and speaker whose career focuses on logo design, visual identity systems, and the role of symbolism in communication, and who is best known for her books on design principles and sacred geometry, which explore how universal patterns and archetypal forms influence effective branding and visual messaging. She built her professional foundation as a graphic designer specializing in logo design and brand identity systems, developing visual identities for clients across industries with an emphasis on symbolic clarity, geometric structure, cultural resonance, and strategic branding, before gaining wider recognition as an author and thought leader whose work bridges professional graphic design practice with research into cultural symbolism, anthropology, and geometry. She has been adjunct faculty for nearly 30 years at various universities and colleges including University of New Mexico, Santa Fe University of Art and Design, Santa Fe Community College and Institute of American Indian Arts. She is also recipient of multiple regional, national and international design awards and has been published in multiple design book anthologies. Ms. Macnab is the author of *Decoding Design: Understanding and Using Symbols in Visual Communication*, a study of how universal symbols and geometric principles shape effective logo design, and *Design by Nature: Using Universal Forms and Principles in Design*, an exploration of how patterns found in nature, mathematics, and science — including fractals, growth patterns, and geometric ratios — inform strong visual communication, both of which combine design case studies with research into archetypes, mythology, and geometry and are widely used by branding professionals and design

students. She has taught workshops and lectured internationally on logo design, branding systems, and the application of sacred geometry in visual communication, presenting at design conferences and educational institutions and contributing to professional discourse on identity design, and has helped popularize the discussion of sacred geometry and natural pattern systems within mainstream graphic design education. Ms. Macnab is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Macnab, and for which Anthropic caused damages under the Copyright Act. Ms. Macnab registered her two (2) works *Decoding Design: Understanding and Using Symbols in Visual Communication* and *Design by Nature: Using Universal Forms and Principles in Design* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $300,000 in statutory damages. *See* Exhibit A.

100. Plaintiff **Debra Berndt Maldonado** is a resident of Virginia. Ms. Maldonado is an American author, Certified Master Jungian Life Coach Instructor, clinical hypnotherapist, and personal-growth entrepreneur who co-founded and serves as CEO of CreativeMind, a life-coaching company she operates with her husband, Dr. Robert Maldonado, through which they developed the CreativeMind Method — a coaching and self-development framework rooted in Jungian psychology, Eastern spirituality, and social neuroscience. She left her corporate career in 2003 to fully commit to personal development work, and has since built a practice centered on helping individuals explore their inner selves through shadow work and Jungian archetypes, heal past conditioning, and transform their lives in love, career, and self-esteem. Ms. Maldonado is the author of *Let Love In: Open Your Heart and Mind to Attract Your Ideal Partner* (Wiley, 2010), which explores how people can change patterns in relationships, heal past wounds, and open up to healthy, conscious love grounded in emotional and spiritual maturity, and *Like a Spark From Fire: Break Free From the Past, Shine Your Brilliance and Become Your True Self* (CreativeMind Media, 2022), as well as co-host of the Soul Sessions podcast on CreativeMind, where she and her husband discuss psychology, spirituality, relationships, and conscious growth. As a training instructor, Ms. Maldonado has certified numerous Jungian life coaches in her

CreativeMind Method worldwide, amplifying her influence beyond her books and into the broader field of personal development. Ms. Maldonado is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Maldonado, and for which Anthropic caused damages under the Copyright Act. Ms. Maldonado registered her one (1) work *Let Love In: Open Your Heart and Mind to Attract Your Ideal Partner* (published under the name Debra Berndt) prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

101. Plaintiff **Erin Siegal McIntyre** is a resident of North Carolina. Ms. McIntyre is an American investigative journalist, photographer, and academic whose work has exposed corruption, fraud, and human rights abuses across Latin America and along the United States-Mexico border, and whose reporting has appeared in *The New Yorker*, *The Atlantic*, *The New York Times*, *Rolling Stone*, and *Latino USA*, among other outlets. She holds a Master's degree in Journalism from Columbia University's Graduate School of Journalism, where she was a Fellow at the Toni Stabile Center for Investigative Journalism, and a Bachelor of Fine Arts in Photography from Parsons School of Design; she has also served as a staff photographer at the United Nations, covering the 2006 and 2009 General Assemblies, and was a Senior Fellow at the Schuster Institute for Investigative Journalism from 2009 through 2019. Ms. McIntyre is the author of *Finding Fernanda* (Beacon Press, 2012), an investigative work exposing fraudulent, criminal, and corrupt practices in international adoption between Guatemala and the United States, which was honored by the Overseas Press Club of America with a Robert Spiers Benjamin Award citation for best reporting on Latin America, an SPJ James Madison Award, a Gold IPPY Award, and an International Latino Book Award, and served as the basis for an hour-long CBS special investigation that won a 2015 News Emmy. Her work has been supported by grants and awards from the Soros Foundation, the Fund for Investigative Journalism, the International Women's Media Fund, and Investigative Reporters and Editors, and she has worked in broadcast as a staff investigative reporter and producer for Univision's Documentary unit and as a border reporter for the Fronteras Desk, a public radio collaboration of NPR affiliates along the southwest

border; she joined the journalism faculty at the University of North Carolina in 2020 as an Assistant Professor in Journalism and Media. Ms. McIntyre is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. McIntyre, and for which Anthropic caused damages under the Copyright Act. Ms. McIntyre, under the name Erin Segal registered her one (1) work *Finding Fernanda* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

102. Plaintiff **Karen McQuestion** is a resident of Wisconsin. Ms. McQuestion is an American fiction author born in Milwaukee, Wisconsin, whose novels have sold millions of copies worldwide and been translated into multiple languages, and who is best known as an Amazon Charts bestselling novelist with a prolific output of emotionally rich, character-driven stories blending humor, heart, and elements of the whimsical across adult, young adult, and children's fiction. Before becoming a full-time novelist she pursued traditional publishing, before embracing self-publishing on Amazon's Kindle Direct Publishing platform in 2009 and finding immediate reader support; her breakthrough novel *A Scattered Life* was re-released through AmazonEncore, Amazon's first publishing imprint, and became the first self-published Kindle book ever optioned for a movie deal, establishing her as a pioneer of successful independent authorship in the digital age. Ms. McQuestion has since written more than twenty novels, including *Hello Love*, *Dovetail*, *Easily Amused*, *Good Man, Dalton*, *The Long Way Home*, *Life on Hold*, *The Moonlight Child*, *Half a Heart*, and the Edgewood series for teen readers, among others, and her publishing journey has been featured in *The Wall Street Journal*, *Entertainment Weekly*, and NPR, with television appearances on ABC's World News Now and America This Morning; she also co-hosted the podcast Behind the Book with *USA Today* bestselling author Tess Thompson, discussing writing craft and the publishing industry. Ms. McQuestion is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. McQuestion, and for which Anthropic caused damages under the Copyright Act. Ms. McQuestion registered her six (6) works *Easily*

*Amused*; *The Long Way Home*; *Life on Hold*; *Dovetail*; *Hello Love*; and *Good Man, Dalton* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $900,000 in statutory damages. *See* Exhibit A.

103. Plaintiff **Karen McQuestion** also is the author and copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from **McQuestion**, and for which Anthropic caused damages under the Copyright Act and which titles did not appear on the *Bartz v. Anthropic* works list. **McQuestion** registered her nine (9) titles *A Scattered Life; Half a Heart; The Moonlight Child; Wanderlust: Book Two - Edgewood Series; Absolution: Book Three - Edgewood Series; Favorite; Grimm House*, *Wish Upon a Christmas Star* and *Write that Novel! (You know you want to...)* and she seeks statutory damages of up to $150,000 per work, for a total of up to $1,350,000 in statutory damages for these works. See Exhibit A.

104. Plaintiff **Glen Merzer** is a resident of Indiana. Mr. Merzer is an American author, playwright, screenwriter, and media personality who has authored or co-authored fifteen books advocating a vegan diet, and who earlier in his career wrote for network television in the 1980s and 1990s. He is the host of The Glen Merzer Show, a YouTube channel and podcast, and recently directed his first film, Buddhist Blues. Mr. Merzer's published works include *Mad Cowboy* (co-authored with Howard Lyman), which grew out of Lyman's transformation from a fourth-generation cattle rancher to a vegan and animal rights activist who gained national attention following his appearance on The Oprah Winfrey Show regarding the dangers of *Mad Cow disease*; *No More Bull!* (co-authored with Howard Lyman); *Food over Medicine* (co-authored with Plaintiff Pamela Popper; *Better Than Vegan (*co-authored with Del Sroufe); *The Happy Cow Cookbook*; and most recently *Moving Medicine Forward*, co-authored with Dr. Michael Klaper, collectively representing a sustained body of work advocating plant-based nutrition and dietary reform. Mr. Merzer is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Merzer, and for which Anthropic caused damages under the Copyright Act. Mr. Merzer

registered his four (4) works *Better Than Vegan*; *Food over Medicine* (co-authored with Plaintiff Pamela Popper); *Mad Cowboy*; and *No More Bull!* (each of *Mad Cowboy* and *No More Bull!* was co-authored with Howard Lyman, who has assigned his copyright interests therein to Mr. Merzer) prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $600,000 in statutory damages. See Exhibit A.

105. Plaintiff **Merzer** also is the author and copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from **Merzer**, and for which Anthropic caused damages under the Copyright Act and which titles did not appear on the *Bartz v. Anthropic* settlement works list. **Merzer** registered his three (3) titles *Off the Reservation; Own Your Health* and *Food Is Climate* and he seeks statutory damages of up to $150,000 per work, for a total of up to $450,000 in statutory damages for these works. See Exhibit A.

106. Plaintiff **Pamela Popper** is a resident of Ohio. Dr. Popper is an American health and wellness expert, author, and speaker widely recognized for her work in preventive medicine, lifestyle medicine, and holistic approaches to chronic disease management, who combines medical training with research-based strategies to help individuals, organizations, and communities optimize health through nutrition, exercise, stress management, and behavioral change. She is the founder and CEO of the Wellness Forum, a nonprofit organization dedicated to health education, corporate wellness, and community initiatives promoting preventive health, through which she has led programs integrating evidence-based lifestyle modifications with behavioral change strategies for corporate, community, and public health audiences. Dr. Popper is the author of books and publications focused on health optimization, preventive medicine, and wellness program development that combine scientific research with practical guidance for clinicians and the general public, and she is a sought-after speaker who has delivered presentations to healthcare professionals, corporate audiences, and wellness conferences nationally on topics including nutrition, exercise, and organizational wellness. Her work has contributed to shifting focus from reactive medical care to proactive, lifestyle-based prevention,

and she is a recognized authority in the growing field of lifestyle medicine, helping to establish it as a critical component of modern healthcare while translating complex medical research into understandable, actionable guidance for individuals and organizations. Dr. Popper is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Dr. Popper, and for which Anthropic caused damages under the Copyright Act. Dr. Popper registered her work *Food over Medicine* (co-authored and co-owned with Plaintiff **Glen Merzer**) prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

107. Plaintiff **Lindsay S. Nixon** is a resident of Washington. Ms. Nixon is an American cookbook author, food blogger, and speaker best known for her work promoting low-fat, whole-food, plant-based cooking, and has played a notable role in the mainstream popularization of plant-based eating in the United States by making vegan diets accessible, affordable, and practical for everyday home cooks. She first gained attention through her food blog Happy Herbivore, which built a large following by offering budget-conscious meal ideas, oil-free cooking techniques, nutritionally mindful recipes, and meal planning strategies, distinguishing her from more gourmet or specialty-focused vegan chefs through her emphasis on simplicity and pantry staples. Ms. Nixon transitioned from blogging to traditional publishing with a series of bestselling cookbooks that collectively helped establish her as a recognizable voice in plant-based lifestyle media and reflect her consistent focus on whole-food, oil-free cooking built around unprocessed ingredients, legumes, whole grains, fruits, and vegetables. Beyond writing, Ms. Nixon has conducted cooking demonstrations, workshops, and lectures on plant-based nutrition, addressing topics including transitioning to a vegan diet, weight management through diet, and budget-friendly grocery planning, with her work consistently aligning with the broader whole-food, plant-based preventive health movement. Ms. Nixon is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Nixon, and for which Anthropic caused damages under the Copyright Act. Ms. Nixon registered her six (6) works *Everyday Happy Herbivore*; *The Happy Herbivore Cookbook*; *Happy*

*Herbivore Abroad*; *Happy Herbivore Light and Lean*; *Happy Herbivore Holidays and Gatherings*; and *The Happy Herbivore Guide to Plant-Based Living* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $900,000 in statutory damages. *See* Exhibit A.

108. Plaintiff **Hannah Nordhaus** is a resident of Colorado. Ms. Nordhaus is an American journalist and nonfiction author known for narrative nonfiction that blends science, history, culture, and personal voice, and who holds degrees in American Studies and history from Yale University and the University of Colorado. She has served as a National Geographic Storytelling Fellow and Explorer and is a Journalist in Residence at the University of Colorado Boulder, where she serves as an ambassador to students and researchers, speaking to classes, seminars, and journalism panels. Her writing has appeared in *National Geographic*, *Scientific American*, *Smithsonian*, *Wired*, *The Wall Street Journal*, the *Financial Times*, and *Outside*, among other major publications. Ms. Nordhaus is the author of *The Beekeeper's Lament: How One Man and Half a Billion Honey Bees Help Feed America* (HarperCollins, 2011), a national bestseller that profiles a migratory beekeeper to explore the challenges facing bees, agriculture, and rural communities, which was a finalist for the PEN Center USA Book Awards and Colorado Book Awards and won the National Federation of Press Women Book Award, and *American Ghost: A Family's Haunted Past in the Desert Southwest* (HarperCollins, 2015), a critically acclaimed investigation into the life and legend of her great-great-grandmother — a German immigrant whose life became entwined with frontier history and ghost lore in New Mexico — which won the WILLA Literary Award and the Seven Sisters Book Award and was named one of the Best Books of 2015 by *Entertainment Weekly* and *The Denver Post*. Both books have appeared on national bestseller lists, establishing Ms. Nordhaus as a prominent voice in narrative nonfiction whose work illuminates complex ecological and cultural issues through rigorous reporting and deeply human storytelling. Ms. Nordhaus is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Nordhaus, and for which Anthropic caused damages under the Copyright Act. Ms. Nordhaus registered her two (2) works *American Ghost* and *The Beekeeper's Lament*

prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $300,000 in statutory damages. *See* Exhibit A.

109. Plaintiff **Kate O'Hearn** is a resident of the United Kingdom. Ms. O'Hearn is a Canadian-born, internationally bestselling author of children's and middle-grade fantasy novels widely known for her mythologically-infused adventure series, who was born in Toronto, Ontario, raised primarily in New York City, and whose family's frequent moves across the United States and Europe exposed her to a variety of cultures and landscapes she later drew upon in her storytelling. Before turning to full-time writing she worked in the fashion industry and later in film production, and her first published novel, *Shadow of the Dragon: Kira* (2008), launched what became a prolific career spanning the Pegasus series (beginning 2011), the Valkyrie trilogy, the Titans series, and the Atlantis series, with multiple titles published across U.S., U.K., and international markets. Ms. O'Hearn's work consistently blends ancient mythology — Greek, Norse, and Atlantis lore — with contemporary settings and young protagonists, frequently female, who navigate extraordinary world-changing events while remaining grounded in friendship, loyalty, and family bonds, helping young readers engage with classical legends in accessible and emotionally resonant ways. She resides in England, where she continues to write and maintain a global readership, and her prolific output across richly detailed fantasy worlds has made her a significant contributor to the children's and middle-grade fantasy publishing landscape. Her play, Gail Force Nine, recently won a UK national award from NODA. Ms. O'Hearn is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. O'Hearn, and for which Anthropic caused damages under the Copyright Act. Ms. O'Hearn registered her six (6) works *Pegasus and the Flame*; *Pegasus and the New Olympians*; *Pegasus and the Origins of Olympus*; *Valkyrie*; *The Runaway*; and *Olympus at War* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $900,000 in statutory damages. *See* Exhibit A.

110. Plaintiff **Randal Pinkett** is a resident of New Jersey. Dr. Pinkett is an American

entrepreneur, innovator, speaker, author, and media personality who is the co-founder, chairman, and CEO of BCT Partners, a global, multimillion-dollar research, training, consulting, technology, artificial intelligence, and data analytics firm whose mission is to transform lives and create lasting change, and which has been recognized by Forbes as one of America's Best Management Consulting Firms, by Ernst & Young as EY Entrepreneur of the Year, by Global 100 as Management Consulting Business of the Year, and by both the Black Enterprise BE100s list of the nation's largest Black-owned businesses and the Inc. 5000 list of the fastest-growing private companies in America. Dr. Pinkett holds five degrees in electrical engineering, computer science, and business administration from Rutgers University, Oxford University, and MIT, where he earned his Ph.D.; he was the first and only African American to receive the prestigious Rhodes Scholarship at Rutgers, was inducted into the Academic All-America Hall of Fame as a former Rutgers track and field athlete, and was the winner of NBC's hit reality television show *The Apprentice*. He is a regular contributor on MSNBC, CNN, and Fox Business News, an international public speaker, and the author of several books including *Data-Driven DEI*, *Black Faces in High Places*, *Black Faces in White Places*, *Campus CEO*, and *No-Money Down CEO*, works that collectively reflect his leadership at the intersection of business, technology, and social justice. Dr. Pinkett is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Dr. Pinkett, and for which Anthropic caused damages under the Copyright Act. Dr. Pinkett registered his three (3) works *Campus CEO: The Student Entrepreneur's Guide to Launching a Multimillion-Dollar Business*; *Black Faces in White Places*, and *Black Faces In White Places: 10 Game-Changing Strategies To Achieve Success And Find Greatness* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $450,000 in statutory damages. *See* Exhibit A.

111. Plaintiff **Matteo Pistono** is a resident of California. Mr. Pistono is an American author, teacher, and scholar of Buddhism whose work bridges spiritual practice, cultural history, and social engagement. His writing includes memoir, biography, investigative reportage, and practical guides exploring the human mind, Tibetan culture, and the intersection of spirituality

and human rights. Mr. Pistono earned a Bachelor of Arts degree in Anthropology from the University of Wyoming and a Master of Arts degree in Indian Philosophy from the School of Oriental and African Studies, University of London, in 1997. Early in his career, he worked with the Smithsonian Institution on Tibetan cultural programs. Mr. Pistono is the author of In the *Shadow of the Buddha: Secret Journeys, Sacred Histories, and Spiritual Discovery in Tibet* (2011), a work combining spiritual biography, undercover reporting, and Himalayan travel writing based on more than a decade of firsthand travel and fieldwork in Tibet and the Himalayas. During that period, Mr. Pistono operated as one of a small number of independent Western human rights documentarians working inside the People's Republic of China and Tibetan regions under Chinese control. The book draws upon his unique firsthand experiences, relationships, and access to Tibetan teachers, pilgrims, monasteries, and communities that were inaccessible to most foreign writers and journalists at the time. Mr. Pistono is also the author of *Fearless in Tibet: The Life of the Mystic Tertön Sogyal* (2014), a biographical and historical study of the nineteenth-century Tibetan Buddhist master Tertön Sogyal, whose teachings influenced the Thirteenth Dalai Lama and modern Tibetan Buddhism. The book reflects years of specialized research, translation work, pilgrimage, oral history collection, and study within Tibetan Buddhist lineages. Mr. Pistono is widely recognized for his expertise regarding the life, teachings, and historical significance of Tertön Sogyal. The perspectives, research, access, field experience, and personal relationships underlying *In the Shadow of the Buddha* and *Fearless in Tibet* are uniquely tied to Mr. Pistono's lived experience, scholarship, and decades of work within Tibetan Buddhist communities. These works could not have been created without Mr. Pistono's distinctive combination of firsthand reporting, academic training, spiritual practice, historical research, and personal access to Tibetan teachers and communities. Mr. Pistono is also the author of *Meditation: Coming to Know Your Mind* (2017), *Roar: Sulak Sivaraksa and the Path of Socially Engaged Buddhism* (2019), and *Breathe How You Want to Feel* (2024). His articles, essays, and photography have appeared in *The Washington Post*, the BBC, *Men's Journal*, *Tricycle*, and other publications. Mr. Pistono is the founder of Nekorpa, a foundation dedicated to protecting sacred pilgrimage sites worldwide, and serves on the Executive Council of the International Network of Engaged Buddhists,

reflecting his longstanding commitment to cultural preservation, contemplative practice, and compassionate social engagement. Mr. Pistono is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Pistono, and for which Anthropic caused damages under the Copyright Act. Mr. Pistono registered his two (2) works *Fearless in Tibet* and *In the Shadow of the Buddha* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $300,000 in statutory damages. See Exhibit A.

112. Plaintiff **Bruce Ratner, as Executor of the Estate of Michael Ratner**, is a resident of New York. Michael Ratner (1943–2016) was an American civil rights attorney, constitutional lawyer, legal scholar, and author who became one of the most prominent legal advocates for human rights and government accountability in the United States over the course of his career. He served as President Emeritus of the Center for Constitutional Rights, a nonprofit legal organization dedicated to advancing and protecting constitutional and human rights, where he led litigation efforts involving civil liberties violations, government surveillance, U.S. foreign policy accountability, and detainee rights, and played a central role in landmark legal challenges to U.S. detention practices following the September 11 attacks, representing detainees held at Guantánamo Bay and helping initiate Supreme Court rulings recognizing detainees' rights to habeas corpus and access to U.S. courts. Mr. Ratner also provided legal counsel to high-profile international figures including Julian Assange and was an outspoken critic of policies he believed violated international law. He authored and co-authored several books combining legal analysis with accessible explanations of constitutional rights and international law, including *Guantanamo: What the World Should Know*, *Hell No: Your Right to Dissent in 21st-Century America*, and *Moving the Bar: My Life as a Radical Lawyer*, and lectured widely on constitutional law, human rights, and civil liberties while appearing frequently in media interviews and public forums discussing executive power, surveillance, and international accountability. The Estate of Michael Ratner is the copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization, and for which

Anthropic caused damages under the Copyright Act. Michael Ratner registered his one (1) work *Guantanamo: What the World Should Know* prior to Defendants' infringement with the United States Copyright Office, and seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

113. Plaintiff **Andrew Revkin** is a resident of Maine. Mr. Revkin is an American environmental journalist, author, educator, and communicator who has spent more than forty years reporting on climate change, sustainability, global environmental risk, and science communication, and whose career has shaped how environmental storytelling and problem-solving are understood in the public sphere. He earned a B.S. in Biology from Brown University and a Master's in Journalism from Columbia University, and held editorial and writing positions at *Discover* magazine, *Science Digest*, and the *Los Angeles Times* before joining *The New York Times* in 1995, where he covered environmental issues ranging from the Amazon rainforest and Hurricane Katrina to climate science and politics, created the influential Dot Earth blog in 2007 — recognized as one of *Time* magazine's top blogs — and was the first Times reporter to file stories, photos, and videos from sea ice near the North Pole. Mr. Revkin subsequently served as senior reporter for climate change at ProPublica, as a strategic adviser for environmental and science journalism at the National Geographic Society, and as founding director of the Initiative on Communication and Sustainability at Columbia University's Earth Institute, and has been the recipient of a Guggenheim Fellowship, the John Chancellor Award for sustained journalistic excellence, and National Academies communication awards, among other honors. He is the author of several acclaimed books combining science, history, and narrative reporting, including *The Burning Season: The Murder of Chico Mendes and the Fight for the Amazon Rain Forest*, which inspired an HBO film and won the Robert F. Kennedy Book Award and the Sidney Hillman Foundation Book Prize; *Global Warming: Understanding the Forecast*; *The North Pole Was Here: Puzzles and Perils at the Top of the World*; *Weather: An Illustrated History, from Cloud Atlases to Climate Change*; and *The Human Planet: Earth at the Dawn of the Anthropocene*. Mr. Revkin is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Revkin,

and for which Anthropic caused damages under the Copyright Act. Mr. Revkin registered his one (1) work *The Burning Season* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

114. Plaintiff **Christopher Ricci**, writing professionally as Christopher Greyson, is a resident of Tennessee. Mr. Ricci (aka Christopher Greyson) is a *New York Times, USA Today, Wall Street Journal,* multi-award-winning, international bestselling author of mystery, action, and thriller novels. Recognized as one of the top 100 Kindle authors of all time, his acclaimed novels have sold over 5 million hardcover, eBooks, print, and audiobooks and have grossed over 53 million dollars in sales. An accomplished speaker, actor, and prolific storyteller, he has written more than 30 novels, ranging from pulse-pounding thrillers to cozy mysteries and has over ten separate book series. Mr. Ricci graduated from Bridgewater State University with a dual major in Computer Science and Communications. He worked in the field of computers for twenty-five years for a wide range of companies including the US EPA and a subsidiary of Microsoft. Mr. Ricci (Greyson) is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Ricci (Greyson), and for which Anthropic caused damages under the Copyright Act. Mr. Ricci (Greyson) registered his nine (9) works: *Jack Knifed*; *Data Jack*; *Pure of Heart*; *Jack Frost*; *Girl Jacked*; *Jack and the Giant Killer*; *And Then She Was Gone*; *Jack of Hearts*; and *Jacks Are Wild* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $1,350,000 in statutory damages. *See* Exhibit A.

115. Plaintiff **Christopher Ricci** also is the author and copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from Ricci, and for which Anthropic caused damages under the Copyright Act. These titles did not appear on the *Bartz v. Anthropic* settlement works list. **Ricci** registered his 18 titles: *Data Jacked*; *The Girl Who Lived*; *The Case of the Wayward Ride*; *The Case of the Attic Door*; *The Case of the Dropped Groceries*; *The Case of the Phantom Pet*; *The Case of Disappearing Diamond*; *The Case of Raining Nails*; *The Case of the Slippery Dog*; *The*

*Case of Lightning Strikes Twice*; *The Case of the Missing Gift*; *Jack of Diamonds*; *One Little Lie*; *Captain Jack*; *Kindle the Fires of War*; *Dance of Death*; *A Beautiful Place to Die*; and *The Case of the Mouse in My Soup* prior to Defendants' infringement with the US Copyright Office. He seeks statutory damages of up to $150,000 per work, for a total of up to $2,700,000 in statutory damages for these works. See Exhibit A.

116. Plaintiff **Sarah Elizabeth Richards** is a resident of California. Ms. Richards is an award-winning American journalist, writer, and nonfiction author known for her reporting on health, science, psychology, and social issues, who has written for more than two dozen major newspapers, magazines, and online outlets including *The New York Times*, *The Washington Post*, *The Wall Street Journal*, *The Atlantic*, *Time*, *Elle*, *Marie Claire*, *Slate*, *Salon*, and *Smithsonian Magazine*. She completed her undergraduate studies at the University of California, Berkeley, and holds master's degrees from both the Columbia University Graduate School of Journalism and the School of International and Public Affairs at Columbia University. Ms. Richards is the author of *Motherhood, Rescheduled: The New Frontier of Egg Freezing and the Women Who Tried It* (Simon & Schuster, 2015), a narrative nonfiction work chronicling the lives of several women — including herself — who pursue egg freezing to extend their reproductive options, combining personal narrative with broader social context and scientific research to explore how reproductive technologies intersect with gender norms, career aspirations, dating culture, and family formation. She has been recognized with multiple awards including three Newswomen's Club of New York Front Page Awards, most recently for a science feature on controversial infertility treatments, reflecting her excellence in reporting on nuanced health topics and her ability to translate complex scientific and medical issues into clear, compassionate, and engaging narrative journalism. Ms. Richards is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Richards, and for which Anthropic caused damages under the Copyright Act. Ms. Richards registered her one (1) work *Motherhood, Rescheduled* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

117. Plaintiff **Julian Rubinstein** is a resident of Colorado. Mr. Rubinstein is an American journalist, nonfiction author, documentary filmmaker, and educator born in the Bronx, New York, whose longform reporting blends deep investigation with narrative storytelling and whose work examines crime, culture, race, and community dynamics in America and beyond. He began his career as an agate clerk on the *Washington Post* sports desk before writing for *Sports Illustrated* and later becoming a freelance journalist whose longform pieces have appeared in *The New Yorker*, *The New York Times Magazine*, *Rolling Stone*, and other major publications, with reporting featured in anthologies including *Best American Essays*, *Best American Crime Writing*, *Best American Science and Nature Writing*, and *Best American Sports Writing*. Mr. Rubinstein is the author of *Ballad of the Whiskey Robber* (2004), the true story of Hungarian bank robber and folk figure Attila Ambrus, which won Borders' Original Voices Non-fiction Book of the Year, was a *New York Times* Editors' Choice, and was a finalist for the 2005 Edgar Allan Poe Award for Best Fact Crime, a finalist for the 2005 Anthony Award for Best Nonfiction Crime, and a finalist for the 2007 Audie Award for Best Audio Book, serving as narrator, director and producer; and *The Holly: Five Bullets, One Gun and the Struggle to Save an American Neighborhood* (2021), a deep examination of a 2013 shooting in Denver's Holly neighborhood that serves as a powerful lens on race, policing, activism, and urban development, and which was named a *New York Times* Editors' Choice and won the Colorado Book Award for General Nonfiction and the High Plains Book Award for Creative Nonfiction. While reporting *The Holly*, Mr. Rubinstein began filming the unfolding story, which became the feature documentary he wrote, directed and produced, *The Holly* — executive produced by Academy Award-winner Adam McKay — premiering in 2022 and winning the 2024 Heartland Emmy for Best Documentary, the 2025 national Emmy for Outstanding Regional Documentary, the 2023 Investigative Reporters & Editors Award for Best Documentary and the 2024 University Film and Video Association award for Outstanding Merit in Documentary. He has taught longform and documentary journalism at Columbia University's Graduate School of Journalism, Colorado College, and the University of Denver, and currently serves as Filmmaker and Journalist-in-Residence at Western Colorado University. Mr. Rubinstein is the author and copyright owner of

original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Rubinstein, and for which Anthropic caused damages under the Copyright Act. Mr. Rubinstein registered his two (2) works *Ballad of the Whiskey Robber* and *The Holly* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $300,000 in statutory damages. *See* Exhibit A.

118. Plaintiff **Danny Rust** is a resident of North Dakota. Mr. Rust is an American author, keynote speaker, podcast host, and corporate leadership development executive whose work focuses on leadership, workplace dynamics, employee engagement, and the unwritten rules that shape careers and organizations. He brings more than 30 years of corporate leadership experience to his guidance. He currently serves as Vice President of Global Leadership Development at Infopro Learning, a corporate training firm serving Fortune 500 organizations, and his prior senior leadership roles include learning and support services leadership at Bright Horizons Family Solutions and commercial learning initiatives at GE. Mr. Rust is the author of *Workplace Poker: Are You Playing the Game, or Just Getting Played?* (HarperBusiness, 2016), a practical guide for professionals seeking to navigate the unspoken cultural and political dynamics of corporate life and accelerate their careers, which pairs narrative examples with practical exercises on topics including recognizing career blind spots, authentic self-promotion, building personal influence, learning from setbacks, and navigating organizational politics with strategy and integrity. His forthcoming second book, *The Unbearable Lightness of Leading: Reaching Employees Who Are Restless, Resistant, and Rewired* (Matt Holt/Simon & Schuster, Fall 2026), examines how leaders can connect with today's restless and rapidly changing workforce. Mr. Rust hosts two podcasts, "Leadership, Disrupted" and "Jobsmacked," and has been recognized as a LinkedIn Top Voice for leadership. He has delivered keynote speeches and workshops on leadership, employee engagement, productivity, and career strategy for audiences across sectors, helping individuals, teams, and executives adapt to evolving workplace realities including hybrid work, generational differences, and rapid technological change. Mr. Rust is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and

exploited without authorization from Mr. Rust, and for which Anthropic caused damages under the Copyright Act. Mr. Rust registered his one (1) work Workplace Poker prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. See Exhibit A.

119. Plaintiff **Allen Salkin** is a resident of California. Mr. Salkin is an American journalist, author, media critic, and cultural observer known for his deep reporting on food media, pop culture, politics, and modern American society, whose work spans books, major newspaper and magazine articles, podcasts, documentary appearances, and both print and broadcast media. He earned a Bachelor’s degree from the University of California, Berkeley and a Master’s in Journalism from New York University, and spent several years as a staff reporter at *The New York Times*, writing hundreds of features on food, culture, media, and society, while also contributing to *New York*, *The Village Voice*, *Details*, *Vanity Fair*, *Food & Wine*, and other national outlets; his early journalism included investigative reporting for the *New York Post* covering politics, corruption, and high-profile cultural figures. Mr. Salkin is the author of *Festivus: The Holiday for the Rest of Us* (2005), a cultural exploration of the parody holiday popularized by *Seinfeld*; *From Scratch: The Uncensored History of the Food Network* (2013), an in-depth history of how the Food Network became a cultural powerhouse based on extensive insider interviews; and *The Method to the Madness: Donald Trump's Ascent as Told by Those Who Were Hired, Fired, Inspired -- and Inaugurated.* (2019, co-authored with Aaron Short), an oral history capturing multiple perspectives on Trump’s rise. His reporting on the Sarma Melngailis “Bad Vegan” case became central to the Netflix documentary series *Bad Vegan: Fame. Fraud. Fugitives.* (2022), in which he appears extensively, and he has also appeared in documentary features including *Eat: The Story of Food* and hosted the podcast New Books in Food, reflecting his versatility across platforms in translating cultural phenomena into engaging, well-reported narratives. Mr. Salkin is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Salkin, and for which Anthropic caused damages under the Copyright Act. Mr. Salkin registered his two (2) works *From Scratch: The Uncensored History of the Food Network* and *The Method*

*to the Madness* (note full title above) prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $300,000 in statutory damages. *See* Exhibit A.

120. Plaintiff **Danielle Santiago-Cofield** is a resident of North Carolina. Mrs. Santiago is an American novelist known for writing urban fiction. Her books are focused on the Afro American Community which also includes the Afro Latino community and are predominantly Based around Afro Americans. Her work aligns with authors who foreground the lived experiences of people navigating poverty, crime economies, loyalty networks, and survival-driven ambition, and her career has focused on crafting gritty, character-driven narratives that blend crime fiction with social realism, contributing authenticity and insider perspective to the genre. Mrs. Santiago is the author of *The Conglomerate*, a novel centering on characters involved in organized street-level enterprises that explores the rise and fall of a powerful urban network, examining how ambition, loyalty, love, and betrayal intersect within high-risk underground economies, and which is marked by realistic depictions of street hierarchies, multi-character perspectives, and strong female figures navigating male-dominated environments. Her work has expanded urban fiction's scope by focusing on these communities and bicultural identity within the socioeconomic struggles the genre portrays, integrating women as central decision-makers rather than peripheral characters and preserving the linguistic rhythms, cultural references, and community-specific dynamics that enrich contemporary urban literature. Mrs. Santiago is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mrs. Santiago, and for which Anthropic caused damages under the Copyright Act. Mrs. Santiago registered her one (1) work *The Conglomerate* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

121. Plaintiff **Danielle Santiago-Cofield** also is the author and copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from Santiago-Cofield, and for which Anthropic

caused damages under the Copyright Act. These titles did not appear on the *Bartz v. Anthropic* Works List. **Santiago-Cofield** registered her three (3) titles: *Allure of the Game*, *Little Ghetto Girl* and *Grindin'* prior to Defendants' infringement with the US Copyright Office. She seeks statutory damages of up to $150,000 per work, for a total of up to $450,000 in statutory damages for these works. See Exhibit A.

122. Plaintiff **DeForest B. Soaries, Jr.** is a resident of Florida. Dr. Soaries is an American pastor, civil rights activist, public servant, entrepreneur, and author whose career has spanned pastoral ministry, government service, faith-based community development, and financial literacy advocacy. He served as Senior Pastor of First Baptist Church of Lincoln Gardens in Somerset, New Jersey from 1990 to 2021, founded the Central Jersey Community Development Corporation in 1992 to revitalize distressed neighborhoods, and founded the Harvest of Hope Family Services Network in 1996 to develop permanent solutions for children in the foster care system. Dr. Soaries began his career as a civil rights activist working with Reverend Jesse Jackson, Sr. as National Coordinator of Operation PUSH, served as New Jersey's Secretary of State from 1999 to 2002 — the first African American male to hold that position — and served as chairman of the United States Election Assistance Commission, established by Congress to implement the Help America Vote Act of 2002. In 2005, Dr. Soaries launched the dfree® Financial Freedom Movement, a strategy teaching people how to break free from debt as a first step toward financial freedom that is currently used by over 5,000 churches and organizations across the country and was featured in a 90-minute CNN documentary entitled *Almighty Debt*. He is the author of thirteen books including *Say Yes to No Debt: How to Achieve Financial Freedom*, *Meditations for Financial Freedom* (Volumes 1–4), and *Say Yes When Life Says No*, and holds a Bachelor of Arts from Fordham University, a Master of Divinity from Princeton Theological Seminary, and a Doctor of Ministry from United Theological Seminary. Dr. Soaries is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Dr. Soaries, and for which Anthropic caused damages under the Copyright Act. Dr. Soaries registered his one (1) work *Say Yes to No Debt* prior to Defendants' infringement with the United States Copyright Office, and he

seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

123. Plaintiff **Jesse Stay** is a resident of Utah. Mr. Stay is an American author, social media strategist, technology consultant, and entrepreneur known for his expertise in digital marketing, social media platforms, and automation, and who describes himself as the "Social Geek" through his consultancy and agency Stay N Alive Productions, LLC, through which he helps businesses grow their audiences and leverage new technologies. Drawing on early experience as a software developer and Facebook application developer, he worked on Facebook Connect integrations and early social application initiatives for major companies before pivoting in 2008 to helping brands grow their follower counts, engage audiences, and use analytics to convert social media activity into business goals, and has also served as a professor of social media advertising and advocacy. Mr. Stay is the author of thirteen or more books bridging technical fluency with accessible marketing guidance, including titles in the widely used For Dummies series such as *FBML Essentials*, *Facebook All-In-One for Dummies*, *Minecraft for Dummies*, *Minecraft Recipes for Dummies*, *Google+ for Dummies*, *Facebook Application Development for Dummies*, *Google+ Marketing for Dummies*, *Canva for Dummies*, and *TikTok for Dummies*, among others — works that have democratized knowledge of digital platforms by bringing complex topics including social media advertising, automation, and influencer tactics into the hands of business owners, marketers, and creators without technical backgrounds. His early involvement in Facebook's developer community, combined with his sustained public presence through speaking engagements and consulting for large organizations, has positioned him as a recognized thought leader in the digital marketing ecosystem. Mr. Stay is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Stay, and for which Anthropic caused damages under the Copyright Act. Mr. Stay registered his one (1) work *FBML Essentials* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

124. Plaintiff **Gene Stone** is a resident of California. Mr. Stone is an American author,

editor, journalist, and ghostwriter who graduated Phi Beta Kappa from Stanford University and earned a Master's degree in English and American Literature from Harvard University before serving two years as a Peace Corps teacher in Niger. He went on to work as a book, magazine, and newspaper editor for companies including the *Los Angeles Times*, *Esquire*, and Simon & Schuster, then as a magazine journalist for *New York*, *Esquire*, *GQ*, and other publications, before transitioning to books — most often as a ghostwriter — for a diverse roster of subjects including theoretical physicist Stephen Hawking (*A Brief History of Time: A Reader's Companion*), CNN Executive Vice President Gail Evans (*Play Like a Man, Win Like a Woman*), TOMS shoes founder Blake Mycoskie (*Start Something That Matters*), and New York City Mayor Eric Adams (*Healthy at Last*). Mr. Stone has also written numerous books under his own name, including the #1 *Washington Post* bestseller *The Bush Survival Bible*, the #1 *Los Angeles Times* bestseller *The Trump Survival Guide*, the bestselling *Secrets of People Who Never Get Sick*, and the #1 *New York Times* bestseller *Forks Over Knives*, and has written, co-written, or ghostwritten a substantial body of works on plant-based diets and their relationship to health, animals, and the environment, including *72 Reasons to Be Vegan*, *How Not to Die*, *Living the Farm Sanctuary Life*, *Rescue Dogs*, *Mercy for Animals*, *The Engine 2 Diet*, and *Animalkind*, among others — bringing his total of written, co-authored, and ghostwritten books to fifty. Mr. Stone is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Stone, and for which Anthropic caused damages under the Copyright Act. Mr. Stone registered his six (6) works *How Not to Die*, *The How Not to Die Cookbook*; *Secrets of People Who Never Get Sick*; *Eat for the Planet*, *Eat for the Planet Cookbook*, and *72 Reasons to Be Vegan* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $900,000 in statutory damages. *See* Exhibit A.

125. Plaintiff **Gene Stone** also is the author and copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from **Stone**, and for which Anthropic caused damages under the Copyright Act and which titles did not appear on the *Bartz v. Anthropic* works list. **Stone** registered his two

(2) titles: *The Watch, Thoroughly Revised* and *Little Girl Fly Away* and he seeks statutory damages of up to $150,000 per work, for a total of up to $300,000 in statutory damages for these works. See Exhibit A.

126. Plaintiff **Jordana Rothman** is a resident of New York. Ms. Rothman is an American food writer, editor, and author known for her work at the intersection of cookbooks, culinary storytelling, and practical home cooking, and who built her career in food media and publishing as an influential voice for translating professional culinary ideas into accessible formats. She served as Restaurant Editor at *Food & Wine* where she oversaw editorial direction, and large-scale culinary projects, collaborating closely with chefs, photographers, and writers to shape how global cuisines and contemporary food culture were presented to a broad readership. Ms. Rothman is the author and co-author of *Tacos: Recipes and Provocations* (co-authored and co-owned with Alex Stupak), a cookbook characterized by clear instruction, cultural sensitivity, and bold flavors. She is widely respected for her ability to synthesize food culture into compelling and distinctive narratives. Ms. Rothman is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Rothman, and for which Anthropic caused damages under the Copyright Act. Ms. Rothman registered her work *Tacos: Recipes and Provocations* (co-authored and co-owned with Plaintiff Alex Stupak) prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. See Exhibit A.

127. Plaintiff **Alex Stupak** is a resident of New York. He owns Plaintiff **Empellon Holdings LLC**. Mr. Stupak is an American chef, restaurateur, and cookbook author recognized for his innovative approach to Mexican cuisine in the United States, who trained in high-end fine-dining kitchens before redirecting his career toward reimagining Mexican food through a modern, technique-driven lens. He is the founder and chef behind the Empellón restaurant group in New York City, which gained national attention for challenging stereotypes about Mexican cuisine by combining traditional Mexican flavors with contemporary culinary techniques and fine-dining aesthetics, earning critical acclaim including James Beard Award nominations. Beyond his

restaurant work, Mr. Stupak has become an influential voice through cookbooks and public commentary advocating for Mexican cuisine to be taken seriously as a complex, evolving culinary tradition, and is the author of *Now & Again: Go-To Recipes, Inspired Menus, and Endless Ideas for Reinventing Leftovers (2018),* a cookbook that reframes leftovers as intentional building blocks and encourages cooks to think in systems, flavors, and transformations. Mr. Stupak is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Stupak, and for which Anthropic caused damages under the Copyright Act. Mr. Stupak registered his work *Tacos: Recipes and Provocations* (co-authored and co-owned with Plaintiff **Empellon Holdings LLC** and Plaintiff **Jordana Rothman**) prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

128. Plaintiff **Empellon Holdings LLC** is the copyright co-owner of the title, *Tacos: Recipes and Provocations* and is a Delaware company that is owned by Plaintiff **Alex Stupak.**

129. Plaintiff **Kiki Swinson** is a resident of Georgia. Ms. Swinson is a New York Times bestselling author and one of the most commercially successful voices in urban fiction and street literature, having written more than fifty novels, many of which have appeared on the *New York Times*, *USA Today*, and *Essence* bestseller lists, and who has played a major role in bringing urban fiction into the mainstream publishing world. She began her writing career independently, building a loyal readership through word-of-mouth and grassroots promotion before being embraced by major publishers including Kensington/Dafina, Grand Central Publishing, and Urban Books, and is especially known for her iconic Wifey series and Candy Shop series, as well as for collaborative novels co-authored with other prominent urban fiction writers including Nikki Turner, which helped expand both her audience and the genre's reach. Ms. Swinson's work centers on strong, flawed, and resilient women navigating street life, crime, love, power, and betrayal, characterized by tight pacing, high drama, and strong commercial appeal, and her consistent bestseller status helped demonstrate that urban fiction could be both culturally relevant and financially successful at scale, transforming the genre from a niche market into a dominant

commercial force. Ms. Swinson is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Swinson, and for which Anthropic caused damages under the Copyright Act. Ms. Swinson registered her twenty-three (23) works *The Candy Shop*; *Wifey*; *Playing Dirty*; *Wifey 4 Life*; *Life After Wifey*; *New York's Finest*; *Cheaper to Keep Her*; *Notorious*; *A Sticky Situation*; *Still Wifey Material*; *Fistful of Benjamins*; *The Score*; *The Mark*; *Most Wanted*; *The Black Market*; *The Deadline*; *Heist 2*; *Schemes*; *Dirty Tricks*; *Bad Behavior*; *Dead on Arrival*; *Property of the State*; and *Public Enemy #1* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $3,450,000 in statutory damages. *See* Exhibit A.

130. Plaintiff **Natalia Sylvester** is a resident of Florida. Ms. Sylvester is a Peruvian American author of literary fiction and young adult novels. She has also written a children's picture book and a middle grade novel, with 4 more books under contract. She has two recently published books: *A Maleta Full of Treasures* and *No Way Never Sisters*. Her works center on Latinx identity, immigration, family dynamics, and political consciousness. She began her publishing career in adult literary fiction with her debut novel *Chasing the Sun* (2014), which introduced her interest in complicated family relationships and transnational identity, and followed with *Everyone Knows You Go Home* (2018), a multi-generational novel blending realism with speculative elements to examine the lingering impact of immigration decisions across time. Ms. Sylvester expanded into young adult fiction with *Running* (2020), which addresses political polarization through the lens of a teenage girl whose father runs for U.S. president on an anti-immigration platform, bringing contemporary immigration debates and civic identity into emotionally resonant YA storytelling, and *Breathe and Count Back from Ten* (2022), which focuses on body autonomy, disability, sexuality, and cultural expectations within a Peruvian American family, broadening the scope of Latinx narratives in youth literature. In addition to her novels, Ms. Sylvester has contributed essays and commentary to literary and cultural publications on issues of representation, immigration narratives, and Latinx storytelling, and her career reflects a sustained commitment to centering underrepresented voices and

normalizing complex Latinx protagonists in both adult and youth mainstream publishing. Ms. Sylvester is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Sylvester, and for which Anthropic caused damages under the Copyright Act. Ms. Sylvester registered her two (2) works *Chasing the Sun* and *Everyone Knows You Go Home* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $300,000 in statutory damages. *See* Exhibit A.

131. Plaintiff **Brenda L. Thomas** is a resident of Pennsylvania. Ms. Thomas is an Essence bestselling author, Philadelphia native, and winner of the African American Literary Award whose work spans multiple genres including erotic fiction, psychological thrillers, mystery and suspense, and memoir, reflecting her refusal to be confined to a single genre. She is the author of the Essence bestselling novels *Threesome*, *Fourplay*, and *The Velvet Rope*, the psychological thriller *Heartless*, the novel *Kaleidoscope*, and the memoir *Laying Down My Burdens*, among other works. Ms. Thomas is also the author of *Woman on Top* (2015), a novel about a former "Queen of Philly's nightlife" navigating high-stakes politics and a dark past, which exemplifies her ability to blend psychological tension, social realism, and compelling character-driven storytelling. Ms. Thomas is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Thomas, and for which Anthropic caused damages under the Copyright Act. Ms. Thomas registered her one (1) work *Woman on Top* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

132. Plaintiff **Brenda L. Thomas** also is the author and copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from Ms. **Thomas**, and for which Anthropic caused damages under the Copyright Act which include titles *The Velvet Rope*; *Fourplay, The Dance Of Sensuality*; *Every Woman's Got A Secret; Laying Down My Burdens; Secret Service; Every New Year; Bewitched; Heartless, When Love Isn't Enough; Sayin' A Taste; Threesome; Where*

*Seduction, Power & Basketball Collide*, and *Four Degrees Of Heat* that did not appear on the *Bartz v. Anthropic* works list. Ms. **Thomas** registered her 11 titles and she seeks statutory damages of up to $150,000 per work, for a total of up to $1,650,000 in statutory damages for these works. See Exhibit A.

133. Plaintiff **Bruce Tulgan** is a resident of Connecticut. Mr. Tulgan is an adviser to business leaders around the world and is often a sought-after keynote speaker. He is the founder and CEO of RainmakerThinking, Inc., a management research and training firm, as well as RainmakerLearning, an online training resource. Mr. Tulgan lectures at the Yale Graduate School of Management and other academic institutions and has written for the *New York Times, the Harvard Business Review, HR Magazine, Forbes.com, Training Magazine,* and *Psychology Today.* Mr. Tulgan has been named by Management Today as a "management guru," and was named to the 2009 Thinkers50 Rising Star list, and on August 13, 2009, received Toastmasters International's most prestigious honor, the Golden Gavel. Mr. Tulgan is the best-selling author of numerous books including *Not Everyone Gets a Trophy (Third Edition, 2023), The Art of Being Indispensable at Work (Harvard Business Review Press), Bridging the Soft Skills Gap (Revised & Updated, 2022), and The 27 Challenges Managers Face (2014).* Mr. Tulgan is also the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization, and for which Anthropic caused damages under the Copyright Act. He registered his seven (7) works *The Manager's Pocket Guide to Generation X; Managing Generation Y: Global Citizens Born in the Late Seventies and Early Eighties; Managing the Generation Mix: From Collision to Collaboration; Performance Under Pressure: Managing Stress in the Workplace; The Customer Service Intervention: Bottom-Line Tactics for Front-Line Managers; Career Skills for the New Economy;* and *Managing Anger in the Workplace* with the United States Copyright Office prior to Defendants' infringement, and he seeks statutory damages of up to $150,000 per work, for a total of up to $1,050,000. See Exhibit A.

134. Plaintiff **Lisa Turner** is a resident of Tennessee. Her legal name is Elizabeth Celeste Turner. Ms. Turner is an American crime novelist and Southern mystery author whose evocative stories explore the darker corners of human nature against the atmospheric backdrop of

the American South, and who was born in Memphis, Tennessee, dividing her time between her ancestral home in the Deep South and a writing retreat in Nova Scotia, with her deep connection to place richly informing her fiction's sense of setting and mood. She is the author of the Detective Billy Able series, beginning with her debut novel *A Little Death in Dixie* (2010), followed by *The Gone Dead Train* (2014), which was nominated for the Edgar Award for Best Paperback Original in 2015 — one of mystery fiction's most prestigious honors — and *Devil Sent the Rain* (2016), a dark Southern mystery involving murder, privilege, and personal betrayal that brings her hard-boiled detective and his partner into an investigation exposing deep social fault lines in Memphis. Ms. Turner's work is characterized by a distinct regional voice and emotional depth, blending traditional police procedural elements with Southern Gothic atmosphere, blues music, local folklore, and the cultural legacy of the Mississippi Delta, and by her fascination with moral ambiguity and complex characters shaped by personal and regional history; her novel *The Gone Dead Train* in particular interweaves unresolved crimes with echoes of the civil rights movement and Santeria magic, using the mystery form to probe historical wounds and ongoing social tensions. Ms. Turner is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Turner, and for which Anthropic caused damages under the Copyright Act. Ms. Turner registered her two (2) works *Devil Sent the Rain* and *The Gone Dead Train* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $300,000 in statutory damages. *See* Exhibit A.

135. Plaintiff **Lemuel (Boo) Walker** is a resident of Maine. Mr. Walker is an American novelist known for bestselling contemporary fiction that blends heartfelt character arcs, rich settings, emotional depth, and narrative resonance appealing strongly to book clubs and general fiction readers, and who also writes thrillers under the pen name Benjamin Blackmore. His creative journey began in music — he worked as a songwriter and five-string banjoist in Charleston and Nashville before health problems ended his music career — after which he worked briefly as a day trader before shifting fully into writing fiction; a move to Washington State's Red Mountain wine country, where he bought a farm and lived among grapevines and

barrels, unlocked his voice as a novelist and inspired the setting and tone of his Red Mountain Chronicles series. Mr. Walker is the author of numerous standalone novels and the multi-book Red Mountain Chronicles series, including *Red Mountain* (2016), *Red Mountain Rising* (2018), *A Marriage Well Done* (2019), *Red Mountain Burning* (2020), *An Unfinished Story* (2020), *The Singing Trees* (2021), *A Spanish Sunrise* (2022), *The Stars Don't Lie* (2023), and *An Echo in Time* (2024), among others — works that have sold millions of copies worldwide and become favorites among book clubs for their emotional weight, layered characters, and compelling plots exploring family, love, healing, and personal transformation. He has lived in South Carolina, Tennessee, Florida, Washington, New York, and Spain, and currently resides in Cape Elizabeth, Maine, with his family, drawing on his diverse life experiences to bring distinctive place and atmosphere to his fiction. Mr. Walker is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Walker, and for which Anthropic caused damages under the Copyright Act. Mr. Walker registered his two (2) works *An Unfinished Story* and *Red Mountain* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $300,000 in statutory damages. *See* Exhibit A.

136. Plaintiff **Boo Walker** also is the author and copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from **Walker**, and for which Anthropic caused damages under the Copyright Act and which titles did not appear on the *Bartz v. Anthropic* works list. **Walker** registered his four (4) titles *The Singing Trees; A Marriage Well Done; Red Mountain Burning* and *Red Mountain Rising* with the US Copyright Office prior to Defendants' infringement. He seeks statutory damages of up to $150,000 per work, for a total of up to $600,000 in statutory damages for these works. See Exhibit A.

137. Plaintiff **Patrice Washington** is a resident of Georgia. Ms. Washington is an American author, financial educator, speaker, and media personality best known for redefining personal finance through a values-based, holistic framework she calls "Redefining Wealth," whose career centers on the intersection of money, mindset, purpose, and well-being rather than

traditional wealth metrics alone. She began her professional path in real estate and mortgage lending, gaining firsthand experience in financial systems, credit, and wealth-building tools, before facing significant financial setbacks during the mid-2000s housing crisis that became a pivotal turning point reshaping her professional philosophy toward behavioral finance, emotional wellness, and intentional living. Ms. Washington is the author of *Real Money Answers for Every Woman* and *Redefine Wealth for Yourself: How to Stop Chasing Money and Finally Live Your Life's Purpose*, works that integrate financial literacy with personal development, emphasizing clarity, self-worth, and alignment over accumulation, and that consistently center on helping individuals — particularly women and entrepreneurs — build financial confidence without sacrificing mental, emotional, or spiritual health. She is the creator and host of the Redefining Wealth podcast, which has garnered millions of downloads and positioned her as a leading voice in modern financial education, and has appeared across television, radio, digital media, and live stages contributing expert commentary on financial wellness, entrepreneurship, and mindset; she also develops courses, workshops, and coaching programs used in corporate, faith-based, and entrepreneurial settings. Ms. Washington is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Washington, and for which Anthropic caused damages under the Copyright Act. Ms. Washington registered her one (1) work *Real Money Answers for Every Woman* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

138. Plaintiff **Ben Westhoff** is a resident of Missouri. Mr. Westhoff is an American investigative journalist, author, and cultural critic whose work focuses on the intersections of drug policy, public health, music culture, and poverty, and who began his career as a music journalist writing about underground and independent music scenes for publications including *The Guardian*, *The Village Voice*, *Rolling Stone*, and *Pitchfork*, where he developed a reputation for immersive reporting and cultural analysis. As his career evolved, he transitioned into long-form investigative journalism concentrating on drug markets, policy failures, and the human consequences of prohibition-based approaches to substance use, while maintaining his

engagement with music culture through works including *Dirty South: OutKast, Lil Wayne, Soulja Boy, and the Southern Rappers Who Reinvented Hip-Hop* and *Original Gangstas*. Mr. Westhoff is best known for *Fentanyl, Inc.: How Rogue Chemists Are Creating the Deadliest Wave of the Opioid Epidemic* (2019), a rigorously reported investigation into the global supply chains behind synthetic opioids that combines on-the-ground reporting, interviews with chemists, law enforcement, drug users, and policymakers, and analysis of regulatory loopholes and enforcement failures, and which has been praised for making a complex, opaque system understandable to both policymakers and the general public, reframing the opioid crisis as a systemic, policy-driven problem rather than a moral failure. His work has been cited by policymakers, educators, journalists, and public health advocates, and he is a frequent speaker at universities, conferences, and public forums on drug reform, overdose prevention, and evidence-based policy. Mr. Westhoff is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Westhoff, and for which Anthropic caused damages under the Copyright Act. Mr. Westhoff registered his three (3) works *Dirty South: OutKast, Lil Wayne, Soulja Boy, and the Southern Rappers Who Reinvented Hip-Hop*; *Fentanyl, Inc.: How Rogue Chemists Are Creating the Deadliest Wave of the Opioid Epidemic*; and *Original Gangstas* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $450,000 in statutory damages. *See* Exhibit A.

139. Plaintiff **Florence Williams** is a resident of Colorado. Ms. Williams is an American journalist, nonfiction author, and podcaster whose work focuses on the environment, health, science, human well-being, and the natural world, and who is a graduate of Yale University and holds an MFA in creative writing from the University of Montana. She has contributed to major national publications including *The New York Times*, *National Geographic*, *The New York Review of Books*, *Slate*, *Mother Jones*, and *Outside Magazine*, where she serves as a contributing editor, and holds positions as a fellow at the Center for Humans and Nature and visiting scholar at George Washington University. Ms. Williams is the author of *Breasts: A Natural and Unnatural History* (2012), which explores the science, culture, health, and

mythologies around the human breast and won the Los Angeles Times Book Prize in science and technology, a 2013 Audie Award, and was named a *New York Times* notable book; *The Nature Fix: Why Nature Makes Us Happier, Healthier, and More Creative* (2017), an Audible bestseller synthesizing global scientific research on the effects of nature on mood, cognition, health, and creativity; and *Heartbreak: A Personal and Scientific Journey* (2022), which combines memoir and science to explore loss, emotional pain, and healing, and won the 2023 PEN/E.O. Wilson Literary Science Writing Award. She has also written and hosted multiple Audible Original audio series, earning Gracie Awards for *Breasts Unbound* and *The Three-Day Effect*, and her work has been anthologized in *Best American Science and Nature Writing*, reflecting her sustained contributions to science communication and environmental advocacy across print, audio, and public speaking platforms. Ms. Williams is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Williams, and for which Anthropic caused damages under the Copyright Act. Ms. Williams registered her two (2) works *Breasts: A Natural and Unnatural History* and *The Nature Fix* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $300,000 in statutory damages. *See* Exhibit A.

140. Plaintiff **David Young** is a resident of the United Kingdom. Mr. Young is an English novelist best known for his historical crime fiction set in Cold War–era East Germany, and whose award-winning Karin Müller series has garnered critical acclaim and international readership. Born in Cottingham, East Riding of Yorkshire, he initially pursued a science degree at Bristol University before switching to Humanities with a focus on Modern History at Bristol Polytechnic, and subsequently spent over twenty-five years as a journalist and news producer and editor with BBC World Service radio and television, gaining rich experience in narrative craft and historical context before turning to fiction. Mr. Young wrote his debut novel *Stasi Child* while completing a Creative Writing MA at City University London, where the manuscript won the course prize and was published to immediate acclaim, winning the 2016 Crime Writers' Association Endeavour Historical Dagger — one of the genre's most prestigious honors. His

Karin Müller series — set in 1970s East Germany and portraying the oppressive surveillance of the Stasi and the moral complexities faced by individuals under authoritarian rule — includes *Stasi Child* (2016), *Stasi Wolf* (2017), *A Darker State* (2018), *Stasi '77* (2019), *Stasi Winter* (2020), and *The Stasi Game* (2020), all published by Bonnier Zaffre and sold in eleven territories worldwide, with the series optioned for screen adaptation; he further demonstrated his range with the standalone historical crime novel *Death in Blitz City* (2022), set in World War II–era Hull, England. Mr. Young is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Young, and for which Anthropic caused damages under the Copyright Act. Mr. Young registered his one (1) work *Stasi Child* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

141. Plaintiff **Rebecca Zanetti** is a resident of Idaho. Ms. Zanetti is a *New York Times*, *USA Today*, *Wall Street Journal,* and #1 Amazon bestselling author known for her prolific and influential work in romantic suspense, paranormal romance, and contemporary romance, and who before becoming a full-time novelist worked as a lawyer — an experience that has informed the procedural realism and ethical tensions present in much of her romantic suspense writing. She has published 96 novels and novellas across several highly successful long-running interconnected series, including the Dark Protectors series, a paranormal romance series featuring vampires, witches, and genetically enhanced humans notable for its complex mythology and serialized storytelling; the Sin Brothers and Blood Brothers series, blending romantic suspense and science fiction around genetically altered soldiers; the Deep Ops series, a contemporary romantic suspense series centered on elite law-enforcement and military operatives; and the Anna Albertini Files and serialized novellas in Kindle Vella, reaching #1 for several months demonstrating versatility beyond her series-driven work. Her books are published by major imprints including Kensington Publishing, Entangled Publishing, Hachette Book Group, and she formed her own publishing company called RAZ INK, LLC, which is taxed as an S Corporation. Her books have consistently performed strongly in print, digital, audio, and foreign markets with interconnected

story worlds that reward loyal readers and have helped define expectations for continuity and character evolution in genre fiction. Ms. Zanetti is the author and copyright owner of original literary works that Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Zanetti, and for which Anthropic caused damages under the Copyright Act. Ms. Zanetti registered her nineteen (19) works *Forgotten Sins*; *Sweet Revenge*; *Blind Faith*; *Total Surrender*; *Deadly Silence*; *Lethal Lies*; *Twisted Truths*; *Mercury Striking*; *Shadow Falling*; *Justice Ascending*; *Storm Gathering*; *Winter Igniting*; *Knight Awakening*; *Wicked Ride*; *Wicked Edge*; *Wicked Burn*; *Wicked Kiss*; *Wicked Bite*; and *Disorderly Conduct* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $2,850,000 in statutory damages. *See* Exhibit A.

142. Plaintiff **Rebecca Zanetti** also is the author and copyright owner of original literary works that, upon information and belief, Defendants copied, uploaded, distributed, and exploited without authorization from Ms. Zanetti, and for which Anthropic caused damages under the Copyright Act, and which titles did not appear on the *Bartz v. Anthropic* settlement works list. Ms. Zanetti registered her five (5) titles *Over the Top*; *Shaken*; *Vampire*; *Rescue: Cowboy Style,* and *Rebel's Karma* prior to Defendants' infringement with the United States Copyright Office, and she seeks statutory damages of up to $150,000 per work, for a total of up to $750,000 in statutory damages for these works. *See* Exhibit A.

143. Plaintiff **Kirk Zurosky** is a resident of North Carolina. Mr. Zurosky is an American fiction author and practicing attorney known for his work in paranormal and speculative fiction, particularly the Immortal Divorce Court series, and who has maintained a career as a plaintiff's personal injury and workers' compensation attorney in North Carolina and South Carolina for 30 years. Writing has been a lifelong passion for Mr. Zurosky, with a particular interest in blending fantasy elements, humor, and adult themes, and his legal background — dealing with high-stakes real-world conflict — informs his ability to craft compelling interpersonal and fantastical drama. His best-known work, *Immortal Divorce Court Volume 1: My Ex-Wife Said Go to Hell* (2020), introduces a world where mythological beings including vampires, werewolves, and merfolk navigate ordinary and absurd personal problems

such as relationships, court battles, and family dynamics through a fantastical and often humorous lens, featuring an immortal vampire assassin named Sirius Sinister entangled in a supernatural divorce court; the series continued with additional volumes including *Immortal Divorce Court, Volume 3*. Mr. Zurosky's fiction reflects a creative blending of paranormal elements with humor, romance, and speculative scenarios that humanizes supernatural characters with real-world emotional stakes and expands what paranormal novels can explore beyond traditional genre tropes, appealing to fans of offbeat fantasy and supernatural storytelling. Mr. Zurosky is the author and copyright owner of an original literary work that Defendants copied, uploaded, distributed, and exploited without authorization from Mr. Zurosky, and for which Anthropic caused damages under the Copyright Act. Mr. Zurosky registered his one (1) work *Immortal Divorce Court Volume 3 – Who Doesn't Love a Wedding?* prior to Defendants' infringement with the United States Copyright Office, and he seeks statutory damages of up to $150,000 per work, for a total of up to $150,000 in statutory damages. *See* Exhibit A.

**B. *Defendants***

144. Defendant Anthropic PBC is a Delaware corporation with its principal place of business at 548 Market Street, PMB 90375, San Francisco, California 94104. Anthropic is located within this judicial District.

145. Upon information and belief, Defendant Dario Amodei is an individual residing in San Anselmo, California. He is a co-founder and the Chief Executive Officer of Anthropic.

146. Upon information and belief, Defendant Benjamin Mann is an individual residing in or around San Francisco, California. He is a founder and member of the technical staff of Anthropic.

## III. JURISDICTION AND VENUE

147. This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq*.

148. This Court has original subject matter jurisdiction over all claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

149. This Court has personal jurisdiction over Defendant Anthropic. Anthropic maintains its principal place of business in California and in this District. Anthropic purposefully directed the conduct alleged herein from California and in this District and committed substantial acts giving rise to this action in California. Anthropic also contributed to thousands of instances of copyright infringement in California causing injury to Plaintiffs.

150. This Court has personal jurisdiction over Amodei and Mann because, on information and belief, each resides in California, exercised control over the challenged conduct, and personally participated in, directed, authorized, ratified, or knowingly benefited from the infringing acts alleged herein.

151. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c) and 1400(a) because Defendants reside in California and in this District, and a substantial part of the events and transactions giving rise to the claims alleged herein occurred in this District.

## IV. FACTUAL ALLEGATIONS

### A. Anthropic's Acquisition of the "Books3" and "Bibliotik" Pirate Libraries

152. Upon information and belief, Anthropic was co-founded in 2021 by Dario Amodei, Benjamin Mann, and a group of other individuals who had once worked at OpenAI.

153. Since its founding, Anthropic has rapidly grown into a company that is today valued at $900 billion or more.

154. Despite its near trillion-dollar valuation, Anthropic has until recently (as part of a litigation settlement in *Bartz v. Anthropic*) refused to pay for the vast amounts of copyrighted content — including Plaintiffs' literary works — which it pirated without permission, credit, or compensation to build its business. Anthropic's refusal to compensate the owners of the content it downloaded is unlike its approach to other necessary business costs such as power, hardware, data centers, software and labor, for which Anthropic pays substantial sums.

155. Anthropic's signature product is a series of commercial general-purpose large language models (or "LLMs") referred to as "Claude." Anthropic "trains" these AI models by feeding them massive collections of text—including countless copyrighted works—totaling

billions of words. As a result of this training, Anthropic's AI models provide text-based responses to user queries in a manner intended to be human-like.

156. From its inception, Anthropic collected and stockpiled this enormous amount of material in a vast central library that it maintains, intended to maintain and exploited for a range of different purposes which was and is not limited to AI training.

157. Anthropic compiled this central library by copying and ingesting text from the internet and other sources via a range of different means, including by employing BitTorrent to download and copy copyrighted works from illegal pirate library websites.

158. The text that Anthropic copies to fuel its AI models and to maintain in its central library for other purposes includes the copyrighted works that Plaintiffs own or control the copyrights, among vast amounts of other copyrighted works harvested from illegal pirate libraries, other internet sources, and elsewhere.

159. Defendants have never sought or secured Plaintiffs' permission to use their valuable copyrighted works in this way.

160. In 2021, Anthropic faced a dilemma: it was behind in the race to develop artificial intelligence models against well-funded rivals like OpenAI and Google. Facing pressure to catch up with larger rivals, Anthropic lacked the proprietary data and budget of its competitors.

161. Rather than legally acquire the necessary data—which would have cost tremendous capital and likely would have required years to acquire each book—Defendants chose to cut corners and steal each book.

162. Anthropic claims that Claude outperforms other competing LLMs such as OpenAI's ChatGPT and Google's Gemini, and that Claude can be used to "draft everything from a text message or email to a screenplay or a novel."[5]

163. Anthropic's Claude has been wildly successful in a short period of less than four years with both the general public and large businesses. Anthropic currently offers free access to

[5] *See* "What are some things I can use Claude for?," *Anthropic*, https://support.claude.com/en/articles/7996845-what-are-some-things-i-can-use-claude-for (active link in August 2024, but text has since changed). By the time this gets to trial, it's unknown all the applications and ways the model can be used.

Claude, with increased usage caps and access to models like Claude Pro with additional subscription fees.[6]

164. Anthropic has been secretive about the sources it copied but has admitted to using a dataset called The Pile.

165. The Pile is an open-source dataset of at least 800 GB created for large language model training.

166. The Pile was hosted and made publicly available online by a nonprofit called EleutherAI.

167. "The Pile is constructed from 22 diverse high-quality subsets . . . many of which derive from academic and professional sources. . . . [M]odels trained on the Pile improve significantly over both Raw CC and CC-100 on all components of the Pile, while improving performance on downstream evaluations."[7]

168. Shawn Presser is one of The Pile's architects. Presser created a dataset included in The Pile called "Books3," which is a massive collection of pirated books.

169. Presser described how he created Books3 on Twitter in October 2020:




[6] *See* https://claude.com/pricing (last visited on August 17, 2026).

[7] "The Pile: An 800GB Dataset of Diverse Text for Language Modeling," Gao et al, Abstract, https://arxiv.org/pdf/2101.00027.

170. Presser claimed, via Twitter, that he created Books3 in response to "OpenAI's papers on GPT-2 and 3," which "refer[] to datasets named 'books1' and 'books2,'" the latter of which Presser suspects "might be 'all of libgen.'"

171. LibGen refers to "Library Genesis," a website offering pirated books that was ordered to be shut down for copyright infringement in 2015. *See Elsevier, Inc. et al v. www.Sci-hub.org et al*, 15-cv-2482-RWS, Dkt. 53 (Oct. 30, 2015). Presser also claimed when he posted on Twitter that to create a pirated-book dataset comparable to what he suspected OpenAI created for itself, that Books3 was also a direct download of all books from a different pirated website—a compilation of "196,640 books," which comprises "all of bibliotik."

172. Bibliotik is a "notorious pirated collection" of "pirated books".[8]

173. Books3 was a key component part of The Pile. In EleutherAI's paper on The Pile, it touted the key value of Books3 as follows: "Books3 is a dataset of books derived from a copy of the contents of the Bibliotik private tracker . . . Bibliotik consists of a mix of fiction and nonfiction books and is almost an order of magnitude larger than our next largest book dataset (BookCorpus2)."

---

[8] *See* Schoppert, "Whether you're an undergraduate doing research, or a fan of the Nick Stone novels, or indeed a hungry AI...," Nov. 29, 2022, https://aicopyright.substack.com/p/whetheryoure-an-undergraduate-doing ("What is Bibliotik? A notorious pirated collection."); "What I Found in a Database Meta Uses to Train Generative AI," Alex Reisner, *The Atlantic*, Sept. 25, 2023, https://www.theatlantic.com/technology/archive/2023/09/books3-ai-training-metacopyright-infringement-lawsuit/675411/ ("a collection of pirated ebooks, most of them published in the past 20 years."); "Revealed: The Authors Whose Pirated Books are Powering Generative AI," Alex Reisner, *The Atlantic*, Aug. 19, 2023, https://www.theatlantic.com/technology/archive/2023/08/books3-ai-meta-llama-piratedbooks/ 675063/ ("collections of pirated books, such as Library Genesis, Z-Library, and Bibliotik, that circulate via the BitTorrent file-sharing network."); "Are ChatGPT, Bard and Dolly 2.0 Trained On Pirated Content?," Roger Monti, *Search Engine Journal*, April 20, 2023, https://www.searchenginejournal.com/are-chatgpt-bard-and-dolly-2-0-trained-on-piratedcontent/485089/ ("The Books3 dataset contains the text of books that were pirated and hosted at a pirate site called, bibliotik.").

174. The paper then summarized its key point for why The Pile included this known illegal source of copyrighted material: "We included Bibliotik because books are invaluable for long-range context modeling research and coherent storytelling."[9]

175. The Pile's datasheet states that "Books3 is almost entirely comprised of copyrighted works . . . ."[10]

176. Presser admitted to releasing Books3 despite a "fear of copyright backlash."[11]

177. As background, while Anthropic concealed the contents of its training datasets, what is known about the training data indicates that Anthropic's Claude models were trained on a mass of copyrighted books and other copyrighted material.

178. Anthropic downloaded and reproduced copies of The Pile and Books3, knowing that these datasets contained a trove of copyrighted works sourced from pirate websites like Bibliotik.

179. In or around January or February 2021, Defendant Mann personally directed or downloaded a dataset known as "Books3."

180. This operation was a personal act of reproduction on a machine under Mann's control, independent of his purely corporate capacity.

181. Defendants knew "Books3" was assembled from unauthorized, pirated copies of copyrighted works, including Plaintiffs' works.

182. Despite this knowledge, Defendants downloaded and copied the dataset and incorporated it into Anthropic's internal systems.

183. From the start, Anthropic "ha[d] many places from which" it could have purchased books, but it preferred to steal them to avoid "legal/practice/business slog," as cofounder and

---

[9] "The Pile: An 800GB Dataset of Diverse Text for Language Modeling," Gao et al, p. 3-4, https://arxiv.org/pdf/2101.00027

[10] "Datasheet for the Pile," Gao et al, Jan. 20, 2022, p. 15, https://arxiv.org/pdf/2201.07311 (last visited August 17, 2026).

[11] Comment of "sillysaurusx," Hacker News, Jul. 11, 2023, https://news.ycombinator.com/item?id=36685115 (last visited August 17, 2026)

chief executive officer Dario Amodei testified in his deposition taken in *Bartz v. Anthropic PBC.*[12]

**B. Further Acts of Piracy: Library Genesis and PiLiMi**

184. Anthropic did not stop at "Books3." Anthropic's next pirated acquisitions involved downloading distributed, reshared copies of other pirate libraries.

185. To obtain the contents of these pirate libraries, Mann, with Amodei's knowledge, approval, and participation, used BitTorrent, a peer-to-peer ("P2P") files-haring protocol historically used for widespread unauthorized reproduction and distribution of copyrighted materials.

186. P2P file-sharing has evolved since the days of Napster, allowing users to distribute infringing files directly and evade detection.

187. Rather than uploading and downloading files through a central repository, P2P protocols like BitTorrent break files into pieces and distribute the pieces between and amongst multiple users (i.e., "peers") simultaneously and instantaneously.

188. Once a user downloads a piece of a file, the user immediately becomes a distributor of the file to others, creating a "swarm" where everyone downloading the file also acts as a distributor of the file to other users.

189. Files on BitTorrent are shared simultaneously with thousands of other users; unlike old-fashioned cassette-copying or even Napster-era P2P systems, copying is no longer one-to-one but thousands-to-thousands.

190. Thus, as users join the BitTorrent network, instead of slowing down file-transfer speed, downloads get faster and are more widespread.

191. In addition, once an infringing file is distributed on BitTorrent, there is no containing it, as the viral nature of online infringement enables massive rapid proliferation across a limitless universe of users. Indeed, a single file can be distributed thousands of times in mere hours.

[12] *Bartz*, 787 F. Supp. 3d at 1015.

192. In June 2021, Defendants downloaded at least five million copies of books from "Library Genesis" (or "LibGen"), a site universally known for hosting pirated content.

193. LibGen is one of the world's biggest and most notorious online infringement operations.

194. Controlled by anonymous overseas pirates, reportedly from Russia, LibGen maintains an enormous collection of stolen books and other written works.

195. At least two U.S. federal courts have found LibGen liable for willful copyright infringement and issued broad permanent injunctions against the website.

196. LibGen has been listed on the Office of the U.S. Trade Representative's Review of Notorious Markets for Counterfeiting and Piracy since at least 2016.

197. LibGen's illegal conduct is widely known and has been broadly publicized online.

198. In June 2021, Defendant Mann downloaded at least five million copies of books from LibGen, which he knew had been pirated.

199. While employed at OpenAI, Defendants Amodei and Mann sought out these pirate libraries as sources of material to train LLMs.

200. Mann was personally involved in downloading a portion of LibGen to be used in AI training at OpenAI, and he discussed downloading datasets from LibGen and exploiting those datasets for AI training during that time with both Amodei and another future Anthropic founder, Tom Brown.

201. Before downloading five million pirated copies of copyrighted books from LibGen, Mann discussed with Amodei, Anthropic founder and Chief Science Officer Jared Kaplan, and other Anthropic senior leadership whether to download these works via torrenting from LibGen.

202. Anthropic's own Archive Team had deemed LibGen to constitute a "blatant violation of copyright," and Amodei himself had described the site as "sketchy."

203. Amodei and others at Anthropic approved the torrenting, and, at their direction, Mann personally engaged in the torrenting of these millions of books.

204. Amodei, Mann, and their Anthropic colleagues understood at this time that LibGen was an illegal pirate library and that the files that Mann torrented were pirated copies of copyrighted works.

205. Mann personally performed the LibGen BitTorrent download in June 2021.

206. This operation was a personal act of reproduction on a machine under Mann's control, independent of his purely corporate capacity, but intended for the benefit of Anthropic and Mann individually.

207. When one of Anthropic's founders discovered that he could torrent additional copyrighted works from "Pirate Library Mirror" (or "PiLiMi"), another known repository of pirated works (which mirrored the contents of the shuttered Z-Library), he messaged his Anthropic colleagues, "[J]ust in time!"

208. Another Anthropic employee responded, "zlibrary my beloved."

209. In July 2022, Anthropic downloaded via torrenting at least two million copies of books from PiLiMi.

210. As in 2021, Amodei, Mann, and other members of senior leadership at Anthropic discussed whether to torrent these files from PiLiMi and ultimately authorized the illegal torrenting of these copyrighted works.

211. As with their decision to torrent copyrighted books from LibGen a year earlier, Amodei, Mann, and their colleagues at Anthropic understood that the files Anthropic was torrenting from PiLiMi were pirated.

212. Amodei and Mann were the primary participants and driving forces behind the illegal downloading of millions of copyrighted works from LibGen and PiLiMi by Defendants, including Plaintiffs' works at issue here. Amodei directed, authorized, and ratified Mann's illegal torrenting from LibGen in 2021, and both Amodei and Mann personally authorized, directed, and controlled Anthropic's torrenting activity from PiLiMi in 2022.

213. In total, Anthropic pirated over seven million copies of books from LibGen and PiLiMi in 2021 and 2022, respectively, along with a separate catalog of bibliographic metadata for each collection with fields like title, author, and ISBN.

214. Those catalogs of bibliographic metadata reveal that among the millions of books that Defendants illegally downloaded from LibGen and PiLiMi were hundreds of copyrighted works owned and/or controlled by Plaintiffs that are the subject of this action, including but not limited to the works identified in Exhibit A hereto.

215. When Defendants downloaded copies of these pirated books via torrenting, they violated Plaintiffs' exclusive right of reproduction in these works. Even worse, because of the two-way nature of the BitTorrent protocol, when Defendants downloaded copies of these pirated books via torrenting, they simultaneously uploaded unauthorized copies of the same books to the public writ large, thereby infringing Plaintiffs' exclusive right of distribution in these works and contributing to further infringement of Plaintiffs' works as well.

**C. The Creation of the "Central Library" and "Forever" Retention**

216. Anthropic used these downloads to populate a "central library" or "generalized data area" on its servers. The purpose of this library was to serve as a "permanent, general-purpose resource." Anthropic's internal policy was to "store everything forever."

217. Anthropic explicitly determined that "[t]here [wa]s no compelling reason to delete a book" even if it was not used for training AI models.

218. Defendants maintained and stored copies of these files in the same format as they had originally torrented them. Anthropic exploited the mass collection of works in this central library for numerous uses, including to develop its commercial products.

219. Anthropic never paid a cent for the copyrighted works it downloaded to build this sprawling database.

220. Consequently, Anthropic retained pirated copies of works — including each of Plaintiffs' respective works —to have them available for potential future uses, research, or general reference.

221. Anthropic built its own massive library without paying for the copyrighted works it stole, behaving as if it were above the law.

222. This retention of pirated copies served a distinct purpose from AI training and is separately actionable as a violation of the Copyright Act because the works were also copied, distributed and/or retained without Plaintiffs' authorization.

223. Anthropic employees noted that the library allowed Anthropic's engineers to make other uses of the materials such as: browse books, search metadata, and assess content for various internal purposes unrelated to the immediate training of an LLM and for the benefit of building Anthropic.

224. Anthropic's acquisition of these files displaced the need to purchase legitimate copies. Anthropic could have purchased each of Plaintiffs' respective books — and indeed, later spent millions to purchase used print books for scanning — but initially chose to steal Plaintiffs' works to save money and time.

225. The use of the copies for a central library cannot be excused as fair use (which it is not in any event) merely because some books may have eventually been used to train LLMs. As Judge Alsup made clear in *Bartz*: "Piracy of otherwise available copies is inherently, irredeemably infringing even if the pirated copies are immediately used for the [alleged] transformative use and immediately discarded."

226. However, Anthropic did not use these copies only for training its LLMs but instead retained pirated copies even after deciding it would not use them for training its LLMs ever again. "They were acquired and retained, as a central library of all the books in the world."

227. Pirating copies of copyrighted books to build a research library without paying for them, and to retain copies of the pirated works should they prove useful for one thing or another, was its own use — and not a transformative use of the books Anthropic had later purchased, as ruled by Judge Alsup in *Bartz*.

228. The initial copies were pirated to create a central, general-purpose library, as a substitute for paid copies to do the same thing. The copies used to build a central library that were obtained from pirated sources plainly displaced demand for Plaintiffs' respective books — copy for copy. That copying is an undisputed act of infringement with no plausible defense of any kind.

229. The pirated copies in Anthropic's central library also lacked any internal controls limiting access and use, distinguishing them from the secure environments often required in fair use precedents.

230. Every factor weighs against a finding of fair use for the retention of pirated works in a centralized library for any purpose Anthropic deems fit in the future.

231. Anthropic employees admitted said copies of works (pirated ones, too) would be retained "forever" for "general purpose" even after Anthropic determined they would never be used for training LLMs.

**D. Infringement of Plaintiffs' Works**

232. As noted above, Plaintiffs are the authors of works, books protected by United States Copyright. *See* Exhibit A.

233. Each of Plaintiffs' respective works was included in the Books3 / LibGen / PiLiMi datasets downloaded by Anthropic in 2021 and 2022.

234. Each of the Plaintiffs named herein opted out of the class action settlement in *Bartz v. Anthropic PBC,* which was preliminarily approved in September 2025 and approved by the Court on July 20, 2026. In its order granting final approval of the settlement, the Court expressly permitted Plaintiff Laura Esquivel and Plaintiff Jordi Castells — each of whom first learned of the settlement shortly after the February 9, 2026 opt-out deadline and acted promptly thereafter — to opt out of the class settlement notwithstanding the deadline, finding excusable neglect. With the exception of Plaintiff Matthew Chase — whose registered works were excluded from the Works List, were therefore never part of the class, and whose claims the final judgment expressly preserved — each of the Plaintiffs named herein, including Esquivel and Castells, opted their works out of the *Bartz* class settlement.

235. To the extent a work was not on the Works List, Plaintiffs alleged that upon information and belief, Defendants copied and distributed each of those Works without a defense, causing damages to each work.

236. Plaintiffs did not discover, and could not have reasonably discovered, that their specific works were included in Anthropic's private, internal database until November 24, 2025,

when the direct notice to class members was completed and/or their claims were tolled pending the approval of the settlement of *Bartz,* or February 9, 2026, the deadline for opting out of the class action. Also, only Defendants control and possess the evidence of which works they copied and distributed.

237. Defendants reproduced each of Plaintiffs' respective works when they downloaded and/or authorized the downloading of the pirated datasets from Books3, LibGen, and PiLiMi containing the works. Defendants did so without Plaintiffs' authorization.

238. Defendants distributed each of Plaintiffs' works to the public at the time they downloaded the pirated works from LibGen and PiLiMi in 2021 and 2022 via the BitTorrent protocol. Defendants did so without Plaintiffs' authorization.

239. Defendants further reproduced each of Plaintiffs' respective works from the pirated datasets by saving a copy to its "central library" or "generalized data area."

240. Anthropic retained this pirated copy of each of Plaintiffs' respective work(s) pursuant to its "store everything forever" policy, regardless of whether the work was ultimately selected for inclusion in an AI training "data mix".

241. Anthropic's infringement was willful. Anthropic knew the sources from which it downloaded Plaintiffs' works were pirate repositories, knew that no license existed, and nevertheless copied and retained each of Plaintiffs' respective works for its own commercial benefit.

242. Anthropic's own records confirm that Plaintiffs' works were among the millions of works that Defendants downloaded from LibGen and PiLiMi. As alleged above, Defendants downloaded and retained catalogs of bibliographic metadata for the LibGen and PiLiMi collections, with fields including title, author, and ISBN. In *Bartz v. Anthropic*, Anthropic used that metadata to compile the official list of the works it downloaded from LibGen and PiLiMi (the "Works List") that defined the scope of the settlement class. The substantial majority of the works identified in Exhibit A appear on Anthropic's own Works List, which constitutes an admission by Anthropic that it downloaded, reproduced, and distributed those specific works via BitTorrent from LibGen in June 2021 and/or PiLiMi in July 2022.

243. Certain of Plaintiffs' registered works identified in Exhibit A never appeared on the Works List. Upon information and belief, Defendants nonetheless downloaded, reproduced, and distributed unauthorized copies of those works as well, because those works were available in the LibGen and PiLiMi collections and/or the Books3 dataset at the times Defendants downloaded those collections in bulk, and because Defendants' practice — consistent with Anthropic's "store everything forever" policy — was to acquire and retain each pirated collection in its entirety rather than on a title-by-title basis.

244. The Works List, moreover, contains errors and omissions and does not exhaustively identify every work that Defendants in fact copied, as class members demonstrated in the *Bartz* proceedings.

245. Plaintiffs' claims for direct infringement herein are each tied to specific, identified acts of copying accomplished by specific means: (a) Defendants reproduced Plaintiffs' works when they downloaded the Books3 dataset via HTTP in or around January or February 2021; (b) Defendants reproduced Plaintiffs' works when they downloaded the LibGen collection via BitTorrent in June 2021 and the PiLiMi collection via BitTorrent in July 2022; (c) Defendants distributed Plaintiffs' works to the public when, as a function of the BitTorrent protocol they employed, they simultaneously uploaded pieces of those works to other users in the torrent "swarm" while downloading from LibGen and PiLiMi; and (d) Defendants further reproduced Plaintiffs' works when they copied them into, and retained them in, Anthropic's central library. No claim for relief pled in this First Amended Complaint is premised on text generated as output by Anthropic's Claude models, and no discovery is required to identify the acts of infringement alleged herein, which are documented in Anthropic's own internal records and in sworn testimony made public in *Bartz*.

246. Defendants' uploading and distribution of Plaintiffs' works was not incidental, passive, or de minimis. The BitTorrent protocol is inherently a two-way, peer-to-peer protocol: a user downloading a file simultaneously uploads pieces of that file to other peers in the swarm. Upon information and belief, the BitTorrent clients that Defendants used to download the LibGen and PiLiMi collections were configured to, and did, upload pieces of the downloaded files —

including pieces of Plaintiffs' works — to other BitTorrent users during the download process, and Defendants took no steps to disable, limit, or throttle that uploading. Distribution of unauthorized copies to others was a known, necessary, and accepted feature of the piracy method that Defendants deliberately chose in lieu of lawful acquisition.

**E. The Continued & Serious Harm to Plaintiffs caused by Defendants' Infringement**

247. Anthropic's unlawful conduct has caused and continues to cause substantial and irreparable harm to Plaintiffs.

248. Plaintiffs' works are creative intellectual property at the core of copyright protection under the Copyright Act. In turn, Anthropic is a for-profit commercial operation that has engaged in extensive reproduction and distribution of Plaintiffs' works through its use of BitTorrent to acquire a library of copyrighted works from notorious pirate library websites. Distribution through BitTorrent is particularly malicious, because each work can be distributed hundreds or thousands of times through the swarm. Anthropic's widescale use of BitTorrent contributes to the continued viability and normalization of that infringing protocol, and Anthropic's acquisition of copies of Plaintiffs' works from notorious pirate library websites contributes to the continued viability and normalization of those pirate sites as sources of content, causing further damages to Plaintiffs.

249. Anthropic's extensive use of Plaintiffs' works devalues the creative efforts of Plaintiffs and deprives them of compensation and credit. Anthropic's actions also deny Plaintiffs control over how their creative works are reproduced, modified, and adapted into other works, uses which require their authorization under the Copyright Act. The sheer breadth and scope of Anthropic's copying makes it essentially impossible to measure, calculate, or even estimate the financial damage it imposes on Plaintiffs and other authors of copyrighted works.

250. Anthropic has failed to seek or obtain the licenses or other agreements necessary for it to lawfully use Plaintiffs' works. Anthropic's unlawful conduct enriches Anthropic at Plaintiffs' expense and to the detriment of the creation of literary works. Anthropic's infringement undermines the incentive for authors to create new literary works and for their publishers to invest in, support, and exploit those creative efforts, which in turn hinders authors'

ability to earn a living based on their craft.

251. Anthropic's unauthorized use of Plaintiffs' copyrighted works also undercuts the existing and potential markets for licensing their works. Many authors have established an active and growing AI training licensing market, including licensing deals through the Copyright Clearance Center, direct publisher agreements, and opt-in programs – specifically because retail book purchases, whether digital or physical, do not include AI training rights. The growth of this AI training licensing market was harmed by Defendants' decision to use pirated copies rather than pay for licenses.

252. Anthropic's extensive copying of Plaintiffs' and other authors' works also allows Anthropic to offer AI models that users can and do use to create new literary works that compete with and dilute the market for Plaintiffs' works and diverts royalties and income they would earn from the sale and licensing of their works.

253. Plaintiffs timely secured valid copyright registrations in their respective works prior to filing suit and prior to the infringement by Anthropic. See Exhibit A.

254. Defendants' knowing and intentional copying of works from pirated datasets without permission, license, or a valid legal defense infringes Plaintiffs' exclusive rights under the Copyright Act, 17 U.S.C. § 106(1), (3).

255. Defendants' Bit Torrenting of their works from pirated datasets without permission, license, or a valid legal defense infringes Plaintiffs' distribution rights under the Copyright Act, 17 U.S.C. § 106(1), (2), and (3).

## V. JOINDER

256. Plaintiffs bring this action as joined individual actions pursuant to Federal Rule of Civil Procedure 20:

(a) Persons Who May Join or Be Joined.

(1) Plaintiffs. Persons may join in one action as plaintiffs if:

(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

(B) any question of law or fact common to all plaintiffs will arise in the action.

257. Defendants' infringing conduct alleged herein arose from its unauthorized reproduction and distribution of Plaintiffs' works when they downloaded pirated copies of the works from Books3 via HTTP in January 2021, and from LibGen and PiLiMi via torrenting in June 2021 and July 2022, respectively.

258. Common liability questions may be decided by one Court. The common questions of law and fact include, but are not limited to:

a. Whether Defendants' conduct as alleged constitutes an infringement of the copyrights held by Plaintiffs in their respective works for violations of their exclusive rights of reproduction, to prepare derivative works, and distribution from the same series of transactions and occurrences.

b. Whether Defendants acted willfully with respect to the copyright infringements alleged herein.

c. Whether Plaintiffs have sustained statutory damages and, if so, what is the proper measure of relief.

d. Whether injunctive relief is available under 17 U.S.C. § 502 to stop Defendants from continuing any exploitation of the works at issue that all were copied and are hosted in Anthropic's central library and other uses by Defendants.

## VI. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Direct Copyright Infringement

### (Against all Defendants)

259. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in each of the preceding paragraphs.

260. Each Plaintiff owns a valid, registered copyright in the work(s) identified in this Complaint, as set forth in Exhibit A, which lists the author/copyright owner, title of the book, and

United States Copyright Registration Number, or owns and controls the exclusive rights to each work through written agreement.

261. As detailed in the preceding paragraphs, Defendants, without Plaintiffs' permission or consent, have unlawfully infringed, including by downloading, copying, reproducing and distributing to the public and for their own benefit Plaintiffs' copyrighted literary works.

262. Specifically, Defendants have unlawfully copied and then reproduced and distributed to the public through torrenting Plaintiffs' copyrighted literary works listed in Exhibit A.

263. Such torrenting activity constitutes direct infringement by Defendants of Plaintiffs' registered copyrights in these works in violation of their exclusive rights under the Copyright Act, 17 U.S.C. §§ 106(1), (3) and 501. This specific act of copying a permanent library of pirated copies of books to be used for any purpose is not fair use under the following relevant factors:

- **a. Purpose:** The purpose was to avoid the expense of purchasing the books, a commercial benefit. There was nothing transformative about the illegal copying
- **b. Nature**: The works are expressive literary works entitled to strong copyright protection.
- **c. Amount:** Anthropic copied each of Plaintiffs' respective works in their entirety.
- **d. Effect on Market:** The pirated copy displaced the sale of legitimate copies. Defendants usurped the market for the books it stole, a market it could have participated in legitimately by purchasing a license and paying Plaintiffs' fair compensation for Defendants' commercial exploitation of the works.

264. Each infringement of Plaintiffs' copyrighted literary works by Defendants constitutes a separate and distinct act of infringement.

265. Defendant Mann personally performed the LibGen BitTorrent download in June 2021 and personally directed or conducted the Books3 HTTP download in January or February 2021. Each was a personal act of reproduction on a machine under Mann's control.

266. Defendant Amodei, as co-founder and Chief Executive Officer of Anthropic, was a moving, active, conscious force behind Anthropic's infringement of Plaintiffs' works. Amodei personally participated in, directed, controlled, authorized, approved, and ratified Anthropic's decision to acquire Plaintiffs' works by torrenting them from the pirate libraries LibGen and PiLiMi rather than licensing or purchasing them; overruled internal objections to that course of conduct; and approved the risk-mitigation strategies used to carry out the BitTorrent operations. Without Amodei's direction, authorization, and approval, Anthropic's torrenting of Plaintiffs' works would not have occurred.

267. Amodei's participation in the infringing copying was direct and contemporaneous with it. Before Anthropic downloaded millions of pirated books from LibGen in June 2021, Amodei personally discussed with Mann, Anthropic co-founder and Chief Science Officer Jared Kaplan, and other members of Anthropic's senior leadership whether to acquire those works by torrenting them from LibGen and whether doing so was lawful. Amodei himself described LibGen—a notorious pirate library that Anthropic's own Archive Team had deemed a "blatant violation of copyright"—as "sketchy," yet personally approved and directed the torrenting notwithstanding that knowledge. Amodei and other members of Anthropic's senior leadership likewise discussed and authorized the July 2022 torrenting of pirated books from PiLiMi. The pirated LibGen and PiLiMi collections that Amodei approved for acquisition were in fact retained in Anthropic's central library and used by Anthropic, including in the training of Anthropic's "Finch" model in 2022.

268. Amodei had the right and the ability to control, supervise, and halt the infringing copying, and a direct financial interest in it. As co-founder, Chief Executive Officer, and an equity holder of Anthropic, Amodei stood to benefit financially from Anthropic's acquisition of a vast, permanent library of copyrighted books without paying for it, and he chose piracy over lawful acquisition specifically to avoid what he characterized as the "legal/practice/business slog"

of licensing or purchasing the works. Rather than exercise his authority to stop the infringement, Amodei drove it forward as the moving, active, conscious force behind it, knowing that the works were being copied from known pirate libraries without authorization.

269. To the extent Amodei and Mann's acts are outside the scope of their agency for Anthropic and/or participated in, authorized, directed, or ratified the conduct of Anthropic, Defendants are separately liable infringers, each of them subject to up to $150,000 in statutory damages per work under 17 U.S.C. § 504(c)(1).

270. Defendants' acts of infringement were and are willful, intentional, purposeful, and in reckless disregard of Plaintiffs' rights.

271. Plaintiffs have each suffered actual damages as a direct and proximate result of Defendants' infringement of the copyrighted books.

272. As a direct and proximate result of Defendants' infringement of Plaintiffs' copyrights and exclusive rights, Plaintiffs are each entitled to recover statutory damages up to $150,000 per work pursuant to 17 U.S.C. § 504(c)(1).

273. Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to their actual damages and Defendants' profits from infringement that are not considered in computing the actual damages, as will be proven at trial.

274. Where two or more Plaintiffs are co-authors and co-owners of the same copyrighted work, statutory damages are sought with respect to each such work; the allocation of any award among co-owning Plaintiffs shall be determined by agreement of the co-owners or as otherwise directed by the Court or jury.

275. Plaintiffs are each entitled to costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

276. Defendants' conduct has caused, and any continued infringing conduct will continue to cause, irreparable injury to each Plaintiff, unless enjoined by this Court. Plaintiffs have no adequate remedy at law.

277. Pursuant to 17 U.S.C. § 502, Plaintiffs are each entitled to a permanent injunction prohibiting infringement of each of Plaintiffs' exclusive copyrights in each of their books by Defendants and all persons acting in concert with them.

**SECOND CAUSE OF ACTION**

**Contributory Copyright Infringement**

**(Against Defendants Dario Amodei and Benjamin Mann)**

278. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in each of the preceding paragraphs.

279. As detailed above, Plaintiffs' copyrighted works were directly infringed when they were unlawfully reproduced and distributed to the public via torrenting: in June 2021, Defendant Mann, at the direction of and with the express approval of Defendant Amodei, used the BitTorrent protocol to unlawfully reproduce and distribute to the public millions of pirated books from LibGen, including Plaintiffs' works identified in Exhibit A; and in July 2022, other Anthropic employees, at the direction of Amodei and Mann, used the BitTorrent protocol to unlawfully reproduce and distribute to the public millions of pirated books from PiLiMi, including Plaintiffs' works identified in Exhibit A. Each such act constitutes direct infringement of Plaintiffs' registered copyrights and exclusive rights in violation of the Copyright Act, 17 U.S.C. §§ 106(1), (3) and 501.

280. Amodei had actual knowledge of this infringing activity. Amodei personally discussed with Mann, Anthropic co-founder and Chief Science Officer Jared Kaplan, and other members of Anthropic's senior leadership whether to download millions of pirated books from LibGen and PiLiMi via torrenting; personally described LibGen as "sketchy"; knew that Anthropic's own Archive Team had deemed LibGen a "blatant violation of copyright"; and understood that the files to be torrented were pirated copies of copyrighted works hosted on notorious, illegal pirate libraries.

281. With that knowledge, Amodei intentionally induced, caused, and materially contributed to the infringing conduct. Amodei expressly directed, authorized, approved, controlled, and ratified Mann's June 2021 torrenting from LibGen and Anthropic's July 2022

torrenting from PiLiMi; chose piracy over lawful acquisition to avoid what he characterized as a "legal/practice/business slog"; and caused Anthropic to supply the funding, computing infrastructure, storage, and personnel used to carry out the torrenting and to retain the pirated copies. Without Amodei's direction and approval, this infringing activity would not have occurred.

282. Mann likewise had actual knowledge of the infringing activity. Mann had personally torrented data from LibGen for AI training purposes while at OpenAI and discussed exploiting pirate libraries for AI training with Amodei and others; he knew that LibGen and PiLiMi were illegal pirate libraries and that the files Anthropic torrented from them were pirated copies of copyrighted works.

283. In addition to his own acts of direct infringement, Mann intentionally induced, caused, and materially contributed to infringement carried out by others. Mann expressly directed, controlled, and intentionally induced other Anthropic employees to engage in the same kind of torrenting through PiLiMi in July 2022 that he had personally performed through LibGen in June 2021, including by supplying the direction, instructions, tooling, and know-how used to carry it out. Without Mann's direction and approval, the PiLiMi torrenting would not have occurred.

284. One infringes a copyright contributorily by intentionally inducing or encouraging direct infringement with knowledge of the infringing activity. By the conduct alleged herein, Amodei and Mann are each contributorily liable for the infringement of Plaintiffs' copyrighted works via torrenting, in violation of Plaintiffs' registered copyrights and exclusive rights under the Copyright Act, 17 U.S.C. §§ 106(1), (3) and 501.

285. Each infringement of Plaintiffs' copyrighted works constitutes a separate and distinct act of infringement.

286. Amodei's and Mann's conduct was and is willful, intentional, and purposeful, and in disregard of and with indifference to Plaintiffs' rights.

287. As a direct and proximate result of the infringement to which Amodei and Mann knowingly and materially contributed, Plaintiffs are each entitled to recover statutory damages of up to $150,000 per work pursuant to 17 U.S.C. § 504(c)(1). Alternatively, at Plaintiffs' election,

pursuant to 17 U.S.C. § 504(b), Plaintiffs are entitled to their actual damages and Amodei's and Mann's profits from infringement that are not considered in computing the actual damages, as will be proven at trial.

288. Plaintiffs are each entitled to costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

289. Amodei's and Mann's conduct has caused, and any continued infringing conduct will continue to cause, irreparable injury to each Plaintiff unless enjoined by this Court. Plaintiffs have no adequate remedy at law and, pursuant to 17 U.S.C. § 502, are entitled to a permanent injunction prohibiting further infringement of Plaintiffs' exclusive rights in their copyrighted works.

## VII. PRAYER FOR RELIEF

Wherefore, Plaintiffs each pray for judgment against Defendants Anthropic, Amodei and Mann as follows:

a. Judgment on each of the claims set forth above, including that Anthropic has directly infringed Plaintiffs' respective copyrights under the Copyright Act, that Dario Amodei and Benjamin Mann have directly and contributorily infringed Plaintiffs' copyrights under the Copyright Act and that such infringements and unlawful activities were willful or reckless;

b. An order requiring Defendants to pay Plaintiffs statutory damages in an amount up to the maximum provided by law, arising from Defendants' willful violations of Plaintiffs' rights under the Copyright Act, in an amount up to $150,000 per work infringed, pursuant to 17 U.S.C. § 504(c);

c. Alternatively, at Plaintiffs' election, Defendants to pay Plaintiffs actual damages and Defendants' profits from the infringement, in an amount to be proven at trial, pursuant to 17 U.S.C. § 504(b);

d. An order for such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiffs' copyrights, including a permanent injunction requiring that Anthropic and its

officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, including Dario Amodei and Benjamin Mann, cease directly or indirectly infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of Plaintiffs' exclusive rights under copyright, including without limitation in the literary works in Exhibit A of Plaintiffs' works.

e. An order requiring that Defendants destroy under the Court's supervision all infringing copies of Plaintiffs' copyrighted works in Defendants' possession or control, and then file a sworn report setting forth in detail the manner in which it has complied with the aforesaid order, pursuant to 17 U.S.C. § 503(b);

f. Plaintiffs' reasonable attorneys' fees and costs in this action, pursuant to 17 U.S.C. § 505;

g. Pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Defendants, and

h. Such other and further relief as the Court deems proper.

## VIII. JURY TRIAL DEMANDED

290. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury of all the claims asserted in this First Amended Complaint so triable.

Dated: August 17, 2026

Respectfully submitted,

**JAMES H. BARTOLOMEI, III P.A.**

By: */s/ James H. Bartolomei III*
James H. Bartolomei III
Michael P. Manapol, Of Counsel
809 W. 3rd Street
Little Rock, Arkansas 72201
Telephone: (501) 228-7600
james@duncanfirm.com
michael@manapollaw.com

**DONIGER / BURROUGHS**

Stephen M. Doniger (SBN 179314)
Benjamin F. Tookey (SBN 330508)
Andres Navarro (SBN 358499)
603 Rose Avenue
Venice, California 90291
Telephone: (310) 590-1820
stephen@donigerlawfirm.com
btookey@donigerlawfirm.com
anavarro@donigerlawfirm.com

**GAFNI & LEVIN, LLP**
Adam I. Gafni, Esq. (SBN: 230045)
11811 San Vicente Blvd.
Los Angeles, California 90049
Telephone: 424.744.8344
adam@gafnilaw.com

*Attorneys for Plaintiffs*